**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TELE-GUIA TALKING YELLOW PAGES, INC., | |
| Plaintiff, | **07-cv-3948-DLC** |
| v. | **Jury Trial Demanded** |
| CABLEVISION SYSTEMS CORPORATION, | **ECF Case** |
| Defendant. | |

**DEFENDANT CABLEVISION SYSTEMS CORPORATION'S REPLY TO PLAINTIFF
TELE-GUIA'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

I.      INTRODUCTION..............................................................................................1

II.     EACH PATENT OWNER MUST BE JOINED AS A NECESSARY AND
        INDISPENSABLE PARTY..............................................................................1

        A.      Micron is a Necessary and Indispensable Party Under the Micron
                Agreements and Has Not Provided the Necessary Specific Assurances.................3

        B.      Micron and Mr. Jimenez Rodriquez are Necessary and Indispensable
                Parties Under the Liberty Agreement and Have Not Provided the
                Necessary Specific Assurances.................................................................5

III.    CONCLUSION ................................................................................................7

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Agilent Tech., Inc. v. Micromuse, Inc.*,
2004 U.S. Dist. LEXIS 20723 (S.D.N.Y. Oct. 19, 2004) ........................................3, 4, 6

*Dunn v. Std. Bank London Ltd.*,
2006 WL 217799 (S.D.N.Y. Jan. 30, 2006) ................................................................6

*Ethicon, Inc. v. United States Surgical Corp.*,
135 F.3d 1456 (Fed. Cir.),
*cert. denied,* 525 U.S. 923 (1998) ............................................................................2

*E.Z. Bowz, LLC v. Prof'l Prod. Research Co, Inc.*,
2003 U.S. Dist. LEXIS 15257 (S.D.N.Y. Sept. 5, 2003) ............................................4

*E.Z. Bowz, LLC v. Prof'l Prod. Research Co, Inc.*,
2003 U.S. Dist. LEXIS 15364 (S.D.N.Y. Sept. 5, 2003) ............................................4

*Independent Wireless Telegraph Co. v. Radio Corp. of Am.*,
269 U.S. 459 (1926) ................................................................................................1

*Int'l Business Machines Corp. v. Conner Peripherals, Inc.*,
1994 U.S. Dist. LEXIS 2884 (N.D.Cal. Jan. 28, 1994) ........................................3, 4, 6

*Michaels of Oregon Co. v. Mil-Tech, Inc.*,
1995 U.S. Dist. LEXIS 20875 (D.Or. Oct. 17, 1995) ..........................................3, 4, 6

*Waterman v. Mackenzie*,
138 U.S. 252 (1891) ................................................................................................1

**Federal Rules**

Fed. R. Civ. P. 12(b)(7) ..........................................................................................1, 6

Fed. R. Civ. P. 19 ................................................................................................1, 2, 6

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '491 Patent | U.S. Patent No. 5,479,491 |
| '735 Patent | U.S. Patent No. 5,187,735 |
| CSC | Defendant Cablevision Systems Corporation |
| CSC Br. | Defendant Cablevision Systems Corporation's *Memorandum of Law in Support of its Motion to Dismiss* |
| Ex. | Exhibit attached to the Declaration of Benjamin Hershkowitz |
| Liberty Agreement | Agreement between Liberty Cablevision of Puerto Rico, Inc. and Tele-Guia dated May 12, 2003 (Ex. F) |
| Micron | Micron Technology, Inc. |
| Micron Agreement | Agreement between Micron and Tele-Guia dated March 15, 1999 (Ex. E) |
| Micron General Agreement | Agreement between Micron and Tele-Guia dated March 15, 1999 that was attached as Ex. 3 to the *Declaration of Jeffrey M. Rollings in Support of Tele-Guia's Opposition to Defendant Cablevision Systems Corporation's Motion to Dismiss* |
| Micron Letter | Letter from Micron's counsel to Tele-Guia dated March 25, 1999 that was attached as Ex. 4 to the *Declaration of Jeffrey M. Rollings in Support of Tele-Guia's Opposition to Defendant Cablevision Systems Corporation's Motion to Dismiss* |
| Mr. Jimenez Rodriguez | Carlos R. Jimenez Rodriguez |
| Opp. Br. | Plaintiff Tele-Guia Talking Yellow Pages, Inc.'s *Opposition to Cablevision Systems Corporation's Motion to Dismiss* |
| Patents-in-suit | The '735 Patent and the '491 Patent |
| Tele-Guia | Plaintiff Tele-Guia Talking Yellow Pages, Inc. |
| USPTO | United States Patent and Trademark Office |

Defendant Cablevision Systems Corporation hereby replies to Plaintiff Tele-Guia Talking Yellow Pages, Inc.'s *Opposition to Defendant Cablevision Systems Corporation's Motion to Dismiss*.

## I.    INTRODUCTION

As discussed in CSC's opening brief, and more fully below, both Micron Technology Inc. and Carlos R. Jimenez Rodriguez are necessary and indispensable parties as co-owners of the Patents-in-suit and Tele-Guia's complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(7) because neither party can be joined to this action.  Tele-Guia's Opp. Br. does not alter this conclusion.  Tele-Guia has failed to secure the required *specific assurances from the co-owners* disavowing any claims against CSC.  Instead, Tele-Guia casually dismisses CSC's arguments as "specious" while providing self-serving assurances that conveniently ignore the assignment and license executed by Tele-Guia that are publicly recorded with the United States Patent and Trademark Office.  Tele-Guia's self-serving assurances do not overcome the requirements for dismissal.

## II.    EACH PATENT OWNER MUST BE JOINED AS A NECESSARY AND INDISPENSABLE PARTY

Federal Rule of Civil Procedure 12(b)(7) requires dismissal when necessary and indispensable parties under Fed. R. Civ. P. 19 are not joined.  *See* CSC Br. at Section II.  The general rule is that all patent owners must be joined in patent infringement litigations.  *See Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891).  The rationale behind this rule is to prevent parties from having to re-litigate the same issues multiple times and to insure parties are not prejudiced by the risk of duplicative litigation.  *See Independent Wireless Telegraph Co. v. Radio*

1

*Corp. of Am.*, 269 U.S. 459, 468 (1926). For defendants, the overriding concern is the large cost associated with defending patent infringement litigations.[1]

Tele-Guia attempts to obfuscate the legal analysis by denigrating the Supreme Court cases. Opp. Br. at 8 ("Cablevision's Motion recites and relies upon the old general rule …"). Tele-Guia is wrong. The Federal Circuit has carried forward the Supreme Court precedents. *See Ethicon, Inc. v. United States Surgical Corp.,* 135 F.3d 1456, 1467 (Fed. Cir.), *cert. denied,* 525 U.S. 923 (1998). In particular, the Federal Circuit has stated that it is a "settled principle" that all patent owners must be joined in an infringement litigation. *Id.* There are only two exceptions to this "settled principle:" (1) exclusive licensees may sue in the patent owner's name; and (2) if the patent owners have specifically contracted around this requirement. *Id.* at n. 9. Under Federal Circuit law, a co-owner must be joined if they do not fall within either of these exceptions. As discussed in CSC's opening brief (CSC Br. at 7-9) and below, neither third party with an ownership interest in the Patents-in-suit fall within these exceptions.[2]

---

[1] The recently released 2007 American Intellectual Property Law Association Economic Survey reports that the average cost of defending a patent infringement action involving a single patent in New York ranged from $3.354 Million to $6.586 Million. Ex. I. (Cost figures for litigations where the amount at risk is in excess of $1 million are given in order to be consistent with the 2005 American Intellectual Property Law Economic Survey previously attached as Ex. D). In addition, there is also the risk of prejudice to the missing co-owners. *See* CSC Br. at Section II.B.

[2] Tele-Guia does not even attempt to address whether Micron or Mr. Jimenez Rodriguez fulfill the joinder requirements of Fed. R. Civ. P. 19. Under Fed. R. Civ. P. 19(a) patent co-owners are necessary parties. *See* CSC Br. at Section II.A. If a necessary party cannot be joined because of a lack of personal jurisdiction, then the four factors of Fed. R. Civ. P. 19(b) must be analyzed to determine if the suit should proceed in the party's absence. *See* CSC Br. at Section II.B. Telling, Tele-Guia does not dispute that there is no jurisdiction over Micron or Mr. Jimenez Rodriguez, and offers no analysis of the required Rule 19(b) factors. *See* CSC Br. at Section II.C. As set forth in CSC's opening brief, both Micron and Mr. Jimenez Rodriguez are necessary and indispensable parties under Rule 19 and this action must be dismissed. *See* CSC Br. at Section III.

A. **Micron is a Necessary and Indispensable Party Under the Micron Agreements and Has Not Provided the Necessary Specific Assurances**

Tele-Guia apparently argues that Micron falls under the second exception. Tele-Guia does not dispute, as explained by CSC in its opening brief, that: (1) the Micron Agreement provides that Micron has an ownership interest in at least the '491 patent; and (2) that the Micron Agreement was publicly recorded with the USPTO. CSC Br. at Section III.A.

Instead, Tele-Guia has identified two new documents – an agreement between Micron and Tele-Guia ("Micron General Agreement")[3] and a March 23, 1999 letter from Micron to Tele-Guia ("Micron Letter"). Tele-Guia next argues that these documents collectively show that Micron's co-ownership rights in the '491 Patent, which are unrestricted in the Micron Agreement, are limited to enforcement only against Lucent by the Micron General Agreement and Micron Letter. Opp. Br. at 9-10. Tele-Guia next cites to *Agilent Tech., Inc. v. Micromuse, Inc.*, 2004 U.S. Dist. LEXIS 20723 (S.D.N.Y. Oct. 19, 2004) (attached hereto as Ex. 1), *Int'l Business Machines Corp. v. Conner Peripherals, Inc.*, 1994 U.S. Dist. LEXIS 2884 (N.D.Cal. Jan. 28, 1994) (attached hereto as Ex. 2), and *Michaels of Oregon Co. v. Mil-Tech, Inc.*, 1995 U.S. Dist. LEXIS 20875 (D.Or. Oct. 17, 1995) (attached hereto as Ex. 3) for the proposition that the Micron General Agreement somehow absolves Tele-Guia from the need to join Micron as a necessary and indispensable party. However, the documents provided by Tele-Guia do not provide the required "specific assurances" *from the co-owner* and therefore fail under the very case law cited by Tele-Guia.

---

[3] "Micron General Agreement" refers to the agreement attached as Ex. 3 to the *Declaration of Jeffrey M. Rollings in Support of Tele-Guia Talking Yellow Pages, Inc.'s Opposition to Defendant Cablevision Systems Corporation's Motion to Dismiss*. The "Micron Agreement" was recorded with the USPTO and was attached as Ex. E to the *Declaration of Benjamin Hershkowitz in Support of Cablevision Systems Corporation's Motion to Dismiss*. Tele-Guia asserts that the Micron Agreement was an exhibit to the Micron General Agreement.

In *Agilent* this Court held that joinder was not necessary "where the co-owner of a patent … has **specifically disclaimed** all interest in pursuing litigation related to the patent."  2004 U.S. Dist. LEXIS 20723 at *21 (emphasis added).  Similarly, in *Int'l Business Machines*, the N.D.Cal Court did not require the joinder of a non-party patent co-owner who filed a stipulation with the Court "**specifically acknowledge[ing] that it would be bound by the outcome of the lawsuit** and that it had no right to independently litigate any rights under the [asserted] patent[s] against [defendants] or their licensees …".  1994 U.S. Dist. LEXIS 2884 at *4 (emphasis added).  Lastly, in *Michaels of Oregon* the co-owner submitted a declaration of its President "that states [the co-owner] **will not** directly or indirectly **contest the result of any final judgment** with respect to this infringement action."  1995 U.S. Dist. LEXIS 20875 at *6-7 (emphasis added).  In all of these cases the *non-party* co-owner provided *specific assurances* to the accused party to avoid being a necessary and indispensable party. [4]  Tele-Guia has *not* secured a specific disclaimer or acknowledgement *from Micron* that it will not assert any rights against CSC.  This failure is quite telling since Tele-Guia was required to secure Micron's permission to disclose the Micron General Agreement.  Opp. Br. Ex. 3 at ¶4.3 (confidentiality clause).  Tele-Guia even requested an extension to file its Opp. Br. to secure that permission.  D.I. 11.[5]

---

[4] Tele-Guia also cites to *E.Z. Bowz, LLC v. Prof'l Prod. Research Co, Inc.*, 2003 U.S. Dist. LEXIS 15364 (S.D.N.Y. Sept. 5, 2003) (attached hereto as Ex. 4).  However, *E.Z. Bowz* does not discuss any of the legal issues relevant to CSC's motion.  However, a different *E.Z. Bowz* decision issued from the same court the same day supports CSC's position.  *See E.Z. Bowz, LLC v. Prof'l Prod. Research Co, Inc.*, 2003 U.S. Dist. LEXIS 15257 (S.D.N.Y. Sept. 5, 2003) (attached hereto as Ex. 5).  In that case, the Court did not require joinder of a co-owner as the co-owner "is no longer an 'owner' as she assigned her interest in the [patents in suit] to E-Z Bowz after commencement of the present action."  *Id.* at *13.  In other words, the necessary assurances *from the third party co-owner* were obtained.

[5] The need for explicit assurances are further heightened in this case because the Micron Letter is *over eight years old* and there is no record of any suit by Micron against Lucent under the '491 Patent (Ex. J), nor is there any information as to whether Lucent was ever licensed under the '491 Patent.  A search for prior litigations involving the '735 Patent also revealed no litigations involving Micron or Lucent.  Ex. K.

**B.**    **Micron and Mr. Jimenez Rodriquez are Necessary and Indispensable Parties Under the Liberty Agreement and Have Not Provided the Necessary Specific Assurances**

Tele-Guia does *not* come forward with any new information regarding the Liberty Agreement *nor* specific assurances from either Micron or Mr. Jimenez Rodriquez.  Instead, Tele-Guia provides empty assurances, and self-serving representations regarding the Liberty Agreement.  Tele-Guia's arguments confirm the need for joinder of Micron and Mr. Jimenez Rodriguez.

Tele-Guia's primary argument is that the Liberty Agreement was the result of "cautionary drafting" on the part of Liberty's counsel in 2003.  Opp. Br. at 11.  In other words, Liberty's counsel apparently had sufficient concerns about the existence of co-ownership interests in the Patents-in-suit by both Micron and Mr. Jimenez Rodriquez that the parties addressed them in the Liberty Agreement.  *See* CSC Br. at Section III.  This is the same concern which motivated CSC's *Motion to Dismiss*.

"Cautionary drafting" alone can also not account for inconsistencies related to the indemnification provision in the Liberty Agreement.  Tele-Guia has not explained why if, as Tele-Guia asserts, Micron has no interest in the '735 Patent then there is not some differentiation between the '491 Patent and '735 Patent in the indemnification provision of the Liberty Agreement.  *See* Ex. F at ¶3.4.  Nor has Tele-Guia explained why Liberty did not also include Mr. Jose E. Herrero Garcia (the other named inventor) in the Liberty Agreement indemnity provision if Mr. Jimenez Rodriguez was included because of his status as a co-inventor.  Opp. Br. at 11.  Finally, if Tele-Guia could not dissuade Liberty from including the indemnification provision in the Liberty Agreement after, presumably, informed settlement negotiations, how can Tele-Guia's current unsupported representations have that effect here?

Tele-Guia further attempts to dispel CSC's arguments by criticizing CSC's reliance on the Liberty Agreement as "specious at best." *Id.* at 3. Yet, the Liberty Agreement was recorded at the USPTO. CSC's reliance, on a document publicly recorded with a government agency, which indicates Tele-Guia is not the owner of the necessary rights to assert either of the Patents-in-suit, is proper.

Regardless of the reasons behind the inclusion of the pertinent provisions in the Liberty Agreement, the very cases cited by Tele-Guia require more than Tele-Guia's self-serving statements. [6] *Agilent*, *Int'l Business Machines*, and *Michaels of Oregon* require specific assurances ***from the third-parties*** with patent ownership interests to support their non-joinder to an infringement action. 2004 U.S. Dist. LEXIS 20723 at *21; 1994 U.S. Dist. LEXIS 2884 at *4; 1995 U.S. Dist. LEXIS 20875 at *6-7.

Tele-Guia's failure to secure assurances from the co-owners is all the more surprising in light of its access to Micron and Mr. Jimenez Rodriguez. As discussed above, in Section II.A, Tele-Guia required Micron's permission to disclose the Micron General Agreement yet failed to obtain a declaration from Micron addressing their ownership interest, or lack thereof, in both the '735 Patent and '491 Patent. The lack of a declaration from Mr. Jimenez Rodriguez is also surprising given that he is listed as an officer of Tele-Guia and a named inventor on both of the Patents-in-suit. *See* Exs. A, B, G & H.

---

[6] As set forth in CSC's opening brief and above, CSC made a *prima facie* case that Tele-Guia is *not* the exclusive owner of the Patents-in-suit, and Tele-Guia has *not* secured the necessary assurances from the third parties with ownership interests. As a result this case should be dismissed. However, the Court has the discretion to allow for limited, focused discovery as to the ownership of the Patents-in-suit. *See, e.g., Dunn v. Std. Bank London Ltd.*, 2006 WL 217799 (S.D.N.Y. Jan. 30, 2006) (attached hereto as Ex. 6) (ordering limited discovery to determine whether a party meets the requirements of Fed. R. Civ. P. 19 for a motion to dismiss under Fed. R. Civ. P. 12(b)(7)).

## III.    CONCLUSION

CSC's motion should be granted, and this action dismissed without prejudice, because both Micron and Mr. Jimenez Rodriguez are necessary and indispensable parties with ownership interests in the Patents-in-suit.  Tele-Guia has not secured specific assurances from the co-owners required to avoid their joinder in the instant action.  None of Tele-Guia's arguments or unsubstantiated assertions changes this fact.  CSC also again respectfully requests that Tele-Guia be ordered to provide adequate evidence of all joint ownership interests in both the '735 Patent and '491 Patent prior to the refiling any infringement action against CSC.


Dated: September 21, 2007                     Respectfully submitted,


                                              /s/ Benjamin Hershkowitz
                                              Benjamin Hershkowitz (BH 7256)
                                              GOODWIN PROCTER LLP
                                              599 Lexington Avenue
                                              New York, NY 10022
                                              (212) 813-8800 (tel.)
                                              (212) 355-3333 (fax)
                                              bhershkowitz@goodwinprocter.com

                                              Attorneys for Defendant
                                              Cablevision Systems Corporation


LIBNY/4631607

7

# EXHIBIT 1

LEXSEE



Caution
As of: Sep 05, 2007

**AGILENT TECHNOLOGIES, INC., Plaintiff, v. MICROMUSE, INC., Defendant.**

**04 Civ. 3090 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 20723**

**October 19, 2004, Decided
October 19, 2004, Filed**

**DISPOSITION:**    Micromuse's motion to dismiss the complaint was denied and its motion for a more definite statement was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a communications technology provider, brought a patent infringement action against defendant, an alleged infringer, regarding its patents for a particular internet service and a network service. The alleged infringer moved to dismiss under Fed. R. Civ. P. 12(b)(6), moved for a more definite statement, moved to add a necessary party, and moved to disqualify the provider's counsel. The provider cross-moved for a supplemental declaration.

**OVERVIEW:** The alleged infringer claimed that the provider's complaint failed to specify or identify any allegedly infringing product. The court held that dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim was not appropriate because the provider's complaint complied with Fed. R. Civ. P. 8(a)(2) by establishing jurisdiction, by setting forth the ownership of the patents, and by alleging patent infringement by the alleged infringer. The court then held that the alleged infringer was entitled to a more definite statement under Fed. R. Civ. P. 12(e) setting forth which of its products or services were alleged to have infringed the provider's patents due to the general allegations in the provider's complaint. The court further held that the co-owner of the provider's patents was not required to be joined as a

necessary party under Fed. R. Civ. P. 19(a) because, pursuant to an agreement between the provider and the co-owner, the co-owner had no independent capacity to file a patent infringement action against the alleged infringer regarding the patents at issue. The court finally held that the alleged infringer was not entitled to disqualification of the provider's counsel.

**OUTCOME:** The alleged infringer's motion to dismiss was denied, and its motions to add a necessary party and to disqualify the provider's counsel were denied with leave to renew. The alleged infringer's motion for a more definite statement was granted. The provider's motion to file a supplemental declaration was granted.

**CORE TERMS:** patent, network, infringement, co-owner, patent infringement, definite, disqualification, necessary party, infringing, notice, software, prior representation, disqualify, licensee, exclusive right, infringed, lawsuit, joinder, vague, join, supplemental declaration, supplemental, discovery, infringe, entity, joined, renew, law firm, subject matter, substantial relationship

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1]In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court should construe the complaint liberally, accepting all factual allegations in

the complaint as true, and drawing all reasonable inferences in the plaintiff's favor, although mere conclusions of law or unwarranted deductions need not be accepted. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. In other words, the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof. Dismissal is only appropriate when it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief.

***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation***
[HN2]The indulgent standard for a filing a complaint is codified in Fed. R. Civ. P. 8, which requires no more than a short and plain statement of a claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The United States Supreme Court has interpreted Fed. R. Civ. P. 8 not to require a claimant to set out in detail the facts upon which he bases his claim. Indeed, the Federal Rules of Civil Procedure require (with irrelevant exceptions) only that the complaint state a claim, not that it plead the facts that if true would establish (subject to any defenses) that the claim was valid. All that need be specified is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Civil Procedure > Dismissals > General Overview***
[HN3]Whether a complaint satisfies Fed. R. Civ. P. 8(a)(2) is determined by whether the pleading provides fair notice to the opposing party. Accordingly, dismissal for failure to comply with the requirements of Fed. R. Civ. P. 8 is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Defects of Form***
[HN4]Where a pleading is sufficient to provide notice of the claim but does not contain sufficient information to allow a responsive pleading to be framed without risk of

prejudice, the proper remedy is a motion for a more definite statement under Fed. R. Civ. P. 12(e).

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Defects of Form***
[HN5]See Fed. R. Civ. P. 12(e).

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Defects of Form***
***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Denials***
[HN6]Fed. R. Civ. P. 12(e) applies only in limited circumstances: the pleading must be sufficiently intelligible for the district court to be able to make out one or more potentially viable legal theories on which the claimant might proceed; in other words the pleading must be sufficient to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss. At the same time, the pleading also must be so vague or ambiguous that the opposing party cannot respond to it, even with a simple denial as permitted by Fed. R. Civ. P. 8(b), with a pleading that can be interposed in good faith or without prejudice to himself.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Defects of Form***
***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Infringement Actions > Burdens of Proof***
[HN7]Although motions pursuant to Fed. R. Civ. P. 12(e) are generally disfavored where prompt resort to discovery may provide an adequate means for ascertaining relevant facts, courts have considered Fed. R. Civ. P. 12(e) relief appropriate in patent infringement cases where a plaintiff has failed to identify any allegedly infringing product or products. A pleading need not identify every infringing product where some other limiting parameter has been set forth or at least one purportedly infringing product has been identified.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Defects of Form***
[HN8]Where a motion made under Fed. R. Civ. P. 12(e) has been granted, the order of the court to provide a more definite statement must be obeyed within ten days after notice of the order or within such other time as the court may fix. Fed. R. Civ. P. 12(e).

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss***

*Civil Procedure > Parties > Joinder > Indispensable Parties*
*Civil Procedure > Parties > Joinder > Necessary Parties*

[HN9]Fed. R. Civ. P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party belongs in the suit, i.e., whether the party qualifies as a necessary party under Fed. R. Civ. P. 19(a).

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
*Civil Procedure > Parties > Joinder > Necessary Parties*

[HN10]See Fed. R. Civ. P. 19(a).

*Civil Procedure > Parties > Joinder > Necessary Parties*

[HN11]If a party is deemed necessary, it then must be determined whether the party's absence warrants dismissal pursuant to Fed. R. Civ. P. 19(b). If a party does not qualify as necessary under Fed. R. Civ. P. 19(a), then the court need not decide whether its absence warrants dismissal under Fed. R. Civ. P. 19(b).

*Civil Procedure > Parties > Joinder > Necessary Parties*
*Copyright Law > Civil Infringement Actions > Standing > Copyright Act of 1976*
*Patent Law > Ownership > Conveyances > Equitable Assignments & Joint Ownership*

[HN12]As a general matter, United States patent law requires that all co-owners normally must join as plaintiffs in an infringement suit. Since all co-owners have standing to sue for infringement, if all the co-owners are not joined in an infringement suit, there may be a risk that the defendant will be subject to multiple suits. Since the introduction of Fed. R. Civ. P. 19 and its 1966 amendments, however, courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of the patent co-owner. Thus, where the co-owner of a patent or other entity or individual whose interest in a patent might be directly affected by litigation has specifically disclaimed all interest in pursuing litigation related to the patent in favor of the party who has brought the suit, courts have held that joinder of the co-owner or other entity or individual is not necessary.

*Patent Law > Ownership > Conveyances > Equitable Assignments & Joint Ownership*
*Patent Law > Ownership > Conveyances > Licenses*
*Real Property Law > Estates > Future Interests > Reverter & Reversions*

[HN13]A licensor is a necessary party to a patent infringement action despite the existence of an agreement with a plaintiff licensee granting the licensee sole and exclusive rights to sue for infringement where the agreement is of fixed term and where the licensor retains a reversionary interest in the patent.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Pleading & Practice > Pleadings > Supplemental Pleadings*

[HN14]Although submission of supplemental papers is often more of a hindrance than a help, where the issues addressed in the supplemental papers presented are carefully cabined and respond to arguably new contentions contained in reply papers on the underlying motion, and where the opposing party has disclaimed any prejudice resulting from the submission of the supplemental papers, there is no evidence of bad faith by the party seeking to submit the supplemental papers, and the parties will be best served by the court's deciding the issue presented to it on the most complete factual basis possible, leave to submit supplemental papers is appropriately granted.

*Civil Procedure > Counsel > General Overview*
*Criminal Law & Procedure > Counsel > Right to Counsel > General Overview*
*Legal Ethics > Client Relations > Appearance of Impropriety*

[HN15]Motions to disqualify counsel have long been disfavored in the United States Court of Appeals for the Second Circuit. Disqualification motions are often made for tactical reasons, and thereby unduly interfere with a party's right to employ counsel of his choice. Moreover, disqualification motions, even when made in the best of faith inevitably cause delay. A high standard of proof is therefore required from one who moves to disqualify counsel. The appearance of impropriety alone does not warrant disqualification.

*Civil Procedure > Counsel > General Overview*
*Legal Ethics > Client Relations > Appearance of Impropriety*

[HN16]In determining whether an attorney can oppose his former client, courts evaluate whether the new matter

is substantially related to the subject matter of the prior representation. An attorney may be disqualified from representing a client in a particular case if: (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client. Under this standard, proof of substantial similarity must be patently clear to warrant disqualification. A substantial relationship exists where facts pertinent to the problems underlying the prior representation are relevant to the subsequent representation.

*Civil Procedure > Counsel > General Overview*

[HN17]A party is entitled to seek an opposing party's counsel's disqualification based on the counsel's prior representation of the party's wholly owned subsidiary. A plaintiff's law firm will be deemed to have previously represented a defendant where the plaintiff's law firm has previously represented the defendant corporation's subsidiary and the defendant corporation has taken in active role with regard to the law firm's representation of its subsidiary.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Employee Inventions*
*Patent Law > Infringement Actions > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview*

[HN18]For purposes of the disqualification of counsel, prior general business representation by a plaintiff's law firm of an entity related to a defendant on matters unrelated to the lawsuit at issue does not meet the high burden of establishing a conflict.

**COUNSEL:** [*1] Attorneys for Plaintiff: CHRISTIAN & BARTON, Richmond, VA. By : MICHAEL W. SMITH, ESQ. CRAIG T. MERRITT, ESQ. R. BRAXTON HILL, ESQ. Of Counsel. GRAY CARY WARE & FREIDENRICH, San Diego, CA. By: EDWARD H. SIKORSKI, ESQ. JOHN ALLCOCK, ESQ. SEAN C. CUNNINGHAM, ESQ. MEGAN WHYMAN OLESEK, ESQ.

Attorneys for Defendant: BROWN RAYSMAN MILLSTEIN FELDER & STEINER, New York, NY. By: SETH OSTROW, ESQ. JEFFREY P. WEINGART, ESQ. ERIC C. OSTERBERG, ESQ. Of Counsel. WILLCOX & SAVAGE, Norfolk, VA. By: MICHAEL R. KATCHMARK, ESQ. GARY A. BRYANT, ESQ. Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**Sweet, D.J.,**

Defendant Micromuse, Inc. ("Micromuse") has moved pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint of plaintiff Agilent Technologies, Inc. ("Agilent") alleging patent infringement, and, in the alternative, for a more definite statement pursuant to Rule 12(e), and to add Hewlett Packard Company ("H-P") as a necessary party under Rules 12(b)(7) and 19(a) of those same Rules. Micromuse has also moved to disqualify Gray Cary Ware & Freidenrich, LLP ("Gray Cary") from representing Agilent in this action, [*2] Gray Cary having previously represented NetWork Harmoni, Inc. ("Network Harmoni"), an entity acquired by Micromuse prior to the filing of this action. Agilent has cross-moved for leave to file a supplemental declaration in opposition to Micromuse's motion to disqualify Gray Cary. For the reasons set forth below, Micromuse's motion to dismiss is denied, the motion for a more definite statement is granted, the motion to add H-P as a party is denied at this time with leave granted to renew, and the motion to disqualify is denied at this time with leave granted to renew. Agilent's cross-motion for leave to file a supplemental declaration is granted.

*Prior Proceedings*

The complaint in this patent infringement action was filed in the United States District Court for the Eastern District of Virginia, Norfolk Division, on November 10, 2003.

On December 17, 2003, Micromuse filed the instant motions in the Eastern District of Virginia as well as a motion to transfer the action to this district, which latter motion was granted by order of the Honorable Raymond A. Jackson filed on April 16, 2004. The action was transferred to this district on April 22, 2004.

The remaining motions [*3] were argued and marked fully submitted on May 19, 2004.

*The Complaint*

The following facts are drawn from Agilent's complaint and do not constitute findings of fact by the Court.

According to the complaint, Agilent is a Delaware corporation having its headquarters in Palo Alto, California, and significant operations in Fort Collins, Colorado. It is alleged that Micromuse is a Delaware Corporation with headquarters in San Francisco, California, and significant operations in Northern Virginia, Georgia, Illinois, Texas, New York, London, and other overseas destinations. Subject matter jurisdiction is alleged under 28 U.S.C. §§ 1331 and 1338.

With regard to the factual background of the complaint, it is alleged that:

6. Agilent is a leading provider of components, test, measurement, monitoring and management solutions for the communications industry. Agilent's broad set of solutions and services includes, among other technologies, optical, wireless, Internet and broadband technologies that span the entire communications life cycle. Having invested substantial resources in the development of these technologies, Agilent maintains a portfolio [*4] of patents covering its inventions, including the patents at issue.

7. On October 24, 2000, United States Patent No. 6,138,122 ("the '122 Patent"), entitled "Modeling of Internet Services," was duly and legally issued to MarkD. Smith, Deborah L. Caswell and Srinivas Ramanathan. All rights, title and interest in the '122 Patent were assigned to Agilent, which remains the sole owner of the '122 Patent....

8. On January 1, 2002, United States Patent No. 6,336,138 ("the '138 Patent"), entitled "Template-Driven Approach For Generating Models On Network Services," was duly and legally issued to Deborah L. Caswell, Srinivas Ramanathan, James D. Hunter, Scott S. Neal, Frederick A. Sicker and Mark D. Smith. All rights, title and interest in the '138 Patent were assigned to Hewlett-Packard Company. Agilent and Hewlett-Packard Company now jointly own the '138 Patent, and Agilent has the exclusive

right to enforce the '138 Patent against Micromuse....

(Compl. at PP 6-8.) It is further alleged that Micromuse "makes, sells, or offers products for sale in this district that infringe Agilent's patents." (Compl. at P 4.)

The complaint contains two counts and Micromuse's liability [*5] is alleged as follows:

COUNT ONE

Infringement of U.S. Patent No. 6,138,122

9. Agilent realleges the foregoing paragraphs.

10. Agilent is informed and believes that Micromuse has directly infringed and continues to infringe, has induced and continues to induce, and/or has committed and continues to commit acts of contributory infringement of, one or more claims of the '122 Patent.

11. Agilent is informed and believes that Micromuse's acts of patent infringement are and continue to be willful and deliberate.

12. As a result of Micromuse's patent infringement, Agilent has suffered damages in an amount not yet determined, and will continue to suffer damages in the future.

13. Unless an injunction is issued enjoining Micromuse and its agents, servants, employees, attorneys, representatives, and all others acting on their behalf from infringing the '122 Patent, Agilent will be greatly and irreparably harmed.

COUNT TWO

Infringement of U.S. Patent No. 6,336,138

14. Agilent realleges the foregoing paragraphs.

15. Agilent is informed and believes that Micromuse has directly infringed and continues to infringe, has induced and continues to induce, and/or has committed and continues [*6] to commit acts of contributory infringement of, one or more claims of the '138 Patent.

16. Agilent is informed and believes that Micromuse's acts of patent infringement are and continue to be willful and deliberate.

17. As a result of Micromuse's patent infringement, Agilent has suffered damages in an amount not yet determined, and will continue to suffer damages in the future.

18. Unless an injunction is issued enjoining Micromuse and its agents, servants, employees, attorneys, representatives, and all others acting on its

behalf from infringing the '138 Patent, Agilent will be greatly and irreparably harmed.

(Compl. at PP 9-18.)

### *Discussion*

### I. *Micromuse's Motion To Dismiss Is Denied*

Micromuse has moved to dismiss Agilent's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the complaint fails to meet the notice requirements of Rule 8(a) of those same Rules.

[HN1]In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable [*7] inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)). In other words, "the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir. 2004) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts [*8] which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000); *accord Eternity Global Master Fund*, 375 F.3d at 176-77.

[HN2]"The indulgent standard evident in these precedents is codified in Rule 8, which requires no more than 'a short and plain statement of [a] claim showing that the pleader is entitled to relief.'" *Id.* at 177 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original); *see also Wynder v. McMahon*, 360 F.3d 73, 76-77 & n.5 (2d Cir. 2004) (referring to the "bare-bones standards of Rule 8" and noting that "Rule 8 pleading is extremely permissive"). The Supreme Court has interpreted Rule 8 "not to require a claimant to set out in detail the facts upon which he bases his claim." *Leatherman v. Tarrant County County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). Indeed,

The federal rules require (with irrelevant exceptions) only that the complaint state a claim, not that it plead the facts that if [*9] true would establish (subject to any defenses) that the claim was valid .... All that need be specified is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer.

*Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002); *see also Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) ("'More extensive pleading of fact is not required because the Federal Rules of Procedure provide other devices besides pleadings that will serve to define the facts and issues and to dispose of unmeritorious claims.'") (quoting 2 James Wm. Moore, *et al.*, *Moore's Federal Practice* § 8.04[1] (3d ed. 1999) (citation omitted)). [HN3]Whether a complaint satisfies Rule 8(a)(2) is determined by whether the pleading provides fair notice to the opposing party. *See Conley*, 355 U.S. at 47; *see also Wynder*, 360 F.3d at 79 ("The key to Rule 8(a)'s requirements is whether adequate notice is given."). Accordingly, dismissal for failure to comply with the requirements of Rule 8 "is usually reserved for those cases in which the complaint is [*10] so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'" *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)).

Here, Agilent's complaint establishes the jurisdiction of this Court, sets forth the ownership of the patents in suit and alleges that Micromuse makes, sells, or offers products for sale that infringe Agilent's patents. The complaint further alleges that Micromuse is liable for direct infringement, contributory infringement and infringement by inducement. Agilent has provided a "short and plain statement" of its claims against Micromuse and the nature of those claims is discernible. Fed. R. Civ. P. 8(a)(2). Indeed, it would be difficult to frame a more skeletal pleading.

Micromuse nonetheless argues that dismissal of Agilent's complaint is appropriate because the complaint fails to specify any allegedly infringing product, fails to identify any allegedly infringing conduct, and fails to set forth any of the other actors implicated by the allegations that Micromuse has contributed to and [*11] induced patent infringement. The absence of allegations such as those described does not demonstrate that the harsh sanction of dismissal is appropriate here, as this absence does not make it "appear[] beyond doubt that the plaintiff

can prove no set of facts which would entitle him or her to relief," *Sweet,* 235 F.3d at 83, nor that the complaint is "'so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'" *Simmons,* 49 F.3d at 86 (quoting *Salahuddin,* 861 F.2d at 42); *see generally Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 235, 3 L. Ed. 2d 770, 79 S. Ct. 760 (1959) ("It may well be that petitioner's complaint as now drawn is too vague, but that is no ground for dismissing his action.").

[HN4]Where, as here, a pleading is sufficient to provide notice of the claim but does not contain sufficient information to allow a responsive pleading to be framed without risk of prejudice, the proper remedy is a motion for a more definite statement under Rule 12(e), Fed. R. Civ. P. *See, e.g., Scott v. City of Chicago,* 195 F.3d 950, 952 (7th Cir. 1999); [*12] *Sisk v. Texas Parks & Wildlife Dep't,* 644 F.2d 1056, 1059 (5th Cir. 1981); *Harman v. Nat'l Bank of Arizona,* 339 F.2d 564, 567 (9th Cir. 1964); *but compare Ondeo Nalco Co. v. Eka Chems., Inc.,* 2002 U.S. Dist. LEXIS 26195, No. 01 Civ. 537 (SLR), 2002 WL 1458853, at *1-2 (D. Del. August 10, 2002) (dismissing defendant's counterclaims where it was unclear which products were being accused, concluding that the pleading was "too vague to provide plaintiff with fair notice," and granting leave to amend).

## II. *Micromuse's Motion For A More Definite Statement Is Granted*

Rule 12(e) of the Federal Rules of Civil Procedure provides in pertinent part that [HN5]"if a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Fed. R. Civ. P. 12(e). [HN6]Rule 12(e) applies only in limited circumstances:

> The pleading must be sufficiently intelligible for the district court to be able to make out one or more [*13] potentially viable legal theories on which the claimant might proceed; in other words the pleading must be sufficient to survive a Rule 12(b)(6) motion to dismiss. At the same time, the pleading also must be so vague or ambiguous that the opposing party cannot respond to it, even with a simple denial as permitted by Rule 8(b), with a pleading that can be interposed in good faith or without prejudice to himself.

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1376 at 311 (3d ed. 2004)

(footnote omitted); *see Humpherys v. Nager,* 962 F. Supp. 347, 352-53 (E.D.N.Y. 1997) ("A 12(b)(6) motion is one made for a failure to state a claim, while a 12(e) motion is proper when a complaint pleads a viable legal theory, but is so unclear that the opposing party cannot respond to the complaint."); *but compare Home & Nature Inc. v. Sherman Specialty Co.,* 322 F. Supp. 2d 260, 265 (E.D.N.Y. 2004) ("Rule 12(e) motion should be denied if a complaint comports with the liberal pleading requirements of Rule 8(a).") (collecting cases).

[HN7]Although motions pursuant to Rule 12(e) are generally disfavored where prompt resort to discovery [*14] may provide an adequate means for ascertaining relevant facts, *see id.,* courts have considered Rule 12(e) relief appropriate in patent infringement cases where a plaintiff has failed to identify any allegedly infringing product or products. *See, e.g., In re Papst Licensing, GmbH, Patent Litig.,* 2001 U.S. Dist. LEXIS 2255, Nos. MDL 1298 & C.A. 99-3118, 2001 WL 179926, at *2 (E.D. La. Feb. 22, 2001) (concluding that the plaintiff's complaint must be amended to specifically identify which of the defendant's products are alleged to have infringed the plaintiff's patents); *cf. Creative Copier Servs. v. Xerox Corp. (In re Indep. Serv. Orgs. Antitrust Litig.),* 85 F. Supp. 2d 1130, 1169 (D. Kan. 2000) (denying the plaintiff's motion for summary judgment on a defendant's counterclaim where the plaintiff argued that it did not have adequate notice of which of its devices allegedly infringed the defendant's patents, observing that the plaintiff had already answered the counterclaim and that, if the plaintiff "did not truly know which parts were covered by the patents identified, it could have filed a motion for a more definite statement under Rule 12(e)"). The cases cited by Agilent in opposition to Micromuse's motion [*15] do not suggest that a contrary result is required here, as they stand for the propositions that a pleading need not identify every infringing product where some other limiting parameter has been set forth or at least one purportedly infringing product has been identified. *See Symbol Techs., Inc. v. Hand Held Prods.,* 2003 U.S. Dist. LEXIS 21002, No. 03-102-SLR, 2003 WL 22750145, at *3 (D. Del. Nov. 14, 2003) (denying a Rule 12(e) motion where there was a "finite" set of potentially infringing products under identified patents held by the defendant); *Oki Elec. Indus. Co., Ltd. v. Lg Semicon Co., Ltd.,* 1998 U.S. Dist. LEXIS 22507, No. 97 Civ. 20310 (SW), 1998 WL 101737, at *3 (N.D. Cal. Feb. 25, 1998) (denying a motion to dismiss where the plaintiff identified infringing products by specifying that the products concerned were "devices that embody the patented methods, including 4 megabit and higher density DRAMs") (internal quotation marks omitted), *aff'd,* 243 F.3d 559 (Fed. Cir. 2000).

Agilent's complaint does not specify which products infringed plaintiff's patents; it merely states that the alleged infringements occurred as a result of the fact that Micromuse "makes, sells, or offers products [*16]  for sale . . . that infringe Agilent's patents." (Compl. at P 4.) Although Agilent's papers submitted in opposition to Micromuse's various motions suggest that Micromuse possesses at least four infringing products, those products have not been formally accused. Under these circumstances, Micromuse is entitled to know which of its products or services are alleged to have infringed Agilent's patents and a more definite statement setting forth that information is appropriate.

Micromuse has also argued that Agilent's complaint fails to identify the primary infringer with respect to the contributory and inducement claims. Micromuse has cited to a single unpublished authority in support of its argument that such identification is required to render a pleading answerable, and this authority, *Net Moneyin, Inc. v. Mellon Fin. Corp.*, No. O1 Civ. 441 (TUC) (RCC), slip op. (D. Ariz. July 30, 2003), itself cites no other case law directly on point. Micromuse has accordingly failed to establish that relief under Rule 12(e) with respect to the identity of any primary infringers is appropriate.

[HN8]Where a motion made under Rule 12(e) has been granted, the order of the court to provide a more definite [*17]  statement must be obeyed within ten days after notice of the order "or within such other time as the court may fix." Fed. R. Civ. P. 12(e). Agilent is directed to comply with the grant of Micromuse's motion for a more definite statement by filing and serving an amended complaint within thirty (30) days of entry of this order and opinion.

### III. *H-P Will Not Be Deemed A Necessary Party At This Time*

Micromuse argues that, if Agilent's complaint is not dismissed, H-P, as co-owner of the '138 Patent, should be joined as a necessary party to this lawsuit, pursuant to Rule 19(a) of the Federal Rules of Civil Procedure. In addition, Micromuse asserts that if H-P is not so joined, the case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(7).

[HN9]"Fed. R. Civ. P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party belongs in the suit, *i.e.*, whether the party qualifies as [*18]  a 'necessary' party under Rule 19(a)." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000). Rule 19(a) provides in relevant part that,

[HN10]A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

Fed. R. Civ. P. 19(a). Second, [HN11]if a party is deemed necessary, it then must be determined whether the party's absence warrants dismissal pursuant to Rule 19(b), Fed. R. Civ. P. [*19]  See *Viacom Int'l*, 212 F.3d at 725. "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)." *Id. at 724* (citing *Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1123 (2d Cir. 1990)).

[HN12]As a general matter, "United States patent law . . . requires that all co-owners normally must join as plaintiffs in an infringement suit." *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1331 (Fed. Cir. 2001); *see also Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998) (stating that, "as a matter of substantive patent law, all coowners must ordinarily consent to join as plaintiff in an infringement suit") (footnote omitted); *see generally Waterman v. MacKenzie*, 138 U.S. 252, 255-56, 34 L. Ed. 923, 11 S. Ct. 334, 1891 Dec. Comm'r Pat. 320 (1891). As one court has explained, since "'all co-owners have standing to sue for infringement, if all the co-owners are not joined in an infringement suit, there may be a risk that the defendant will be subject to multiple suits.'"*E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co.*, 2003 U.S. Dist. LEXIS 15364, No. 00 Civ. 8670 (LTS) (GWG), 2003 WL 22064257, [*20]  at *3 (S.D.N.Y. Sept. 5, 2003) (quoting *IBM Corp. v. Conner Peripherals*, 1994 U.S. Dist. LEXIS 2884, No. 93 Civ. 20591 (RMW), 1994 WL 409493, at *3 (N.D. Cal. Jan. 28, 1994)); *see also Union Trust Nat'l Bank v. Audio Devices, Inc.*, 295 F. Supp. 25, 27 (S.D.N.Y. 1969) ("That all co-owners be parties to a suit is a necessary

requirement if conflicting decisions about the same patent (for example, its validity) are to be avoided."); *cf. Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991) ("The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer.").

"Since the introduction of Fed. R. Civ. P. 19 and the 1966 amendments to the rule, however, 'courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of the patent co-owner.'" *E.Z. Bowz*, 2003 U.S. Dist. LEXIS 15364, 2003 WL 22064257, at *3 (quoting *Michaels of Oregon Co. v. Mil-Tech, Inc.*, 1995 U.S. Dist. LEXIS 20875, No. 95 Civ. 908 (MA), 1995 WL 852122, [*21] at *1 (D. Or. Oct. 17, 1995)); *cf. Howes v. Med. Components, Inc.*, 698 F. Supp. 574, 576 (E.D. Pa. 1988) ("The adoption of the 1966 amendments to Rule 19 'makes inappropriate any contention that patent co-owners are *per se* indispensable in infringement suits.'") (quoting *Catanzaro v. Int'l Tel. & Tel. Corp.*, 378 F. Supp. 203, 205 (D. Del. 1974)).

Thus, where the co-owner of a patent or other entity or individual whose interest in a patent might be directly affected by litigation has specifically disclaimed all interest in pursuing litigation related to the patent in favor of the party who has brought the suit, courts have held that joinder of the co-owner or other entity or individual is not necessary. *See Vaupel Textilmaschinen*, 944 F.2d at 875-76 (concluding that the policy to join an owner when an exclusive licensee bring suit in order to preclude the possibility of duplicative lawsuits was not undercut where, pursuant to express agreements, the right to sue rested solely with the licensee and denying the defendant's Rule 19 motion); *E-Z Bowz*, 2003 U.S. Dist. LEXIS 15364, 2003 WL 22064257, at *4-5 (holding that the defendant would not [*22] be subject to a substantial risk of incurring inconsistent obligations where the former co-owner of certain patents had relinquished her interest in the patents as well as any rights of action relating to the patents and concluding that the rights of the parties could be fairly adjudicated without joinder of the absent former co-owner); *Michaels of Oregon*, 1995 U.S. Dist. LEXIS 20875, 1995 WL 852122, at *2-3 (determining that an absent co-owner of certain patents was not a necessary party where that absent co-owner had entered into an agreement with the plaintiff providing that only the plaintiff might file actions for patent infringement); *compare Parkson Corp. v. Andritz Sprout-Bauer, Inc.*, 866 F. Supp. 773, 775 (S.D.N.Y. 1995) (concluding that it was not possible to determine whether an owner was a necessary party to an

action brought by an exclusive licensee where the licensing agreement did not unambiguously give the licensee control over whether infringement claims should be brought); *Howes*, 698 F. Supp. at 577 (concluding that an absent patent co-owner was a necessary party where the defendants might face the risk of relitigation by that co-owner).

Although [*23] the complaint alleges that Agilent and H-P jointly own the '138 Patent, it further alleges that Agilent enjoys the exclusive right to enforce the '138 Patent against Micromuse. In opposition to Micromuse's motion, Agilent has submitted a redacted version of an August 22, 2003 agreement between Agilent and H-P (the "August Agreement") regarding their respective rights concerning the enforcement of the '138 Patent. According to the August Agreement, H-P grants to Agilent "the exclusive right to license the ['138] Patent to Micromuse." (Declaration of Megan Whyman Olesek, dated Jan. 15, 2004 ("Olesek Decl."), Exh. X at P 1.) H-P further grants to Agilent "the exclusive right to enforce the ['138] Patent to and against Micromuse" including by "filing and prosecuting the Agilent Patent Suit to final judgment, including appeals." [1] (*Id.*) H-P has also agreed that

> As between the parties, Agilent shall have the full power and authority to control the Agilent Patent Suit and any settlement thereof and shall retain one hundred percent (100%) of any damages or compensation received in connection with the Agilent Patent Suit or settlement thereof.

(*Id.* at P 3.)

1   The "Agilent Patent Suit" is defined as "a patent infringement lawsuit against Micromuse." (Olesek Decl., Exh. X, preamble.)

[*24] Based on the terms of the August Agreement, it does not appear that H-P's absence from this lawsuit will subject Micromuse to any "substantial risk of incurring double, multiple, or otherwise inconsistent obligations," Fed. R. Civ. P. 19(a), because H-P has no independent capacity to file a patent infringement action against Micromuse based on the '138 Patent, having expressly disclaimed any interest in pursuing a claim against Micromuse with respect to the '138 Patent. In light of the broad contractual language by which H-P has granted Agilent the exclusive right to enforce the '138 Patent against Micromuse, the absence of any provision in the August Agreement stating that H-P agrees to be bound by the outcome of this litigation is not

determinative here. Likewise, the absence of an affirmative representation that H-P has relinquished its right to sue Micromuse for any purported past infringement does not, contrary to the argument advanced by Micromuse, require joinder of H-P. On the facts now available, it thus appears that complete relief can be accorded among those already parties.

Micromuse has noted, however, that the August Agreement [*25] makes explicit reference to the existence of a Master Patent Ownership and License Agreement and that the August Agreement is an agreement among Agilent and H-P "together with Hewlett Packard Development Company, L.P." (Olesek Decl., Exh. X, preamble), an entity that, according to Micromuse, may also have an interest in the '138 Patent. Micromuse has further observed that the redacted form of the August Agreement does not set forth its effective term or termination provisions and suggests that the absence of such provisions raises questions of whether H-P enjoys a reversion, termination, or expiration interest in the '138 Patent, questions which may, in turn, affect any determination as to whether H-P is a necessary party here. *See, e.g., Moore U.S.A. Inc. v. Standard Register Co., 60 F. Supp. 2d 104, 109-110 (W.D.N.Y. 1999)* (concluding that [HN13]a licensor was a necessary party to a patent infringement action despite the existence of an agreement with the plaintiff licensee granting the licensee sole and exclusive rights to sue for infringement where the agreement was of fixed term and where the licensor retained a reversionary interest in the patent).

Although the [*26] facts presently available do not establish that H-P is a necessary party, Micromuse's observations suggest that developments resulting from discovery may cause the issue of H-P's joinder to be revisited. Accordingly, Micromuse's motion to join H-P is denied at this time and leave is hereby granted to renew the motion after further discovery.

IV. *Gray Cary Will Not Be Disqualified At This Time*

Micromuse has moved to disqualify Gray Cary from representing Agilent in this matter on the grounds that, for many years, Gray Cary provided extensive legal representation to Network Harmoni, a company acquired by Micromuse in August 2003. Micromuse argues that Network Harmoni's suite of proprietary intelligent software agents is now part of Micromuse's product offerings and, under the current complaint, potentially the target of Agilent's patent infringement claims. Micromuse asserts that Gray Cary thus formerly represented Network Harmoni in matters substantially related to the subject matter of this action and must be disqualified from representing Agilent as a result.

Agilent opposes Micromuse's motion, arguing that in its representation of Network Harmoni Gray Cary was at all [*27] times in an adverse relationship to Micromuse and that Gray Cary's prior representation of Network Harmoni involved no confidential information about the product or products at issue in the present action. [2]

> 2  Following briefing on Micromuse's motion, Agilent moved for leave to submit a supplemental declaration, claiming the need to respond to certain contentions in Micromuse's reply papers, and Micromuse opposed the motion. Agilent's motion for leave to submit the supplemental declaration is granted. [HN14]Although submission of supplemental papers is often more of a hindrance than a help, the issues addressed in the supplemental papers presented here are carefully cabined and respond to arguably new contentions contained in reply papers on the underlying motion. Where this is true, and where, as here, the opposing party has disclaimed any prejudice resulting from the submission of the supplemental papers, there is no evidence of bad faith by the party seeking to submit the supplemental papers, and "the parties will be best served by the Court's deciding the . . . issue presented to it on the most complete factual basis possible," *Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C., 2003 U.S. Dist. LEXIS 4810, No. 03 Civ. 200 (GEL), 2003 WL 1618534, at *1 (S.D.N.Y. Mar. 27, 2003)*, leave to submit supplemental papers is appropriately granted.

[*28]  [HN15]Motions to disqualify counsel have long been disfavored in this Circuit. *See, e.g., Evans v. Artek Sys. Corp., 715 F.2d 788, 791-92 (2d Cir. 1983)* (enumerating the reasons for which disqualification motions are disfavored); *Bennett Silvershein Assoc. v. Furman, 776 F. Supp. 800, 802 (S.D.N.Y. 1991)* ("The Second Circuit has indeed been loathe to separate a client from his chosen attorney . . . .") (collecting cases). "Disqualification motions are often made for tactical reasons, and thereby unduly interfere with a party's right to employ counsel of his choice." *Skidmore v. Warburg Dillon Read L.L.C., 2001 U.S. Dist. LEXIS 6101, No. 99 Civ. 10525 (NRB), 2001 WL 504876, at *2 (S.D.N.Y. May 11, 2001)* (citing *Board of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)*). Moreover, disqualification motions, "even when made in the best of faith . . . inevitably cause delay." *Evans, 715 F.2d at 792* (quoting *Nyquist, 590 F.2d at 1246*). A "high standard of proof" is therefore required from one who moves to disqualify counsel. *Id. at 791* (quoting *Government of India v. Cook Industries, Inc., 569 F.2d 737, 739 (2d Cir. 1978)*). [*29]  The appearance of impropriety alone does

not warrant disqualification. *See Nyquist, 590 F.2d at 1246-47.*

[HN16]In determining whether an attorney can oppose his former client, courts evaluate whether the new matter is substantially related to the subject matter of the prior representation. An attorney may be disqualified from representing a client in a particular case if:

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Id. at 791.* "Under this standard, proof of substantial similarity must be 'patently clear' to warrant disqualification." *Decora Inc. v. DW Wallcovering, Inc., 899 F. Supp. 132, 136 (S.D.N.Y. 1995)* (quoting *Government of India, 569 F.2d at 739-40*) (additional citations omitted). A "substantial relationship" exists where [*30] facts pertinent to the problems underlying the prior representation are relevant to the subsequent representation. *See U.S. Football League v. Nat'l Football League, 605 F. Supp. 1448, 1459-60* & n.25 (S.D.N.Y. 1985) ("It is the congruence of *factual* matters, rather than areas of law, that establishes a substantial relationship between representations for disqualification purposes.") (emphasis in original).

According to Micromuse, Network Harmoni evolved from a research project in network visualization software conducted at Curtin University in Perth, Australia. In 1996, the founders of the project formed NDG Software, Inc., and in November 1998 the company received its first venture funding and moved its headquarters from Australia to San Diego, California. It is alleged that Gray Cary initially provided advice, counsel and representation in establishing and structuring this U.S.-based company and its operations, and served as outside counsel. Subsequently, NDG Software, Inc., changed its name to Network Harmoni, Inc.

During the time of Gray Cary's representation, Network Harmoni developed and licensed to its customers, including Agilent and Micromuse, proprietary

[*31] intelligent software agents designed to provide users with information on the status and security of computer networks, systems and applications. Micromuse contends that Gray Cary, during its five-year relationship with Network Harmoni, represented Network Harmoni in its corporate affairs, employment issues, in prosecuting its patents and trademarks and handling other patent and trademark-related matters, in evaluating third-party patents, and in drafting and negotiating licensing agreements, financing instruments and other corporate-related documents.

Over the course of its representation of Network Harmoni, Gray Cary is alleged to have drafted and filed several patent applications with the United States Patent and Trademark Office relating to certain aspects of Network Harmoni's software products and was informed of virtually all attributes and potential uses of Network Harmoni's suite of proprietary intelligent software agents, as well as the company's plans for future software applications and services.

According to Micromuse, Gray Cary represented Network Harmoni in its negotiations to be purchased by Micromuse, and Network Harmoni and Micromuse executed a non-disclosure agreement [*32] to assure that the parties could have full and complete discussions without the use of such information for non-acquisition purposes.

It is further alleged that in three rounds of financing, Gray Cary was allowed to participate on the same basis as the initial preferred investors and became a shareholder of Network Harmoni, and until September 1999, one of its lawyers served as a member of its board of directors. Gray Cary sold its stock in connection with Network Harmoni's acquisition by Micromuse.

In opposition to Micromuse's motion it is alleged that Gray Cary first became aware of a potential claim against Micromuse by Agilent on September 19, 2003, when Agilent approached Gray Cary about the possibility of Gray Cary handling the matter for Agilent. It is also alleged that on December 8, 2003, an ethical wall was established to isolate all attorneys working on Agilent matters from any and all information related to any matter in which Network Harmoni had been a client for the firm.

Agilent asserts that Gray Cary never had an attorney-client relationship with Micromuse and that such a relationship may not be inferred from Micromuse's disclosure of confidential business information [*33] to Network Harmoni and its then-counsel Gray Cary during negotiations for the acquisition of Network Harmoni. At present, however, there appears to be no dispute that [HN17]Micromuse is entitled to seek Gray Cary's disqualification based on Gray Cary's

prior representation of Micromuse's wholly owned subsidiary, Network Harmoni. *See generally Hartford Accident & Indem. Co. v. RJR Nabisco, Inc., 721 F. Supp. 534, 539-40 (S.D.N.Y. 1989)* (concluding that the plaintiff's law firm would be deemed to have previously represented the defendant where the plaintiff's law firm had previously represented the defendant corporation's subsidiary and the defendant corporation had taken in active role with regard to the law firm's representation of its subsidiary); *cf. Decora, 899 F. Supp. at 137* (concluding that the plaintiff could properly seek disqualification of the defendant's attorney in a patent infringement action where the attorney had previously represented the plaintiff's parent corporation, thereby learning certain of the plaintiff's trade secrets).

Assuming without deciding that the first prong of the test set forth in *Evans* has therefore been satisfied, [*34] Micromuse's motion for disqualification is denied nonetheless, since, to date, Micromuse has not met its burden of proof with respect to establishing a "substantial relationship" between Gray Cary's former representation of Network Harmoni and its current representation of Agilent. It has not been shown that Gray Cary gave Network Harmoni advice on the validity of the patents in suit, including whether there was infringement by Network Harmoni of the patents in suit. All that has been established is that Gray Cary advised Network Harmoni on corporate governance issues, employment matters, original equipment manufacturer ("OEM") agreements, patent and trademark filings, and financing instruments. [HN18]Prior general business representation by the plaintiff's law firm of an entity related to the defendant on matters unrelated to the lawsuit at issue does not meet the high burden of establishing a conflict. *See, e.g., In re Maritima Aragua, S.A., 847 F. Supp. 1177, 1182-83 (S.D.N.Y. 1994).*

The Micromuse products and services alleged to be violative of the Agilent patent will be identified as a consequence of the granting of Micromuse's motion for a more definite statement. [*35] Thereafter, discovery may be sought with respect to the knowledge and participation of Gray Cary in the development of any such accused products or services. Should this discovery yield additional facts establishing that the prior representation of Network Harmoni by Gray Cary dealt with issues presented in this action, leave is granted to Micromuse to renew its disqualification motion, which motion is denied at this time.

**Conclusion**

For the reasons set forth above, Micromuse's motion to dismiss the complaint is denied and its motion for a more definite statement is granted. Agilent is directed to comply with the grant of Micromuse's motion for a more definite statement by filing and serving an amended complaint within thirty (30) days of entry of this order and opinion. In addition, Micromuse's motions to add H P as a party and to disqualify Gray Cary are denied at this time with leave to renew. Agilent's motion to file a supplemental declaration is granted.

It is so ordered.

**ROBERT W. SWEET**

**U.S.D.J.**

# EXHIBIT 2

LEXSEE



Cited
As of: Sep 05, 2007

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Plaintiff v. CONNER PERIPHERALS, INC., Defendant**

**NO. C 93 20591 RMW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**1994 U.S. Dist. LEXIS 2884; 30 U.S.P.Q.2D (BNA) 1315**

**January 26, 1994, Decided
January 28, 1994, Filed**

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff moved to dismiss defendant's second counterclaim alleging patent infringement for failure to join defendant's licensee as an indispensable party pursuant to Fed. R. Civ. P. 12(b)(7) and 19.

**OVERVIEW:** Plaintiff moved to dismiss plaintiff's counterclaim for patent infringement, on the grounds that defendant's failure to join its licensee prevented plaintiff from full and complete adjudication of its rights and liabilities. Defendant argued that the motion to dismiss had to be denied because it was untimely, the licensee was not an indispensable party since it did not have standing on its own to sue plaintiff, and the licensee stipulated to the court the fact that it had no standing and would be bound by the outcome of the case. The court found the motion timely, however, and was unpersuaded by plaintiff's arguments for joinder. The court determined that according to the licensing agreement, which was confirmed by the licensee's stipulation, the licensee had no independent right to sue. The court concluded that failure to join the licensee did not leave plaintiff subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations, and thus denied the motion to dismiss.

**OUTCOME:** The court denied plaintiff's motion to dismiss defendant's second counterclaim for failure to join defendant's licensee as an indispensable party because the licensee had no standing to sue or subject plaintiff to multiple claims.

**CORE TERMS:** patent, indispensable party, infringement, co-owner, join, counterclaim, joined, exclusive right, assignee, patent infringement, infringer, motion to dismiss, substantial risk, side agreement, licensee, joinder, incurring, license, double, assign, patentee, sublicense, invention, assigned, jointly, involuntary, policy underlying, right to exclude, undivided part, equal footing

### LexisNexis(R) Headnotes

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN1] See Fed. R. Civ. P. 19.

*Civil Procedure > Parties > Joinder > Necessary Parties*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN2] All co-owners of a patent must join in bringing a suit for infringement.

Case 1:07-cv-03948-DLC    Document 16    Filed 09/21/2007    Page 27 of 85

1994 U.S. Dist. LEXIS 2884, *; 30 U.S.P.Q.2D (BNA) 1315

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
*Patent Law > Ownership > Conveyances > Licenses*
[HN3] Patent owners have standing to sue for patent infringement, but licensees of patent owners do not have standing to sue on their own.

*Civil Procedure > Parties > Joinder > Necessary Parties*
*Patent Law > Ownership > Conveyances > Equitable Assignments & Joint Ownership*
[HN4] Co-owners may avoid the inconvenience or undesirability of the joinder rule by structuring their interests so that one party is no longer in law an owner.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation*
*Civil Procedure > Parties > Joinder > Indispensable Parties*
*Civil Procedure > Pretrial Judgments > Judgment on the Pleadings*
[HN5] Fed. R. Civ. P. 12(h)(2) preserves the defense of failure to join an indispensable party under Rule 19, providing a defense of failure to join an indispensable party under Rule 19 may be made in any pleading permitted or ordered under Rule 7(1), or by motion for judgment on the pleadings, or at the trial on the merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation*
*Civil Procedure > Parties > Joinder > Indispensable Parties*
*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN6] One does not waive the defense of failure to join an indispensable party by filing a responsive pleading. The failure to join an indispensable party can be raised at any time.

**JUDGES:** [*1]  WHYTE

**OPINION BY:** RONALD M. WHYTE

**OPINION:**

ORDER DENYING COUNTERCLAIM DEFENDANT'S MOTION TO DISMISS SECOND COUNTERCLAIM FOR FAILURE TO JOIN AN INDISPENSABLE PARTY

Counterclaim defendant International Business Machines Corporation's ("IBM") motion to dismiss counterclaim plaintiff Conner Peripheral's ("Conner") second counterclaim was heard on January 7, 1994. The court has read the moving and responding papers and heard the oral argument of counsel. The court has also considered the stipulation filed by Alps Electric Co., Ltd. ("Alps") and the parties' comments relating thereto. For the reasons set forth in this opinion, the court denies defendant's set motion.

## I. BACKGROUND

On August 11, 1993, IBM filed a complaint against Conner seeking declaratory relief. IBM did not name Alps as a defendant in that complaint. In the eleventh claim for relief, IBM seeks a judicial declaration that the U.S. Patent No. 4,933,785 (the Morehouse '785 patent) is invalid and/or not infringed.

On September 27, 1993, Conner filed its answer to IBM's complaint as well as a number of counterclaims. The second counterclaim alleged infringement by IBM of the Morehouse '785 patent. Conner did not join Alps as a party. On October  [*2]  5, 1993, IBM answered Conner's counterclaim. IBM did not raise failure to join an indispensable party as an affirmative defense, nor did IBM concurrently file a motion to dismiss under Rule 12(b)(7). On November 12, 1993, IBM moved to dismiss Conner's second counterclaim for failure to join Alps as an indispensable party.

On May 29, 1992 Prairietek Corporation, a debtor in a Chapter 11 case, assigned the Morehouse '785 patent and several other patents to Conner Peripherals jointly with Alps, a Japanese corporation. Another instrument, an Asset Purchase Agreement dated March 20, 1992, confers rights in the Morehouse '785 patent to Alps, Conner, and Alps Electric U.S.A. n1

> n1 IBM does not seek to join Alps Electric, U.S.A. as an indispensable party at this time.

On April 2, 1992 Conner Peripherals and Alps signed a side agreement. Paragraph 6 of that agreement provides that Alps and Conner would acquire the Morehouse '785 patent as well as other patents from Prairietek "such that title to such patents shall be held by [*3]  [Conner] and [Alps] as joint owners". The side agreement also provides in pertinent part:

> It is agreed that Conner shall have the following exclusive rights with respect to the Patents, which it shall be entitled to exercise in its sole discretion without any

Case 1:07-cv-03948-DLC     Document 16     Filed 09/21/2007     Page 28 of 85

1994 U.S. Dist. LEXIS 2884, *; 30 U.S.P.Q.2D (BNA) 1315

duty of consultation with Alps: (i) the exclusive right to offer, negotiate and grant licenses and sublicenses. . . (ii) the exclusive right to prosecute continuations of the patents and any and all patent applications. . . (iii) the exclusive right to enforce, refrain from enforcing, compromise and settle any claim of infringement by any third party and to manage and determine the cost of such actions . . . (vi) . . . the exclusive right to receive all payments and cross licenses from any such transactions and v) the right to assign or transfer its interests in any or all of the patents provided that the assignee shall become bound by the terms of this Section 5.

Therefore, pursuant to this agreement, Alps may not sue anyone for infringement of the Morehouse '785 patent and cannot force Conner to sue anyone for infringement. The agreement also prohibits Alps from offering licenses or sublicenses in any interest in [*4] the patent. In addition, Alps cannot prevent Conner from offering licenses or sublicenses in any interest in the patent and Alps is not free to assign its interest in the patent without Conner's consent.

During the pendency of the instant motion, a stipulation was filed wherein Alps confirmed its agreement with Conner and specifically acknowledged that it would be bound by the outcome of the lawsuit and that it has no right to independently litigate any rights under the '785 patent against IBM or Western Digital or their customers and their licensees under the '785 patent.

IBM moves to dismiss Conner's second counterclaim pursuant to Rule 12(b)(7) and 19 of the Federal Rules of Civil Procedure because IBM contends that Alps is an indispensable party to Conner's second counterclaim. IBM argues that it cannot be assured of full and complete adjudication of its rights and liabilities with regards to the Morehouse '785 patent in Alps absence from this litigation. IBM also states that the court cannot make any ruling as to Alps' ownership interest in the Morehouse '785 patent that would bind Alps in any subsequent litigation because Alps is not before the court. IBM cites Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 329, 28 L. Ed. 2d 788, 91 S. Ct. 1434 (1971) [*5] for the proposition that litigants may not be collaterally estopped if "they never had a chance to present their evidence and arguments on a claim." IBM, therefore, argues that it can only be assured protection against multiple litigation if the motion is granted.

Conner's contends that the motion to dismiss must be denied because 1) IBM's motion to dismiss is untimely; 2) Alps is not an indispensable party since it is, in effect, a licensee of the Morehouse '785 patent who does not have standing to sue IBM for infringement of the '785 patent; and 3) Alps' stipulation should remove any concern IBM has as to the potential for a subsequent suit by Alps.

## II. LEGAL STANDARDS

Fed. Rule Civ. Pro. 19 sets forth the conditions under which a person must be joined in a suit for that action to proceed. Rule 19(a) provides:

> [HN1] Joinder of Persons Needed for Just Adjudication (a) Persons to Be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he [*6] claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

[HN2] All co-owners of a patent must join in bringing a suit for infringement. Chisum, Patents, § 21.03[3], 21-295. In Waterman v. Mackenzie, 138 U.S. 252, 255, 34 L. Ed. 923, 11 S. Ct. 334 (1891) the court stated that [HN3] patent owners have standing to sue for patent infringement, but licensees do not have standing to sue on their own. Since all co-owners have standing to sue for infringement, if all [*7] the co-owners are not joined in an infringement suit, there may be a risk that the defendant will be subject to multiple suits. Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875 (Fed. Cir. 1991) (policy underlying requirement of joining owners is to prevent possibility of

two suits against a single infringer.) When one co-owner sues for patent infringement, the court will find the non-joined co-owner indispensable to protect a defendant from the "justifiable fear that should [it] prevail and the court determine that the patent in suit is either invalid or not infringed, the remaining joint owners might still relitigate these issues at a later date in another costly and vexatious proceeding." Willingham v. Star Cutter Co., 555 F.2d 1340, 1345 (6th Cir. 1977). [HN4] Co-owners may avoid the inconvenience or undesirability of the joinder rule by structuring their interests so that one party is no longer in law an "owner". Rawlings v. National Molasses Co., 394 F.2d 645 (9th Cir. 1968); Chisum, Patents, § 21.03[3][d], 21-296, n. 23.

This court will consider plaintiff's [*8] motion with these standards in mind.

### III. ANALYSIS

#### A. Is the motion timely?

Conner argues that IBM's motion to dismiss must be denied because it was not made in either a pre-answer motion under Rule 12(b)(7) or in the answer itself. IBM filed an answer to Conner's second counterclaim on October 5, 1993. IBM filed this motion to dismiss on November 12, 1993.

Rule 12(h)(2) [HN5] preserves the defense of failure to join an indispensable party under Rule 19: "A defense of . . . failure to join an indispensable party under Rule 19 . . . may be made in any pleading permitted or ordered under Rule 7(1), or by motion for judgment on the pleadings, or at the trial on the merits." [HN6] One does not waive the defense of failure to join an indispensable party by filing a responsive pleading. The failure to join an indispensable party can be raised at any time. McShan v. Sherrill, 283 F.2d 462, 464 (9th Cir. 1960); CP Nat. Corp. v. Bonneville Power Admin., 928 F.2d 905, 911-12 (9th Cir. 1991). ("the issue [of failure to join an indispensable party] can be properly raised at any stage in the proceedings.")

Therefore, IBM's motion is timely [*9] made.

#### B. Is Alps an indispensable party?

IBM contends that Alps is an indispensable party because it is a joint owner of the Morehouse '785 patent. IBM points to 1) the assignment of patent rights from Prairietek that lists Conner and Alps as joint assignees and 2) the Asset Purchase Agreement between Prairietek, Conner and Alps that confirms that Conner and Alps jointly purchased from Prairietek the Morehouse '785 patent (together with several other patents). IBM argues that as patent co-owners, Conner and Alps fall into what the Supreme Court in Waterman describes as the "second case".

In Waterman, the court states:

> The patentee or his assigns may, by instrument in writing, assign, grant, and convey either, 1st, the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States (citation omitted). A transfer of either of these three kinds of interests is an assignment properly speaking, and vests in the assignee a title in so much of the patent itself, [*10] with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. [citation omitted].
>
> Waterman, supra, 138 U.S. at 255.

IBM states that since Waterman, courts have held that all patent co-owners (the second case in Waterman) are indispensable parties under Rule 19 in suits for patent infringement. Willingham v. Star Cutter Co., 555 F.2d 1340, 1343 (6th Cir. 1977); Switzer Bros. Inc. v. Byrne, 242 F.2d 909, 912 (6th Cir. 1957); Hurd v. Sheffield Steel Corp., 181 F.2d 269, 271 (8th Cir. 1950).

In opposition, Conner states that Alps does not fall under the second case in Waterman. Citing Gayler v. Wilder, 51 U.S. 477, 493, 13 L. Ed. 504 (1850), Conner contends that it is not a co-owner because Alps is not on an equal footing [*11] with Conner. In Gayler, the court stated that "a patentee may assign his whole interest, or an undivided part of it. But if he assigns a part under this section, it must be an undivided portion of his entire interest under the patent, placing the assignee upon an equal footing with himself for the part assigned." Conner argues that since the Conner-Alps agreement does not give Alps the right to sue or to transfer, Alps does not have an undivided interest in these rights, and is, therefore, not an assignee, or owner of the patent and, therefore, not an indispensable party.

Conner further argues that there is no risk of multiple litigation, or even the possibility of litigation by Alps against IBM, because an entity that is prohibited by

contract from suing for patent infringement lacks standing to bring such a suit.

In opposition, IBM argues that the Conner-Alps side agreement fails to provide assurance that there is no risk of multiple litigation. IBM cites Willingham v. Star Cutter Co., 555 F.2d 1340 (6th Cir. 1977) and Valutron, N.V. v. NCR Corp., 99 F.R.D. 254 (S.D. Ohio 1982) for the proposition that [*12] requiring that all patent co-owners join in an action for infringement is not avoided by agreements' allocating amongst a patent's owners the right to sue for infringement.

In Star Cutter, a patent co-owner sued a third party for patent infringement. The co-owner had a written agreement providing that either could sue for infringement in its sole discretion if the other refused or failed to join in the suit. The Sixth Circuit held that, notwithstanding the agreement, involuntary joinder was proper to protect the defendant's justifiable fear of multiple litigation. Id. at 1345.

In Valutron, several minority owners of a patent signed an agreement restricting their ability to license, enforce, and assign the patent. Id. at 256. The minority owners could not enforce the patent except on written consent of the majority owners. Although the minority owners signed powers of attorney authorizing the infringement suit and agreed to be bound by any decision, the court held that Star Cutter was dispositive and that dismissal was required because the minority owners had neither joined in the suit voluntarily nor been joined as involuntary plaintiffs.

In opposition, Conner [*13] argues that Star Cutter is distinguishable because there was a risk of multiple litigation despite the agreement in Star Cutter while there is no risk of multiple litigation in the instant case. Conner contends that Valutron is inconsistent with all the case law concerning ownership. Conner cites Refac International Ltd. v. Visa USA, Inc., 1990 U.S. Dist. LEXIS 11942, 16 U.S.P.Q. 2d 2024 (N.D. Cal. 1990) for the proposition that the right to make, sell and lease is insufficient to constitute an assignment. The court stated that an agreement's substantive provisions must be analyzed to determine whether the patentee transferred substantially all rights in the patent or whether the patentee retained significant incidents of ownership. Id. at 2027. The court found that a transferee's unfettered right to transfer its interest in the patent is a prerequisite to finding a transferee an assignee. Id. at 2029. Conner also cites Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870 (Fed. Cir. 1991) to demonstrate the overriding importance of the right to sue in determining whether [*14] an entity is an assignee.

IBM states that the cases cited by Conner are irrelevant because they deal with the circumstances under which a licensee has standing to sue. IBM contends that these cases turn on whether the license agreement grants all substantive rights in the patent including the sole right to sue alleged infringers. If so, the courts hold that the plaintiff has standing to sue for infringement. Vaupel, supra, 844 F.2d at 876. If not, plaintiff lacks standing to sue. Calgon Corp. v. Nalco Chemical Co., 726 F. Supp. 983 (D. Del. 1989); Raber v. Pittway Corp., 1992 U.S. Dist. LEXIS 6379, 23 U.S. P.Q. 2d 1313, 1315 (N.D. Cal. 1992); Refac Int'l Ltd. v. Visa USA Inc., 1990 U.S. Dist. LEXIS 11942, 16 U.S. P.Q. 2d 2024, 2029 (N.D. Cal. 1990). IBM argues that these cases are inapposite because the instant case does not involve, standing, and there is no allegation that Conner lacks standing. IBM contends that none of these cases stands for the proposition that a record owner of a patent who has given up the exclusive right [*15] to sue for infringement ceases to be a co-owner and therefore an indispensable party.

In opposition, Conner states that the issue is not whether Conner lacks standing but whether Alps lacks standing. If Alps lacks standing to sue, Conner argues, IBM's fear of multiple litigation is groundless. Moreover, Conner argues that, in cases such as Vaupel, the court determines whether the provisions of Rule 19(a) have "been transgressed". In Vaupel the court states:

> This grant [of the right to sue] is particularly dispositive here because the ultimate question confronting us is whether Vaupel can bring suit on its own or whether Marowsky must be joined as a party. The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. (citations omitted.) This policy is not undercut here because the right to sue rested solely with Vaupel. . . . The district court's decision and our affirmance thereof, assure that the provisions of [rule 19(a)] have not been transgressed: complete relief can be afforded among those already parties and there is no substantial risk of a [*16] party incurring double obligations. 944 F.2d at 875-76.

Citing Vaupel, supra, 944 F.2d at 874, IBM urges the court "to examine the substance of what was granted." IBM contends that Alps is a co-owner of the patent and that the side agreement did not change that substance. Therefore, IBM argues that Alps is an indispensable party under Rule 19.

1994 U.S. Dist. LEXIS 2884, *; 30 U.S.P.Q.2D (BNA) 1315

The court finds IBM's argument unpersuasive. Co-owners may avoid "the inconvenience or undesirability of the joinder rule by structuring their interests so that one party is no longer in law an "owner". Chisum, Patents, § 21.03[3], 21-296, n. 23 citing Rawlings v. National Molasses Co., 394 F.2d 645 (9th Cir. 1968). In Rawlings, plaintiff and Feed Service were the joint owners of a patent. Feed Service then assigned to plaintiff all of its rights in the patent, and plaintiff granted to Feed Service an unlimited, royalty free, non-exclusive, non-cancelable right to make, use and sell with a right to sublicense. Plaintiff brought suit for patent infringement. Defendants moved to dismiss the action contending that Feed Service was an indispensable [*17] party. The court held that Feed Service's right is not equivalent to an ownership right because it includes no right to exclude others, which is the essence of the property interest in a patent. The court stated that "the common law and not the patent law gives an inventor the right to make, use and sell his invention. Patent law gives him the license to sue - the right to exclude others from using the invention. . . . An owner of something less than monopoly rights may not sue for patent infringement." Id. at 647-48. The court found that "the absence of Feed Service as a party does not leave the defendants subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations (Fed.R.Civ.P. 19(a)(2)(ii)) because no matter what the outcome of this litigation there is no substantial risk of the defendants being troubled with actions brought by Feed Service. Feed Service has no capacity to sue strangers for infringement of the patent." Id. at 647.

According to the side agreement, confirmed by Alps' stipulation, Alps has no right to sue any infringers and cannot make Conner sue infringers. Alps does [*18] not have the right to sue an infringer even if Conner refuses to do so. Rule 19(a)(2)(ii) provides that joinder is necessary if "the person's absence . . . leave[s] any of the person's already parties' subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Alp's absence does not leave IBM subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations. IBM argues that it might be subject to multiple litigation because Conner and Alps could alter the side agreement. This argument fails because IBM's fear is hypothetical. IBM has not shown that it faces a present threat of multiple litigation or inconsistent obligations.

The court does not find Alps to be a necessary party because IBM does not face a substantial risk of incurring double, multiple, or otherwise inconsistent obligations.

### IV. ORDER

Counterclaim defendant's motion to dismiss counterclaim plaintiff's second counterclaim for failure to join an indispensable party is denied.

DATED: 1/26/94

RONALD M. WHYTE

United States District Judge

# EXHIBIT 3

LEXSEE



Cited
As of: Sep 05, 2007

**MICHAELS OF OREGON CO., an Oregon corporation, Plaintiff, v. MIL-TECH, INC., a Missouri corporation, Defendant.**

**Civil No. 95-908-MA**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON**

**1995 U.S. Dist. LEXIS 20875; 38 U.S.P.Q.2D (BNA) 1060**

**October 16, 1995, Decided**
**October 17, 1995, FILED**

**DISPOSITION:** [*1] Defendant's motion to dismiss for failure to join Bianchi as an indispensable party (#10-1) and to reserve motion to dismiss (#10-2) DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In patent infringement action before U.S. District Court (Oregon) under Patent Act, 35 U.S.C.S. § 1 et seq., defendant moved to dismiss for lack of subject matter jurisdiction and failure to join indispensable party, under Fed. R. Civ. P. 12(b)(1) and 12(b)(7), respectively.

**OVERVIEW:** Plaintiff sued defendant for patent infringement under the Patent Act, 35 U.S.C.S. § 1 et seq., alleging that defendant had made and sold gun holsters that infringed upon three of plaintiff's patents. Defendant moved to dismiss for lack of subject matter jurisdiction and failure to join an indispensable party, under Fed. R. Civ. P. 12(b)(1) and 12(b)(7), respectively. The court denied defendant's motions, holding that although the disputed third party had patent ownership rights, the third party did not have a right to sue for infringement according to an agreement between the third party and plaintiff. Therefore, the court held that the third party was a dispensable party under Fed. R. Civ. P. 19(a) and that plaintiff's failure to join did not prejudice defendant, did not risk an imposition of multiple obligations upon defendant, and adequately covered the third party's interests.

**OUTCOME:** Court denied defendant's motion to dismiss for lack of subject matter jurisdiction and failure to join an indispensable party in patent infringement action because third party had no right to sue, defendant was not prejudiced or subject to multiple obligations, and plaintiff's action adequately covered the third party's interests.

**CORE TERMS:** patent, infringement, join, indispensable party, patent infringement, motion to dismiss, substantial risk, infringer, co-owner, joinder, right to file, holsters, declaration, joined, double, percent interest, volume, infringing, undivided, assigned, selling, venue, complete relief, final judgment, file suit, incurring, accorded

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
*Civil Procedure > Parties > Capacity of Parties > General Overview*
*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN1] See Fed. R. Civ. P. 19.

*Civil Procedure > Parties > Joinder > Necessary Parties*
*Civil Procedure > Parties > Joinder > Permissive Joinder*

Case 1:07-cv-03948-DLC    Document 16    Filed 09/21/2007    Page 34 of 85

1995 U.S. Dist. LEXIS 20875, *; 38 U.S.P.Q.2D (BNA) 1060

*Patent Law > Ownership > Conveyances > General Overview*
[HN2] Since the introduction of Fed. R. Civ. P. 19, courts are less concerned with abstract characterizations of parties and more concerned with whether the rights of parties can be fairly adjudicated absent joinder of a patent co-owner.

**COUNSEL:** Donald B. Haslett, Bruce W. DeKock, Portland, OR, Attorneys for Plaintiff.

Michael Yakimo, Overland Park, KS. Alan T. McCollom, Scott A. Schaffer, Portland, OR, Attorneys for Defendant.

**JUDGES:** Malcolm F. Marsh, United States District Judge

**OPINION BY:** Malcolm F. Marsh

**OPINION:**

OPINION & ORDER

MARSH, Judge

Plaintiff, Michaels of Oregon, Co., filed this patent infringement action alleging that defendant, Mil-Tech, Inc., violated 35 U.S.C. §§ 1 et seq. by making, using and selling hand gun holsters that infringe on three of plaintiff's patents. Plaintiff alleges that it is an owner of United States Letter Patent Nos. 4,485,947, and 4,485,948 granted December 4, 1984 (the '947 and '948 patents, respectively), and United States Letter Patent 4,620,654 granted November 4, 1986 (the '654 patent). Plaintiff contends that defendant is selling and shipping its infringing holsters into Oregon.

Defendant moves to dismiss plaintiff's complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) and failure to join an indispensable party under [*2] Fed.R.Civ.P. 12(b)(7). Defendant contends that Bianchi International (Bianchi) is the holder of one-half of plaintiff's interest in each of the three allegedly infringed patents thus making Bianchi an indispensable party to this action. Defendant also seeks to reserve its right to file a motion to dismiss for improper venue under Fed.R.Civ.P. 12(b)(3) once plaintiff has identified the infringing holsters of defendant. For the reasons which follow, defendant's motion to dismiss is denied.

Discussion

[HN1] .Fed.R.Civ.P. 19 provides the conditions under which a party must be joined. Rule 19 (a) states, in part:

Joinder of Persons Needed for Just Adjudication

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest [*3] or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. .

Traditionally, co-owners of a patent were considered indispensable parties in a patent infringement action. Waterman v. Mackenzie, 138 U.S. 252, 255, 34 L. Ed. 923, 11 S. Ct. 334 (1891) (patent owners have standing to sue for patent infringement while licensees will have standing only when the patent owner joins suit). Courts have reasoned since all co-owners have standing to sue for infringement, if one of the co-owners fails to join, the defendant may risk being subject to multiple actions. Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875 (Fed. Cir. 1991); Willingham v. Lawton, 555 F.2d 1340, 1345 (6th Cir. 1977). It is possible, however, for parties to structure their joint ownership agreements so that only one of the parties retains a complete ownership interest in the patent, an interest that includes the right to bring actions for infringement. [HN2] Rawlings v. National Molasses Co., 394 F.2d 645, 647 (9th Cir. 1968).

Since the introduction of Fed.R.Civ.P. [*4] 19, courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of a patent co-owner. Rawlings, 394 F.2d 645, I.B.M. Corp. v. Conner Peripherals Inc., 1994 U.S. Dist. LEXIS 2884, 30 U.S.P.Q.2D (BNA) 1315 (N.D.Cal. 1994), see also Wright & Miller, Federal Practice and Procedure, Volume 7, § 1614, p. 204 (1986).

In Rawlings, the plaintiff and Feed Service were joint owners of a patent. While the litigation was pending, Feed Service assigned all of its rights in the patent to plaintiff and plaintiff gave Feed Service a 'Patent License Grant' which allowed Feed Service "an unlimited, royalty-free, non-exclusive, and non-

1995 U.S. Dist. LEXIS 20875, *; 38 U.S.P.Q.2D (BNA) 1060

cancelable right and license to make, use and sell the products and use the methods of said patents and each of them, and to sublicense others to do so." Rawlings, 394 F.2d 645, 647. The district court dismissed the action concluding that, notwithstanding the agreement, Feed Service was an indispensable party. Id. at 645. The Ninth Circuit reversed holding that "the absence of Feed Service as a party does not leave defendants subject to a substantial [*5] risk of incurring double, multiple or otherwise inconsistent obligations because no matter what the outcome of this litigation there is no substantial risk of the defendants being troubled with actions brought by Feed Service. Feed Service has no capacity to sue strangers for infringement of the patent." Id.

The issue before this court is whether, absent Bianchi's joinder as a plaintiff, complete relief can be accorded and whether Mil-Tech will be subject to a substantial risk of duplicitous litigation. Defendant contends that Bianchi is an indispensable party because it holds a 50% interest in the three patents. Plaintiff argues that Bianchi is not a necessary party because a January 1, 1986 agreement between Bianchi and plaintiff provides that only plaintiff may file actions for patent infringement. n1 This agreement states, in part:

> 10. Infringements -- It is the understanding of the parties that MICHAELS will diligently enforce THE PATENTS against any infringement which, by its character and volume, is commercially significantly harmful to MICHAELS or BIANCHI . . BIANCHI shall fully cooperate with and assist MICHAELS in enforcing THE PATENTS against any infringement, [*6] and shall join voluntarily as a plaintiff in any suit brought by MICHAELS against any alleged infringer of THE PATENTS. . . MICHAELS and BIANCHI agree that MICHAELS shall control the conduct of any action taken to enforce THE PATENTS, including the making of any decision to file suit or not to file suit against any alleged infringer, and the making of any decision to settle and the terms of any settlement with an alleged infringer, either before of after filing suit.

n1 A February 20, 1986 agreement between Michaels and Bianchi transferred to Bianchi an undivided fifty percent interest in Cook U.S. Patent No. 4,485,947 and Cook U.S. Patent No.

4,485,948. On July 16, 1986, Michaels assigned to Bianchi an undivided fifty percent interest in United States patent application Serial No. 789,931 which became Cook U.S. Patent No. 4,620,654 on November 4, 1986, the date the patent issued.

Plaintiff has also submitted the declaration of Gary W. French, President of Bianchi, that states Bianchi will not directly [*7] or indirectly contest the result of any final judgment with respect to this infringement action.

By its terms, I find that the contract between Bianchi and plaintiff grants Bianchi certain ownership rights in the patents, but the right to file an action for infringement remains exclusively with plaintiff. Thus, like the situation in Rawlings, Bianchi has no independent capacity to file a claim for patent infringement. Accordingly, Bianchi's failure to join will not prejudice defendant. In light of the French declaration, I also find that Bianchi's interests will be adequately protected absent its joinder. Further, considering the agreement and this declaration together, I find that defendant's fear that it will incur a substantial risk of double, multiple or otherwise inconsistent obligations is unfounded as Bianchi has no right to sue infringers even if Michaels refuses to do so and Bianchi has consented to be bound by the final judgment in this action. Under Fed.R.Civ.P. 19 (a) I conclude that Bianchi is a dispensable party to this action.

Defendant also argues that the court should enforce the contractual obligation Bianchi has to Michaels to "join voluntarily as a plaintiff [*8] in any suit brought by MICHAELS against any alleged infringer of THE PATENTS." Although this clause in the agreement relates to the rights and responsibilities between Bianchi and Michaels, it is irrelevant to the issue of whether Bianchi is an indispensable party in this action. Further, defendant lacks standing to seek enforcement of this agreement as it is not a third party beneficiary to the contract between Michaels and Bianchi.

Defendant has requested that the court preserve its right to file a motion to dismiss for improper venue under Fed.R.Civ.P. 12(b)(3) pending further discovery. This request is one the court cannot properly decide at this time. Accordingly, defendant's motion to dismiss for failure to join Bianchi as an indispensable party (#10-1) and to reserve motion to dismiss (#10-2) is DENIED.

IT IS SO ORDERED.

DATED this 16 day of October, 1995.

Malcolm F. Marsh

United States District Judge

# EXHIBIT 4

LEXSEE



Positive
As of: Sep 05, 2007

**E-Z BOWZ, L.L.C., Plaintiff, -v.- PROFESSIONAL PRODUCT RESEARCH CO., INC., Defendant. PROFESSIONAL PRODUCT RESEARCH CO., INC., Third-Party Plaintiff, -v.- DEBORAH LEA CAVENDER, et al., Third-Party Defendants.**

**00 Civ. 8670 (LTS) (GWG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2003 U.S. Dist. LEXIS 15364**

**September 5, 2003, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., 2003 U.S. Dist. LEXIS 18774 (S.D.N.Y., Oct. 23, 2003)
Adopted by E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., 2005 U.S. Dist. LEXIS 3453 (S.D.N.Y., Mar. 8, 2005)

**PRIOR HISTORY:** E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., 2003 U.S. Dist. LEXIS 15257 (S.D.N.Y., Sept. 5, 2003)

**DISPOSITION:** Recommended that plaintiff's motion for partial summary judgment be granted, defendant's motion for summary judgment be granted in part and denied in part, and defendant's previously filed motion to dismiss or, in alternative for summary judgment, be denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder filed suit against defendant alleged infringer for patent infringement, trade dress infringement, and common law unfair competition. The infringer filed a counterclaim and third-party complaint raising claims of antitrust violations, unfair competition, fraud, trade libel, and tortious interference with business relations. Both parties moved for summary judgment and dismissal. The matter was referred to a magistrate.

**OVERVIEW:** The patents at issue concerned a bow making apparatus. The patent holder claimed that the infringer had infringed upon its trade dress by selling a product that lead consumers to believe that the infringer's product was in some manner related to or approved by the patent holder. The infringer argued that the patents in suit were invalid. The magistrate found that the patents were not invalid under the on-sale bar. The magistrate also found that summary judgment was inappropriate for the infringer's claim of invalidity for failure to name a co-inventor, reasoning that there was no deceptive intent. Next, the magistrate found that the patent holder had provided sufficient evidence that its trade dress carried a secondary meaning and that it was not functional. Regarding the infringer's Sherman Antitrust Act counterclaim, the magistrate found that the infringer had failed to define a relevant market, failed to prove the patent holder's market power, and failed to show that it suffered antitrust injury. Regarding the infringer's counterclaims for unfair competition, the magistrate found that the claims must be dismissed.

**OUTCOME:** The magistrate recommended that the patent holder's motion for partial summary judgment should be granted. The magistrate also recommended that the infringer's motion for summary judgment dismissing the patent claims should be granted in part and denied in part. The magistrate further recommended that the infringer's motion for summary judgment dismissing the patent holder's trade dress claims should be denied.

**CORE TERMS:** patent, bow, trade dress, summary judgment, reproduced, citations omitted, retaining, functional, invention, filing date, counterclaim, antitrust, apparatus, infringement, unfair competition, inventor, drawing, invalid, secondary meaning, examiner, relevant market, retainer, monopoly, dress, notice, antitrust laws, trade libel, tortious interference, invalidity, competitor

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN1]Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
[HN2]When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor. However, to survive a motion for summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. In other words, the non-movant must show enough that a jury could reasonably find for the nonmovant. Thus, statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment. In addition, the mere existence of a scintilla of evidence supporting the non-movant's case is also insufficient to defeat summary judgment.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*

*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
[HN3]In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim. Thus, a defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case.

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN4]Under 35 U.S.C.S. § 282, a patent is presumed valid and a party asserting invalidity not only has the procedural burden of proceeding first and establishing a prima-facie case, but the burden of persuasion on the merits remains with that party until final decision. A party claiming a patent is invalid bears the burden to establish such invalidity by clear and convincing evidence. However, once an alleged infringer has raised a prima facie case of invalidity, it falls to the patent owner to come forward with some evidence to the contrary sufficient to raise a genuine issue of material fact. The issue of the validity of a patent is decided under the law of the Federal Circuit.

*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > Elements*
[HN5]The rules of standing, whether as aspects of the U.S. Const. art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Civil Procedure > Declaratory Judgment Actions > General Overview*
*Patent Law > Remedies > Declaratory Relief*
[HN6]In order for a court to have jurisdiction to review a counterclaim for a declaratory judgment of invalidity as to patents, there must be an "actual controversy" between the parties. 28 U.S.C.S. § 2201(a). The party seeking the declaratory judgment bears the burden of establishing the existence of an actual controversy. Under Federal Circuit law, the party seeking the declaratory judgment can meet

its burden by demonstrating two elements: There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

***Patent Law > Date of Invention & Priority > General Overview***
***Patent Law > Statutory Bars > On Sale Bar > General Overview***

[HN7]An inventor is not entitled to patent an invention if the invention was on sale in this country, more than one year prior to the date of the application for patent in the United States. 35 U.S.C.S. § 102(b). The on-sale bar applies when the invention is the subject of a commercial offer for sale, and is ready for patenting before the critical date. In general, the on-sale bar starts to accrue when a completed invention is offered for sale.

***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Priority***

[HN8]35 U.S.C.S. § 120 allows a patent application to acquire the filing date of an earlier application if certain conditions are met.

***Patent Law > Date of Invention & Priority > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview***

[HN9]See 35 U.S.C.S. § 120.

***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Priority***

[HN10]Under 35 U.S.C.S. § 120, claims are granted the benefit of the filing date of an earlier-filed application only if the earlier application provides support according to 35 U.S.C.S. § 112, para. 1 for the later claims.

***Patent Law > Claims & Specifications > Definiteness > General Overview***
***Patent Law > Claims & Specifications > Description Requirement > General Overview***

[HN11]See 35 U.S.C.S. § 112.

***Patent Law > Claims & Specifications > Description Requirement > General Overview***

[HN12]The purpose of the written description requirement of 35 U.S.C.S. § 112 is to prevent an applicant from later asserting that he invented that which he did not.

***Patent Law > Claims & Specifications > Description Requirement > General Overview***
***Patent Law > Claims & Specifications > Enablement Requirement > General Overview***
***Patent Law > Date of Invention & Priority > General Overview***

[HN13]In order to satisfy 35 U.S.C.S. § 112's written description requirement the description must allow an artisan within the field to recognize what invention has been created. Whether or not an application complied with the written description requirement is a question of fact.

***Patent Law > Claims & Specifications > Description Requirement > General Overview***
***Patent Law > Claims & Specifications > Enablement Requirement > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview***

[HN14]In order to determine whether a prior application meets the "written description" requirement with respect to later-filed claims, the prior application need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to persons skilled in the art that as of the earlier date the applicant had invented what is now claimed.

***Patent Law > Infringement Actions > Summary Judgment > General Overview***
***Patent Law > Statutory Bars > On Sale Bar > General Overview***

[HN15]At least one court has denied summary judgment in the on-sale bar context when claims in a parent application were broader than those in a subsequent application, as long as a jury could conclude that they described the later claims.

***Patent Law > Claims & Specifications > Description Requirement > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Filing Requirements > Drawings***

[HN16]The Federal Circuit has held that under proper circumstances, drawings alone may provide a "written description" of an invention as required by 35 U.S.C.S. § 112.

***Patent Law > Claims & Specifications > Description Requirement > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Copendency & Disclosure***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Priority***

[HN17]Under 35 U.S.C.S. §120, no claimed subject matter is entitled to the benefit of the filing date of an earlier application unless that subject matter has been disclosed in every intervening application relied upon to establish a chain of codependency.

***Patent Law > Claims & Specifications > Description Requirement > General Overview***
***Patent Law > Claims & Specifications > Enablement Requirement > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview***

[HN18]Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed. It extends only to that which is disclosed. The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification. Rather, a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought. Although the exact terms need not be used in haec verba the specification must contain an equivalent description of the claimed subject matter. A description which renders obvious the invention for which an earlier filing date is sought is not sufficient.

***Patent Law > Inequitable Conduct > Burdens of Proof***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption***

[HN19]Omission of an inventor can invalidate a patent unless the omission was an error without any deceptive intention. However, every issued patent enjoys a presumption of validity. 35 U.S.C.S. § 282. Intent to mislead or to deceive must be proved by clear and convincing evidence. Deceptive intent is not inferred simply because information was in existence that was not presented to the examiner. Thus, in order to rebut the presumption of validity, a party challenging patent validity for omission of an inventor must present clear and convincing evidence that shows the patent is invalid.

***Civil Procedure > Federal & State Interrelationships > Erie Doctrine***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Causes of Action***

[HN20]In deciding non-patent issues, such as trade dress under § 43(a) of the Lanham Act, a district court applies regional circuit law.

***Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview***
***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***

[HN21]See 15 U.S.C.S. § 1125(a).

***Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview***
***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***

[HN22]The protection afforded by 15 U.S.C.S. § 1125(a) applies equally to claims involving unregistered trademarks and trade dress. Trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer.

***Trademark Law > Infringement Actions > Burdens of Proof***
***Trademark Law > Likelihood of Confusion > General Overview***
***Trademark Law > Subject Matter > Secondary Meaning > General Overview***

[HN23]To succeed in an action for trade dress infringement a plaintiff must show (a) that its trade dress is entitled to protection under the Lanham Act, and (b) that the defendant's dress infringes on the plaintiff's dress by creating a likelihood of confusion. If the plaintiff's trade dress is based on the design of its product it must have acquired a secondary meaning to be protected. However, if the trade dress is not solely based on the design of the product, a plaintiff may show that the trade dress is protected because it is either inherently distinctive or has a secondary meaning. Thus, when a claimed trade dress involves the actual product itself, secondary meaning must be proven. However, when the claimed trade dress involves features that are not actually the product itself, the dress may be protected without

proof of secondary meaning. A product has acquired a secondary meaning if in the minds of the public, the primary significance of a product feature is to identify the source of the product rather than the product itself.

*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Infringement Actions > Burdens of Proof*
*Trademark Law > Infringement Actions > Burdens of Proof*
*Trademark Law > Likelihood of Confusion > General Overview*

[HN24]To prove trade dress infringement, a plaintiff must prove that a likelihood of confusion exists.

*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Infringement Actions > Functionality Defense*

[HN25]A party accused of trade dress infringement can defeat such a charge by asserting that the claimed trade dress is functional. A product feature is functional, and cannot serve as trade dress, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article. The party asserting trade dress protection bears the burden of demonstrating its claimed device is not functional. 15 U.S.C.S. § 1125(a)(3). Finally, while a utility patent is strong evidence that the features therein claimed as trade dress are functional, a "design patent" can be presumptive evidence of non-functionality.

*Trademark Law > Conveyances > General Overview*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*
*Trademark Law > Subject Matter > Secondary Meaning > General Overview*

[HN26]The factors utilized to evaluate whether a claimed trade dress has secondary meaning include (1) advertising expenditures, (2) consumer studies linking the dress to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the dress's use. No factor is determinative and a court need not examine each factor to reach a decision.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*

*Civil Procedure > Summary Judgment > Standards > Materiality*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*

[HN27]The Second Circuit has noted that proof of secondary meaning entails vigorous evidentiary requirements and, therefore, careful weighing of the evidence necessary to determining secondary meaning renders it an unlikely candidate for summary judgment.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > General Overview*
*Trademark Law > Infringement Actions > Summary Judgment > General Overview*

[HN28]Cases have denied summary judgment where a party has submitted similar evidence regarding secondary meaning.

*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*
*Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview*
*Trademark Law > Subject Matter > Labels, Packaging & Trade Dress*

[HN29]To determine whether a claimed trade dress is functional the court must assess the degree of usefulness of the similar features on the competing dress, the degree of similarity between the non-useful, ornamental features of the packaging, and the feasibility of alternatives to the useful features. The factors should be considered along a continuum. On one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Utility Requirement > Proof of Utility*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*

[HN30]When trade dress features are among the claims established in the utility patent, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.

*Patent Law > Utility Requirement > Proof of Utility*

2003 U.S. Dist. LEXIS 15364, *

[HN31]In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as an ornamental pattern painted on features disclosed in the patent the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent.

***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
[HN32]One factor in establishing the non-functionality of a trade dress is a demonstration that feasible, or cost-effective, alternatives to the design exist.

***Patent Law > Infringement Actions > Design Patents***
***Patent Law > Subject Matter > Designs > Functionality***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Causes of Action***
[HN33]Courts have stated that the existence of a design patent is relevant to the functionality defense.

***Patent Law > Infringement Actions > Design Patents***
***Patent Law > Subject Matter > Designs > Functionality***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
[HN34]A design patent cannot be issued if the invention is functional. It follows that because a design patent is granted only for non-functional designs, it can serve as evidence that a plaintiff's trade dress is not functional. The expiration of a design patent does not remove its relevance to the functionality question.

***Civil Procedure > Summary Judgment > Opposition > General Overview***
***Civil Procedure > Summary Judgment > Standards > General Overview***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
[HN35]If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.

***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
[HN36]Trade dress accords protection to symbols consumers are likely to rely upon in distinguishing goods, while denying protection that would hamper efforts to market competitive goods.

***Antitrust & Trade Law > Clayton Act > General Overview***
***Antitrust & Trade Law > Private Actions > Standing > Clayton Act***
[HN37]Section 4 (15 U.S.C.S. § 15) of the Clayton Act is the provision that allows a private right of action for substantive violations of the antitrust laws.

***Civil Procedure > Summary Judgment > Standards > General Overview***
[HN38]Summary judgment serves a vital function in the area of antitrust law.

***Antitrust & Trade Law > Market Definition > Product Market***
***Antitrust & Trade Law > Market Definition > Relevant Market***
***Antitrust & Trade Law > Monopolization > Actual Monopolization > Claims***
[HN39]To demonstrate a monopolization violation of § 2 (15 U.S.C.S. § 2) of the Sherman Act, a plaintiff must show (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. To meet this burden, an antitrust plaintiff must establish the geographic scope of the market and define the actual product market. Products will be considered reasonably interchangeable if consumers treat them as "acceptable substitutes." The party alleging a violation of the antitrust laws has the burden of defining the relevant market and all of its relevant parts.

***Antitrust & Trade Law > Market Definition > Relevant Market***
***Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview***
[HN40]An antitrust complaint must explain why the market it alleges is the relevant, economically significant product market. Because a relevant market includes all products which are reasonably interchangeable, a plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
[HN41]Even on a motion to dismiss, an antitrust claim will be dismissed if a complaint fails to allege facts regarding substitute products, to distinguish among

apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand.

*Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > General Overview*
*Antitrust & Trade Law > Market Definition > General Overview*
*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN42]Merely obtaining a patent for a product does not create a product market for antitrust purposes.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
[HN43]The core element of a monopolization claim is market power, which is defined as the ability to raise price by restricting output. Market power may be proven in two ways: either directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage of the relevant market.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > General Overview*
*Patent Law > Ownership > Patents as Property*
[HN44]Neither the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability. Since a principal purpose of the patent system is to provide innovators with a property right upon which investment and other commercial commitments can be made the patentee must have the right of enforcement of a duly granted patent, unencumbered by punitive consequences should the patent's validity or infringement not survive litigation. The only exception to this statement is if the party initiates a sham litigation as a tactic to destroy competition.

*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN45]The standard to evaluate whether litigation qualifies as sham requires (1) the lawsuit must be objectively meritless such that no reasonable litigant could expect success on the merits and (2) it must be found that the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor. There is no need to evaluate the second step of the process unless the litigation is found to be objectively meritless.

*Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud*
*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN46]A court may infer monopoly power from a high market share.

*Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN47]The Federal Circuit has noted that unless a patent had been obtained by fraud such that the market position had been gained illegally, the patent right to exclude does not constitute monopoly power prohibited by the Sherman Act.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
[HN48]A party claiming an antitrust violation must prove the existence of antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The antitrust laws were enacted for the protection of competition not competitors. Thus, the party asserting a claim under the antitrust laws must allege not only cognizable harm to itself, but an adverse effect on competition market-wide. Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
[HN49]The United States Supreme Court has made clear that low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*

[HN50]The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had, under § 2 (15 U.S.C.S. § 2) of the Sherman Act, a dangerous probability of recouping its investment in below-cost prices.

***Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements***
***Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution***
***Criminal Law & Procedure > Scienter > Specific Intent***
[HN51]In order to state a claim for a conspiracy to monopolize a plaintiff must offer evidence that shows (1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.

***Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview***
[HN52]For a plaintiff to succeed on a claim of attempted monopolization it needed to show (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.

***Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview***
[HN53]Critical to deciding the dangerous probability prong of an attempted monopolization claim is defendant's economic power in the relevant market. Attempted monopolization requires some degree of market power.

***Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview***
***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > Causes of Action***
[HN54]See 15 U.S.C.S. § 1125(a).

***Civil Procedure > Justiciability > Standing > General Overview***
***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***

[HN55]In order to establish standing to sue under § 43(a) (15 U.S.C.S. § 1125(a)) of the Lanham Act, a plaintiff must demonstrate a reasonable interest to be protected against the advertiser's false or misleading claims, and a reasonable basis for believing that this interest is likely to be damaged by the false or misleading advertising. In order to have satisfied the "reasonable basis" prong, a plaintiff must submit specific evidence that the defendant's advertising causes direct harm to the product in which the plaintiff claims a pecuniary interest. While the plaintiff need not demonstrate that it has definitely lost sales because of defendant's advertisements the likelihood of injury and causation will not be presumed, but must be demonstrated in some manner.

***Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview***
***Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
[HN56]In the context of § 43(a) (15 U.S.C.S. § 1125(a)) of the Lanham Act, where a plaintiff seeks money damages, it must introduce evidence of actual consumer confusion.

***Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview***
***Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview***
***Trademark Law > Likelihood of Confusion > Intent > Presumptions***
[HN57]In the context of § 43(a) (15 U.S.C.S. § 1125(a)) of the Lanham Act, without any evidence tending to show the defendant acted with an intent to deceive, the plaintiff is not entitled to a presumption of deception.

***Governments > Courts > Common Law***
***Torts > Business Torts > Unfair Business Practices > General Overview***
[HN58]In a common law unfair competition claim under New York law, the plaintiff must show actual confusion in an action for damages and there must be some showing of bad faith.

***Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof***
***Torts > Business Torts > Fraud & Misrepresentation > General Overview***
[HN59]To prove a claim of fraud under New York law, a plaintiff must show by clear and convincing evidence (1)

the defendant made a material misrepresentation; (2) the defendant knew of its falsity; (3) the defendant possessed an intent to defraud; (4) the plaintiff reasonably relied on the misrepresentation; and (5) the plaintiff suffered damage as a result of the misrepresentation.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN60]A fraud claim may not rest on allegations of speculative or remote injury to the plaintiff; rather, the plaintiff must have suffered losses as a direct, immediate, and proximate result of the defendant's misrepresentation.

*Trademark Law > Federal Unfair Competition Law > General Overview*
*Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview*
*Trademark Law > Special Marks > Trade Names > Infringement*
[HN61]See N.Y. Gen. Bus. Law § 360-l.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
*Torts > Business Torts > Trade Libel > General Overview*
[HN62]New York does recognize a cause of action for trade libel as a common law tort. This cause of action allows for monetary relief.

*Trademark Law > Dilution of Famous Marks > General Overview*
[HN63]To state a claim for dilution under N.Y. Gen. Bus. Law § 360-l, a plaintiff must show (1) ownership of a distinctive mark, and (2) a likelihood of dilution.

*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
[HN64] N.Y. Gen. Bus. Law § 360-m requires a party to own a trademark in order to state a claim for damages.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
*Torts > Business Torts > Trade Libel > General Overview*
[HN65]The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN66]New York recognizes tortious interference with both existing contractual relations and prospective economic advantage.

*Contracts Law > Third Parties > General Overview*
*Patent Law > Inequitable Conduct > Burdens of Proof*
*Torts > Business Torts > Commercial Interference > Contracts > Elements*
[HN67]To assert a claim for tortious interference with contractual relations under New York law a plaintiff must prove (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to the plaintiff. Where the alleged interference involves defendant's assertion of patent rights, the plaintiff must also prove that the defendant was acting in bad faith.

*Civil Procedure > Summary Judgment > Evidence*
*Patent Law > Infringement Actions > Summary Judgment > General Overview*
[HN68]Because the law recognizes a presumption that the assertion of a duly granted patent is made in good faith, defendants are charged with the task of coming forward with some affirmative evidence of bad faith in order to survive a motion for summary judgment.

*Contracts Law > Third Parties > General Overview*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN69]A claim for tortious interference with economic advantage requires four elements: (1) a prospective contractual relation or business with a third party; (2) defendants' interference with that relation; (3) defendant acted with the sole purpose of harming plaintiff or used dishonest, unfair or improper means; and (4) injury to the plaintiff. In addition, a higher degree of interference is required for this tort than a claim for tortious interference with contract. This tort is also subject to the same bad faith requirement as just described with respect to an assertion of patent right.

**COUNSEL:** For E-Z Bowz, LLC, PLAINTIFF: Edward Vincent Di Lello, Darby & Darby, PC, New York, NY USA. John O Threadgill, John O Threadgill, PC, Knoxville, TN USA. Andrew S Neely, Luedeka, Neely & Graham, PC, Knoxville, TN. Richard W Barnes, Jr, Luedeka, Neely & Graham, PC, Knoxville, TN USA.

For Professional Product Research Company, Inc, DEFENDANT: Hiram D Gordon, Janvey, Gordon, Herlands, Randolph, Rosenberg & Cox, LLP, New York, NY USA. Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA. John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

Professional Product Research Company, Inc, THIRD-PARTY PLAINTIFF: Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA. John W Wheeler, Hodges & Carson, PLLC, Knoxville, TN USA.

For Deborah Lea Cavender, Arthur D Cavender, E-Z Crafts, LLC, THIRD-PARTY DEFENDANTS: Edward Vincent Di Lello, Darby & Darby, PC, New York, NY USA.

For E-Z Bowz, LLC, COUNTER-DEFENDANT: John O Threadgill, John O Threadgill, PC, Knoxville, TN USA. Andrew S Neely, Luedeka, Neely & Graham, PC, Knoxville, TN. Richard W Barnes, Jr, Luedeka, Neely & Graham, PC, Knoxville, TN USA.

For Profesional Product Research Company, Inc, THIRD-PARTY PLAINTIFF: Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA. John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

For Professional Product Research Company, Inc, COUNTER-CLAIMANT: Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA. John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

For Professional Product Research Company, Inc, COUNTER-CLAIMANT: Hiram D Gordon, Janvey, Gordon, Herlands, Randolph, Rosenberg & Cox, LLP, New York, NY USA. Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, Hodges, Doughty & Carson, PLLC,

Knoxville, TN USA. John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

**JUDGES:** [*1] GABRIEL W. GORENSTEIN, United States Magistrate Judge, Hon. Laura Taylor Swain, United States District Judge.

**OPINION BY:** GABRIEL W. GORENSTEIN

**OPINION**

REPORT AND *RECOMMENDATION*

**To the Honorable Laura T. Swain**

**United States District Judge Defendant.**

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

Plaintiff E-Z Bowz, L.L.C. ("E-Z Bowz") brought this suit against defendant Professional Product Research Co., Inc. ("PPR") for patent infringement, trade dress infringement and common law unfair competition. In response, PPR filed a counterclaim and third-party complaint raising claims of antitrust violations, unfair competition, fraud, trade libel, and tortious interference with business relations. PPR has sought a judgment declaring that E-Z Bowz's patents are invalid and that PPR did not infringe upon E-Z Bowz's patents or trade dress. PPR has moved to dismiss the patent infringement claim for failure to join an indispensable party and the trade dress claim for failure to state a claim. In addition, PPR has moved for summary judgment dismissing both the patent and trade dress infringement claims. For its part, E-Z Bowz has moved to dismiss all of PPR's counterclaims, with [*2] the exception of the declaratory judgment claim. In addition, E-Z Bowz has moved for summary judgment dismissing the same claims.

For the reasons stated below, PPR's motion for summary judgment dismissing the patent claims should be granted in part and denied in part. PPR's motion for summary judgment dismissing E-Z Bowz's trade dress claims should be denied. In addition, E-Z Bowz's motion for summary judgment should be granted.

The Court is issuing two other Report and Recommendations today. One addresses the third-party defendants' motion to dismiss PPR's third-party complaint for lack of personal jurisdiction. The other addresses PPR's motion to dismiss the complaint for failure to join an indispensable party.

I. *INTRODUCTION*

A. *Factual Background*

In 1993, Deborah Lea Cavender ("Cavender") worked at a company named The Ribbon Outlet. Statement of Material Undisputed Facts, dated January 17, 2003 ("Def. 56.1 Statement") (reproduced in Defendant and Counter-Plaintiff Professional Product Research Co. Inc.'s Notice of Motion for Partial Summary Judgment, filed January 17, 2003 (Docket # 105), Ex. A), P 1; E-Z Bowz' Response to PPR's Statement of Material Undisputed [*3] Facts, filed February 6, 2003 (Docket # 125) ("Pl. 56.1 Resp."), P 1. On or about July 22, 1993, Cavender's father, James Teffeteller, developed a prototype of a bow making machine. Def. 56.1 Statement P 2; Pl. 56.1 Resp. P 2. Cavender began selling a bow making machine on November 18, 1993. Def. 56.1 Statement P 5; Pl. 56.1 Resp. P 5.

On October 7, 1993, Cavender and Tina Lucille Benton Slater filed United States Patent Application Serial Number 08/133,618 (the "'618 Application"). Def. 56.1 Statement P 6; Pl. 56.1 Resp. P 6. The United States Patent and Trademark Office ("USPTO") denied the '618 Application a number of times. Def. 56.1 Statement P 7; Pl. 56.1 Resp. P 7. On or about November 29, 1993, E-Z Bowz, Inc. was incorporated under the laws of the State of Tennessee. Def. 56.1 Statement P 3; Pl. 56.1 Resp. P 3. Cavender and her husband, Art Cavender, are the sole owners and officers of E-Z Bowz, Inc. Def. 56.1 Statement P 4; Pl. 56.1 Resp. P 4.

On January 11, 1995, Cavender filed U.S. Patent Application Serial Numbers 08/371,295 (the "'295 Application") and 29/033,379 (the "'379 Application"). Def. 56.1 Statement PP 9, 11; Pl. 56.1 Resp. PP 9, 11. Both applications were filed [*4] as continuations in part of the '618 Application. Def. 56.1 Statement PP 9, 11; Pl. 56.1 Resp. PP 9, 11. The '295 Application was eventually granted and became United States Utility Patent 5,617,979 (the "'979 Patent") on April 8, 1997. Def. 56.1 Statement P 10; Pl. 56.1 Resp. P 10. The '379 Application was also granted and became United States Design Patent 364,733 (the "'733 Patent") on April 8, 1997. Def. 56.1 Statement P 12; Pl. 56.1 Resp. P 12.

On November 2, 1995, Cavender and Slater jointly filed United States Design Patent Application Serial Number 29/045,935 (the "'935 Application"). Def. 56.1 Statement P 13; Pl. 56.1 Resp. P 13. The '935 Application claimed to be a continuation in part of the '379 Application and the '618 Application, but did not claim to be a continuation in part of the '295 Application or the '979 Patent. Def. 56.1 Statement P 13; Pl. 56. 1 Resp. P 13. The '935 Application was granted and matured into United States Design Patent 389,998 (the "'998 Patent") and was issued on February 3, 1998. Def. 56.1 Statement P 14; Pl. 56.1 Resp. P 14.

On May 15, 1995, E-Z Bowz, L.L.C. was formed. Def. 56.1 Statement P 15; Pl. 56.1 Resp. P 15. The original members [*5] of this limited liability company were Cavender, Slater and E-Z Bowz, Inc. Def. 56.1 Statement P 16; Pl. 56.1 Resp. P 16. PPR contends that at present Cavender and her husband, Mr. Cavender, are the sole members and owners of E-Z Bowz, L.L.C. Def. 56.1 Statement P 17, although E-Z Bowz disputes this allegation. See Pl. 56.1 Resp. P 17. The parties agree that Cavender has served as the President of E-Z Bowz, L.L.C, while Mr. Cavender has served as the company's Chief Operating Officer. Def. 56.1 Statement PP 18, 19; Pl. 56.1 Resp. PP 18, 19.

In 1993 Cavender and Slater allegedly sold approximately 15,000 bow makers. Defendant and Counter-Plaintiff Professional Product Research Co. Inc.'s First Amended Counterclaims and Third-Party Complaint, filed December 12, 2001 (Docket # 43) ("PPR Complaint"), P 17. Mr. Cavender joined E-Z Bowz, Inc. in 1994 and created a craft business around the bow maker. Id. P 19.

On November 18, 1996, a distributor of the E-Z Bowz bow maker, C.M. Offray & Son, Inc. ("Offray"), wrote to the Cavenders enclosing an advertisement for a bow making product. See Letter to Art and Lea Cavender from Regina Benn LoPresti, Vice President of Marketing, C. [*6] M. Offray & Son, Inc., dated November 18, 1996 (reproduced in Memorandum of Law of Plaintiff and Counter-Defendant E-Z Bowz, L.L.C. and Third-Party Defendants, Arthur and Lea Cavender, E-Z Bowz, Inc. and E-Z Crafts, L.L.C., in Opposition to the Motion for Partial Summary Judgment of Defendant and Counter-Plaintiff, Professional Product Research Co., Inc., filed February 6, 2003 (Docket # 123) ("Pl. Opp. Mem."), Ex. C). The device, called "Create-A-Bow," consisted of a stand and two upright members and sold for $ 5. See id. at 2. The device looked so similar to the E-Z Bowz bow maker that Barry Sokol, Offray's Vice President of Sales, thought that Cavender had "knocked . . . off" the E-Z Bowz bow maker. See Deposition of Barry S. Sokol, dated September 12, 2002 (reproduced in Pl. Opp. Mem. Ex. A), at 36. In addition, E-Z Bowz was contacted by their manufacturer and customers about the "Create-A-Bow" maker. See Declaration of Deborah Lea Cavender in Support of Opposition to Professional Product Research Co., Inc.'s Motion for Partial Summary Judgment, dated February 6, 2003 (Docket # 124) ("Cavender Decl."), P 35.

At some point thereafter, E-Z Bowz determined that the "Create-A-Bow" [*7] bow maker was made by PPR. E-Z Bowz wrote a letter to PPR asking that it cease and desist from selling the "Create-A-Bow." PPR, however, refused and E-Z Bowz subsequently filed this lawsuit.

B. *Procedural History*

E-Z Bowz filed suit against PPR in the United States District Court for the Eastern District of Tennessee on March 8, 1999. *See* Complaint for Damages and Injunction for Unfair Competition and Related Claims, filed March 8, 1999 (Tenn. Docket # 1). The original complaint alleged claims of unfair competition and trade dress infringement under the Lanham Act, common law unfair competition and patent infringement of both a utility and design patent. *See id.* PP 5-23. PPR then filed a motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(2), improper venue under Fed. R. Civ. P. 12(b)(3), insufficient process under Fed. R. Civ. P. 12(b)(4), and improper service under Fed. R. Civ. P. 12(b)(5). *See* Motion to Dismiss under Rule 12(b)(2)-(5) F.R.C.P.) or, Alternatively, Motion to Transfer under 28 U.S.C. § 1404, filed April 13, 1999 (Tenn. Docket # 3). In the alternative, PPR asked for the case to be transferred to the Southern [*8] District of New York. *See id.*

E-Z Bowz filed an amended complaint on September 20, 1999 alleging trade dress infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), common law unfair competition, and infringement of the '908 and the '979 Patents. *See* Amended Complaint for Damages and Injunction for Unfair Competition and Related Claims, filed September 20, 1999 (Tenn. Docket # 26) ("Am. Compl."). The amended complaint sought to enjoin PPR's alleged infringement of E-Z Bowz's bow maker and sought an accounting and award of damages. *See id.* P . On March 21, 2000, PPR filed an additional motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(7) for failure to join Slater as an indispensable party. *See* Memorandum in Support of Defendant's Motion to Dismiss under Rule 12(b)(7) for Failure to Join an Indispensable Party under Rule 19, F.R.C.P., filed March 21, 2000 (Tenn. Docket # 52).

On October 30, 2000, the Tennessee district court held that it lacked personal jurisdiction over PPR and ordered the case transferred to this Court. *See* Memorandum Opinion, filed October 30, 2000 (Tenn. Docket # 66), at 10-11.

Following the [*9] transfer, PPR filed a motion to dismiss, or in the alternative summary judgment, on April 3, 2001. *See* Notice of Motion, filed April 3, 2001 (Docket # 17). PPR sought dismissal of the trade dress claim on the ground that E-Z Bowz could not demonstrate secondary meaning in its trade dress and because the elements of its trade dress were functional. With respect to the patent claims, PPR sought summary judgment on the issue of non-infringement because the subject matter of the E-Z Bowz patents had been surrendered in a prior patent application and because prosecution history estoppel prevented E-Z Bowz from using the doctrine of equivalents. *See* Memorandum of Law of Defendant Professional Product Research Co., Inc. in Support of Motion to Dismiss the Amended Complaint or Alternatively for Summary Judgment, filed April 2, 2001 (Docket # 18). E-Z Bowz opposed the motion.

On July 11, 2001, PPR filed a counterclaim against E-Z Bowz and a third-party complaint against a number of third party defendants: Mr. and Mrs. Cavender, E-Z Bowz, Inc., E-Z Distribution, L.L.C., E-Z Crafts, L.L.C. (collectively the "E-Z Defendants"); E-Z Bowz's attorneys, Luedeka, Neely & Graham, P.C. ("LNG"); [*10] and another attorney for E-Z Bowz, John O. Threadgill. *See* Defendant and Counter-Plaintiff Professional Product Research Co. Inc.'s Counterclaims and Third-Party Complaint, filed July 11, 2001 (Docket # 28). Thereafter, E-Z Bowz filed a motion to strike the counterclaims and third party complaint pursuant to Fed. R. Civ. P. 12(f). *See* Notice of Plaintiff's Motion to Strike Defendant's Counterclaims and Third-Party Complaint, filed August 1, 2001 (Docket # 32). On August 10, 2001, this Court issued an order, on joint motion of the parties, withdrawing the third party complaint and counterclaim and the motion to strike. *See* Order, filed August 10, 2001 (Docket # 36). Later, by memorandum endorsement, the Court reinstated the third party complaint and counterclaims -- but not the motion to strike. *See* Memorandum Endorsement, filed December 10, 2001 (Docket # 42).

Shortly thereafter, PPR filed an amended counterclaim and third-party complaint. *See* PPR Complaint. This pleading alleged that the E-Z Defendants, LNG and Threadgill collectively engaged in a conspiracy to monopolize in violation of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, [*11] *see id.* PP 75-84; some of the E-Z Defendants engaged in unfair competition under the common law and section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), *see id.* PP 85-95; all of the defendants committed fraud, *see id.* PP 96-101; all of the defendants committed trade libel in violation of section 360-l of the New York General Business Laws, *see id.* PP 108-11; and all of the defendants committed tortious interference with business relations, *see id.* PP 112-19. PPR also requested a declaratory judgment that the '979, '733 and '998 Patents are invalid and that PPR had not infringed E-Z Bowz's patents or trade dress. *See id.* PP 102-07.

LNG and Threadgill then filed motions to dismiss or in the alternative to transfer the third party complaint to the Eastern District of Tennessee on January 3, 2002. *See* Notice of Motion, filed January 3, 2002 (Docket # 45); Notice of Motion, filed January 3, 2002 (Docket # 48).

The E-Z Defendants responded to the counterclaims and third party complaint on January 16, 2002. *See* Answer to the Amended Complaint and Third Party Complaint, filed January 16, 2002 (Docket # 54). On April 9, 2002, the E-Z [*12] Defendants moved to dismiss the third party complaint, or for judgment on the pleadings or in the alternative to transfer the case to the Eastern District of Tennessee. *See* The Other E-Z Bowz Defendants' Motion to Dismiss, for Judgment on the Pleadings or, in the Alternative, for Change of Venue, filed April 9, 2002 (Docket # 74).

On April 26, 2002, the Court set a date of October 18, 2002 for the end of discovery and for the parties to notify each other of any intention to file dispositive motions. *See* Order, filed April 26, 2002 (Docket # 78). These deadlines were thereafter extended, *see* Memorandum Endorsement, dated August 12, 2002 (Docket # 93); Memorandum Endorsement, filed January 9, 2003 (Docket # 103), and the discovery period concluded.

On January 17, 2003, PPR filed the instant motion for partial summary judgment dismissing E-Z Bowz's claims and granting summary judgment in its favor with respect to its counterclaim of patent invalidity. *See* Defendant and Counter-Plaintiff Professional Product Research Co., Inc.'s Memorandum of Law in Support of its Motion for Partial Summary Judgment, filed January 17, 2003 (Docket # 106) ("Def. Mem."). LNG and Threadgill [*13] moved for summary judgment to dismiss the claims against them in PPR's third party complaint. *See* Notice of Motion, filed January 17, 2003 (Docket # 107). E-Z Bowz and the E-Z Defendants made a separate motion for summary judgment to dismiss the counterclaims and third-party claims. *See* Notice of Motion, filed January 21, 2003 (Docket # 110). The parties filed their respective opposition papers thereafter.

On April 1, 2003, Judge Swain referred all outstanding motions to the undersigned for a Report and Recommendation. *See* Order of Reference, filed April 1, 2003 (Docket # 135).

C. *The Patents in Suit and E-Z Bowz's Trade Dress*

1. *The Patents*

a. *The '618 Application*. Cavender filed the '618 Application on October 7, 1993. Claim Number 1 of the application disclosed:

A bow making apparatus for receiving and maintaining the disposition of bow fabricating material during the making of a decorative bow, such decorative bow defining gathered sections of bow fabricating material and looped portions of bow fabricating material, said apparatus comprising:

a base member defining an upper work surface for supporting the bow fabricating material; and [*14]

at least a first and second retainer member extending upwardly from said upper work surface of said base member for releasably receiving and maintaining the gathered sections of bow fabricating material therebetween.

'618 Application Patent Prosecution History ("'618 History") (reproduced in Index to Exhibits (undated) ("Def. Exhibits") (filed with Def. Mem.), Ex. 8), Description, at. Claims 2 through 5 described the apparatus in Claim Number 1 more fully. Claim Number 6 described a similar apparatus, but went into more detail about the spacing of the two retaining members extending from the apparatus' base. *See id.* at 11-12. Claims 7 through 11 described Claim Number 6 in more detail. Claim Number 12 described a bow making apparatus with "at least a first and second retainer member extending upwardly" that narrowed at the top of the two retainers. *See id.* at 13. Claims 13 through 15 further described the details of Claim Number 12.

The patent examiner first rejected all of the claims in the '618 Application. *See* Examiner's Action, dated February 25, 1994 ("Feb. Denial") (reproduced in '618 History). The examiner found that claims 4 and 5 did not adequately [*15] describe the invention, *see id.* at 2; claims 1-7 and 9-11 were anticipated under 35 U.S.C. § 102(b) by an earlier patent, United States Patent number 2,542,222, *see id.*; *see also* Notice of References Cited, dated February 17, 1994 ("Examiner Refs.") (reproduced in '618 History); claims 8 and 12 were anticipated by another earlier patent, Patent 3,428,227, *see* Feb. Denial at 2-3; *see also* Examiner Refs.; and claims 13-15 were obvious under 35 U.S.C. § 103 in light of the two earlier patents. *See* Feb. Denial at 3-4.

Following the rejections, Cavender sought to amend her claim to answer the examiner's rejections. Specifically, Cavender cancelled claims 6 and 8, amended claims 1, 4, 7, 9 and 12, and added a new claim 16. *See* Amendment, dated April 26, 1994 (reproduced in '618 History), at 1-3. Nonetheless, the claims were rejected again by the examiner for the same reasons. *See* Examiner's Action, dated July 26, 1994 (reproduced in '618 History), at 1-4. Following the rejection, the examiner interviewed Cavender's patent attorney but found his arguments did not overcome the reasons for the rejection. *See* [*16] Examiner Interview Summary

Record, dated November 8, 1994 (reproduced in '618 History), at 1.

Cavender tried to amend claims 1, 2, 4, 7, 12 and 16 again by providing more detail about the individual claims. *See* Amendment, dated November 28, 1994 (reproduced in '618 History), at 1-6. The examiner found the second amendments unavailing, however, and again rejected Cavender's claims. *See* Advisory Action, dated January 11, 1995 (reproduced in '618. On January 11, 1995, the '295 Application was filed as a continuation in part of the '618 Application. In light of the '295 Application, Cavender formally abandoned the '618 Application on January 24, 1995. *See* Express Abandonment, dated January 24, 1995 (reproduced in '618 History), at 1. The USPTO accepted the abandonment of the '618 Application on February 9, 1995. *See* Notice of Abandonment, dated February 9, 1995 (reproduced in '618 History), at 1.

*b. The '295 Application and '979 Patent.* As noted, Cavender filed the '295 Application on January 11, 1995 as a continuation in part of the '618 Application. Claim 1 in the '295 Application was for a bow making apparatus that contained "at least a first and [*17] second retainer member" extending from the base of the apparatus. United States Patent 5,617,979 Prosecution History ("'979 History") (reproduced in Def. Exhibits, Ex. 10), Description, at 14. Claims 2 through 6 related to this apparatus. However, the '295 Application also claimed a device containing three retaining members. Specifically, claim 7 of the '295 Application described a bow making device with three retaining members extending upwards from the base of the apparatus. *Id.* at 16-18. Claims 8 through 10 further described this three retaining member device. *See id.* at 18-19. Claims 11 through 14 also described a bow making device with three retaining members. *See id.* at 19-22.

The Patent examiner rejected claims 1-6 (relating to a device with "at least" a first and second retaining members) as having been anticipated by a prior patent, United States Patent 3,816,888. *See* Examiner's Action, dated August 15, 1995 (reproduced in '979 History), at 1-2. However, claims 7-14 -- which eventually became renumbered claims 1-8 -- were found to be allowable as "the claims include limitations for an angular disposition inwardly between the first, second, and third retainer [*18] members to compensate for bending which is not shown or suggested in the prior art of record." *Id.* at 2-3.

Thereafter, Cavender appealed the denial of claims 1-6, disputing that they were anticipated or obvious in light of the earlier patent. *See* Communication (undated) (reproduced in '979 History), at 1-4. The USPTO considered Cavender's attempt to distinguish claims 1-6 from the earlier patent, *see* Examiner Interview

Summary Record, dated December 19, 1995 (reproduced in '979 History), at 1, but ultimately rejected the arguments finding that the claims were anticipated by the earlier patent. *See* Examiner's Action, dated March 1, 1996 (reproduced in '979 History), at 1-4. However, the examiner again allowed claims 7-14 (renumbered claims 1-8) -- describing the three retaining member apparatus. *See id.* at 1, 3.

After the allowance of renumbered claims 1-7, Cavender filed an amendment which added new claims 15 and 16 (or renumbered claims 9 and 10). *See* Amendment, dated August 30, 1996 (reproduced in '979 History). New claim 15 was "identical to the allowed Claim 7 with the exception that it is limited to a device having a first and second retainer members [*19] as opposed to having first, second and third retainer members." *Id.* at 3. The new claim also had notations on the base to help make loops of certain lengths. *See id.* The USPTO allowed all of the remaining claims including the new claims. *See* Notice of Allowability, dated September 4, 1996 (reproduced in '979 History), at 1.

Prior to the issuance of the patent, Cavender filed a petition to amend the application to name Slater as a co-inventor. *See* Petition and Fee to Correct and/or Add to Originally Named Inventor(s) (37 CFR 1.48(a)and/or(c)), dated March 20, 1997 ("Pet. to Add Inventor") (reproduced in '979 History). Apparently, Slater was omitted because Cavender alone had created the three retaining member device described in original claims 7-14 of the '295 Application. *See* Affidavit of Deborah L. Cavender, dated February 13, 1997 (reproduced in '979 History), PP 3-6, 8. After claims 15 and 16 were added, Cavender and her representatives realized that the two retainer apparatus described in those claims was similar to the '618 Application in which Slater was listed as a co-inventor. *See id.* P 8. Nonetheless, the '979 Patent was issued [*20] with Cavender designated as the sole inventor.

On October 31, 2002, while this case was ongoing, E-Z Bowz petitioned the USPTO to add Slater as a co-inventor on the '979 Patent. *See* Petition to Correct Inventorship under 37 CFR 1.324, dated October 31, 2002 ("Petition to Correct") (reproduced in Pl. 56.1 Resp., Ex. B). The USPTO subsequently granted the petition to add Slater's name as a co-inventor. *See* Decision on Petition under 37 CFR 1.324 (undated) (reproduced in Pl. 56.1 Resp., Ex. C).

The '295 Application matured into the '979 Utility Patent on April 8, 1997.

*c. The '379 Application and '733 Design Patent.* The '379 Application was filed on the same day as the '295 Application and sought to patent a design for the utility

2003 U.S. Dist. LEXIS 15364, *

device claimed in the '295 Application. United States Patent D364,733 Prosecution History ("'733 History") (reproduced in Def. Exhibits, Ex. 12). The drawings submitted with the '379 Application showed a bow making apparatus with three retaining members extending from the base. See Figures 1-7 (reproduced in '733 History). The application was approved subject to a minor amendment added by [*21] the patent examiner. See Notice of Allowability (undated) (reproduced in '733 History) at 1-2. The '379 Application became the '733 Design Patent on December 5, 1995. The '733 Patent discloses a three member bow making apparatus.

d. The '935 Application and the '998 Design Patent. The '935 Application was filed on November 2, 1995 and claimed to be a continuation in part of the '379 Application and the '733 Design Patent as well as the '618 Application. See United States Patent D389,998 Prosecution History ("'998 History") (reproduced in Def. Exhibits, Ex. 14), at 1-2. The '935 Application sought a design patent for a bow making apparatus with two retaining members extending from the base. See Figures 1-9 (reproduced in '998 History). The claim represented in the drawings was allowed by the USPTO. See Notice of Allowability, dated June 17, 1997 (reproduced in '998 History), at 1-3. The Application ultimately matured into the '998 Design Patent on February 3, 1998.

## 2. E-Z Bowz's Claimed Trade Dress

E-Z Bowz has identified four elements of its claimed trade dress: (1) the color, length, width, shape, and design of the base; (2) the color, finish, texture, [*22] length, width, height, placement and color of the dowels (that is, the retaining members); (3) the graphic design, which includes the font, color scheme, labels, background, border, measuring indicia and other elements placed on the top of the base; and (4) the instructions that are included with the bow maker. See Plaintiff's Supplemental Response to Defendant's Interrogatories 3, 6, 7, 9, 10 and 11 and Supplemental Verification, dated January 25, 2002 ("Pl. Resp. to Interr.") (reproduced in Def. Exhibits, Ex. 22), P 6. E-Z Bowz claims that PPR has infringed upon its dress by selling a product that leads consumers to believe PPR's product is in some manner related to or approved by E-Z Bowz. See Am. Compl. PP 6-10. In the instant motion, whether PPR actually infringed E-Z Bowz's claimed trade dress is not at issue. Instead, the only issue before the Court is whether or not E-Z Bowz has a protectible trade dress that could be the subject of an infringement claim.

## II. STANDARD OF REVIEW

### A. Summary Judgment Standard

[HN1]Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the [*23] affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Repp v. Webber, 132 F.3d 882, 889 (2d Cir. 1997), cert. denied, 525 U.S. 815, 142 L. Ed. 2d 40, 119 S. Ct. 52 (1998); Eagle Comtronics, Inc. v. Arrow Communication Labs., Inc., 305 F.3d 1303, 1313 (Fed. Cir. 2002) (citations omitted), cert. denied, 537 U.S. 1172, 154 L. Ed. 2d 914, 123 S. Ct. 995 (2003). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 248).

[HN2]"When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor." Netscape Communications Corp. v. Konrad, 295 F.3d 1315, 1319 (Fed. Cir. 2002) [*24] (citing Anderson, 477 U.S. at 255). However, to survive a motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)) (citation omitted). In other words, "the non-movant must show enough that a jury could reasonably find for [the nonmovant]." Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.), 336 F.3d 94, 102 (2d Cir. 2003). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). Thus, "statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999) (citations omitted), cert. denied, 530 U.S. 1242, 147 L. Ed. 2d 960, 120 S. Ct. 2688 (2000). In addition, "the 'mere existence of a scintilla [*25] of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 252); Golan v. Pingel Enter., 310 F.3d 1360, 1367-68 (Fed. Cir. 2002) ("the party opposing summary judgment . . . must show more than a mere

metaphysical doubt regarding the material facts . . . nor will the existence of a mere scintilla of evidence suffice") (citations omitted).

[HN3]"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Vann v. City of New York, 72 F.3d 1040, 1048 (2d Cir. 1995)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)); see also Conroy v. Reebok Int'l., Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994)* ("The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge [*26] its burden by showing the district court that there is an absence of evidence to support the nonmoving party's case.") (citations omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996)* (citing *Anderson, 477 U.S. at 247-48); see also Novartis Corp. v. Ben Venue Labs, Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001)* ("Summary judgment must be granted against a party who has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case, on which the party will bear the burden of proof at trial.") (citing *Celotex Corp., 477 U.S. at 322*).

B. *Patent Validity*

[HN4]Under *35 U.S.C. § 282*, a patent is presumed valid and a "party asserting invalidity not only has the procedural burden of proceeding first and establishing a prima-facie case, but the burden of persuasion on the merits remains with that party until final decision." *Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1534 (Fed. Cir. 1983).* [*27] A party claiming a patent is invalid bears the burden to establish such invalidity by clear and convincing evidence. *See, e.g., Ralston Purina Co. v. Far-Mar-Co., Inc., 772 F.2d 1570, 1574 (Fed. Cir. 1985).* However, once an alleged infringer has raised a prima facie case of invalidity, "it falls to the patent owner to come forward with some evidence to the contrary sufficient to raise a genuine issue of material fact." *Sinskey v. Pharmacia Ophthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir. 1992)* (citation omitted), *cert. denied, 508 U.S. 912, 124 L. Ed. 2d 256, 113 S. Ct. 2346 (1993).* The issue of the validity of a patent is decided under the law of the Federal Circuit. *See, e.g., Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1359 (Fed. Cir.), cert. denied, 528 U.S. 1019, 145 L. Ed. 2d 409, 120 S. Ct. 527 (1999); Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc., 813 F.2d 1207, 1212 (Fed. Cir. 1987).*

III. *PPR'S MOTION FOR SUMMARY JUDGMENT*

A. *PPR's Motion for Summary Judgment on the Patent Claims*

PPR argues that the E-Z Bowz patents in suit -- [*28] the '979, '733 and '998 Patents -- are invalid because (1) they are precluded by the "on sale bar" in *35 U.S.C. § 102(b)*, Def. Mem. at 3-4, 6-13, and (2) Cavender failed to include Slater as a co-inventor for the '979 Patent. *See id.* at 13-14. Before the Court addresses these arguments, however, it must first determine PPR's standing to raise claims of invalidity. *See, e.g., Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1376 (Fed. Cir. 2000)* ("As a threshold issue, we must determine whether any of the Appellees in this suit had standing"); *see also Warth v. Seldin, 422 U.S. 490, 517-18, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975)* ("[HN5]The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention."). E-Z Bowz has raised an argument regarding PPR's standing to challenge the '733 Patent, *see* Pl. Opp. Mem. at 34-38, although it did not do so with respect to the other patents. Following the discussion of standing, the Court will examine [*29] PPR's arguments as to the invalidity of the patents.

1. *The Scope of PPR's Standing*

As noted, PPR's counterclaim seeks a declaration of invalidity for the '979, '998 and '733 patents. *See* PPR Complaint PP 102-07. [HN6]In order for this Court to have jurisdiction to review PPR's counterclaim for a declaratory judgment of invalidity as to these three patents, there must be an "actual controversy" between the parties. *28 U.S.C. § 2201(a).* Because it is the party seeking the declaratory judgment, PPR bears the burden of establishing the existence of an actual controversy. *See, e.g., Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 95, 124 L. Ed. 2d 1, 113 S. Ct. 1967 (1993)* ("a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy") (citing *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 81 L. Ed. 617, 57 S. Ct. 461 (1937))* (footnote omitted); *see also Intellectual Prop. Dev., Inc. v. TCI Cablevision of Calif., Inc., 248 F.3d 1333, 1340 (Fed. Cir.)* ("the burden rests on [defendant] . . . to establish 'that jurisdiction [*30] over its declaratory judgment action existed at, and has continued since, the time the [counterclaim] was filed'") (quoting *Int'l Med. Prosthetics Research Assocs. v. Gore Enter. Holdings,*

2003 U.S. Dist. LEXIS 15364, *

*Inc.*, 787 F.2d 572, 575 (Fed. Cir. 1986)), *cert. denied*, 534 U.S. 895, 151 L. Ed. 2d 154, 122 S. Ct. 216 (2001). Under Federal Circuit law, PPR can meet its burden by demonstrating two elements:

> "There must be both (1) an explicit threat or other action by the patentee, which creates a *reasonable* apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) *present* activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.'"

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995) (emphasis in original) (quoting *BP Chems., Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993)), *cert. denied*, 516 U.S. 1093, 133 L. Ed. 2d 760, 116 S. Ct. 815 (1996).

Obviously, PPR meets this test with regard to its "Create-A-Bow" product because E-Z Bowz has filed this suit claiming infringement. E-Z Bowz's complaint, however, alleges only that PPR [*31] infringed upon the '998 and '979 Patents (which contain descriptions of devices with two retaining members), *see* Am. Compl. PP 16-23, not the '733 Patent (which describes a three retaining member device). Significantly, the only bow maker ever produced by PPR has only two retaining members. *See*, *e.g.*, Pl. Opp. Mem. Ex. C at 2 (reproduction of an advertisement of the Create-A-Bow showing it has two retaining members). PPR has never suggested that it took "concrete steps" to produce a bow maker with three retaining members. *See Super Sack*, 57 F.3d at 1059-60 (defendant lacked standing because it "has . . . never contended that it has already taken meaningful preparatory steps toward an infringing activity by planning to make a new product that may later be said to infringe"). Because PPR has never produced, or shown that it plans to produce, a three retaining member device, it lacks the ability to challenge the claims in E-Z Bowz's patents that involve three retaining members. *See Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 634 (Fed. Cir.) ("the accused infringer must have actually produced or prepared to produce an allegedly [*32] infringing product") (citing *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1398-99 (Fed. Cir. 1984)), *cert. denied*, 502 U.S. 1013, 116 L. Ed. 2d 749, 112 S. Ct. 658 (1991).

In other words, should PPR demonstrate that the claims in E-Z Bowz's patents involving two retaining members were invalid, the Court would only have the power to invalidate those specific claims -- not the claims in the patents that involve a three retaining member device.

*See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1336 (Fed. Cir. 1998); *Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 327 (Fed. Cir. 1985); *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1568 (Fed. Cir. 1984).

The '733 Design Patent exclusively deals with a bow making device with three retaining members. There is no allegation that PPR infringed this patent and thus PPR lacks standing to challenge its validity. The '979 Utility Patent includes claims for both a two and three retaining member bow making device. However, because PPR is only alleged to have infringed upon this patent by selling a two retaining member bow making device, the Court will only examine whether claims 15 and [*33] 16 (renumbered claims 9 and 10) are invalid. Finally, the '998 Design Patent exclusively deals with a two retaining member bow making device and is properly the subject of examination for validity.

### 2. *On-Sale Bar Claim*

[HN7]An inventor is not entitled to patent an invention if "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). "The on-sale bar applies when the invention is the subject of a commercial offer for sale, and is ready for patenting before the critical date." *Netscape Communications*, 295 F.3d at 1323 (citing *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67, 142 L. Ed. 2d 261, 119 S. Ct. 304 (1998)). In general, "the on-sale bar starts to accrue when a completed invention is offered for sale." *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318, 1324 (Fed. Cir. 1996) (citation omitted). The parties do not dispute that the devices at issue in this case were offered for sale as of November 18, 1993. Def. 56.1 Statement P 5; Pl. 56.1 Resp. P 5. Nor do they dispute that the applications [*34] for the '979 and '998 Patents were filed on January 11, 1995 and November 2, 1995 respectively -- well beyond one year from the corresponding products being sold.

E-Z Bowz argues, however, that the '979 and '998 Patents acquired the filing date of the '618 Application -- October 7, 1993 -- and, thus, are not invalid under the on-sale bar. *See* Pl. Opp. Mem. at 4-7. Thus, disposition of this issue turns solely on the question of whether the claims in the '979 and '998 Patents that involved two retaining members could have acquired the filing date of the '618 Application.

In order for the relevant claims in the '979 and '998 Patents to have acquired the filing date of the '618 Application, their applications must have complied with the requirements of 35 U.S.C. § 120. [HN8]Section 120

allows a patent application to acquire the filing date of an earlier application if certain conditions are met. *See, e.g.,* *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 993 (Fed. Cir. 1999). In pertinent part, section 120 states:

> [HN9]An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 [*35] of this title in an application previously filed in the United States . . . which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

35 U.S.C. § 120. Thus, [HN10]"under 35 U.S.C. § 120, claims are granted the benefit of the filing date of an earlier-filed application only if the earlier application provides support according to 35 U.S.C. § 112, P 1 for the later claims." *Johnson Worldwide*, 175 F.3d at 993 (citations omitted)

PPR claims that E-Z Bowz has failed to meet the requirements of section 120 because it failed to adequately describe the invention under 35 U.S.C. § 112. *See* Def. Mem. at 10-12. The first paragraph of section 112 states: [*36]

> [HN11]
>
> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. [HN12]The purpose of this requirement "is to prevent an applicant from later asserting that he invented that which he did not." *Amgen Inc. v. Hoechst*

*Marion Rousell, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003); *see also* *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345-46 (Fed. Cir. 2000) (per curiam) ("the purpose of this provision is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.") (citing cases). [HN13]In order to satisfy section 112's written description requirement the description must allow an artisan within the field to recognize what invention has been created. *See* *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) [*37] ("a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought") (citations omitted); *see also* *Amgen Inc.*, 314 F.3d at 1330 ("Satisfaction of this requirement is measured by the understanding of the ordinarily skilled artisan.") (citation omitted). Whether or not an application complied with the written description requirement is a question of fact. *See, e.g.,* *ENZO Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 962-63 (Fed. Cir. 2002) (citing *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)).

*a. Whether claims 15 and 16 in the '979 Patent acquired the filing date of the '618 Application.* Claims 15 and 16 (renumbered claims 9 and 10) of the '979 Patent describe a bow making device with only two retaining members. *See* '979 History, Amendment at 1-2. Specifically, claim 15 describes the bow making device itself, while claim 16 describes the markings and measuring lines or indicia placed on the base of the bow maker. *See id.* Claim 1 of the '618 Application [*38] claims a bow making apparatus that comprises "at least a first and second retainer member extending upwardly from said upper work surface of said base member . . ." '618 Application, Description at 10. The "at least" language was included as the original claim 1 in the '295 Application and was rejected. *See* '979 History, Examiner's Action, at 1-2. For E-Z Bowz to benefit from the filing date of the '618 Application, claim 1 of the '618 Application must have "conveyed to a person skilled in the art that the inventor had possession of the claimed subject matter [here, claim 15 of the '979 Patent] at the time of the earlier filing date." *Eiselstein v. Frank*, 52 F.3d 1035, 1039 (Fed. Cir. 1995) (citing *Ralston Purina Co. v. Far-Mar-Co.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985)).

E-Z Bowz and PPR focused their respective motions on whether the "at least" language contained in the '618 Application properly disclosed a three retaining member device described in claims 7-14 (renumbered claims 1-7) of the '979 Patent, without addressing whether this language properly disclosed the two member device

described in claim 15 of the '979 Patent. *Compare* Def. [*39] Mem. at 11, *with* Pl. Opp. Mem. at 4-5. This Court, however, need not determine whether "at least" two members adequately described the three member device disclosed in the '979 Patent. As stated in Section III.A.1 above, the only relevant device at issue is the two member device sold by PPR. Thus, we must determine whether a reasonable jury could conclude that the term "at least" two members adequately described a device with only two members.

The description of "at least a first and a second member" in the '618 Application includes exactly what was described in claim 15 (renumbered claim 9) of the '979 patent. While the "at least a first and second" language is not limited to a two member device, the specification does in fact show that the patentee had invented a device with two retaining members -- the device described in claim 15 (renumbered claim 9) of the '979 Patent. As one court has noted,

[HN14]in order to determine whether a prior application meets the "written description" requirement with respect to later-filed claims, the prior application need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to persons [*40] skilled in the art that as of the earlier date the applicant had invented what is now claimed.

*Eiselstein*, 52 F.3d at 1038 (citations omitted). Here, the phrase "at least two" retainer members could indicate to persons skilled in the art that the applicants had invented a device with two retainer members. Notably, [HN15]at least one court has denied summary judgment in the on-sale bar context when claims in a parent application were broader than those in a subsequent application, as long as a jury could conclude that they described the later claims. *See Pfizer, Inc. v. Perrigo Co.*, 933 F. Supp. 377, 381-82 (S.D.N.Y. 1996) ("the parent application included a broader range of pH levels [than the later patent claims] . . . a rational trier of fact could conclude that the disclosures contained in the parent application reasonably convey to a person skilled in the art that the inventors possessed the invention claimed in the [later patent] at the time the [earlier] application was filed")

Whatever doubt there might be on this point is laid to rest by the drawings submitted as part of the '618 Application, which depict a bow making device with [*41] two retaining members only. *See* '618 Application, Figures 1-7. [HN16]The Federal Circuit has held that "under proper circumstances, drawings alone may

provide a 'written description' of an invention as required by § 112." *Vas-Cath, 935 F.2d at 1565; see also Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc., 291 F.3d 1317, 1322 (Fed. Cir. 2002)* ("Drawings constitute an adequate description if they describe what is claimed and convey to those of skill in the art that the patentee actually invented what is claimed.") (citing *Vas-Cath, 935 F.2d at 1566*); *M.T. McBrian, Inc. v. Liebert Corp., 1998 U.S. Dist. LEXIS 1512, 1998 WL 67621, at *4 (N.D. Ill. Feb. 6, 1998)* ("in determining the extent of the disclosure in the earlier application, the entire application, including diagrams, schematics and drawings, must be considered as part of the disclosure") (citing *Vas-Cath, 935 F.2d at 1564*). A reasonable jury could find that the description in the '618 Application in combination with the drawings would allow an artisan in the field of bow makers to know that Cavender had invented the device embodied in claim 15 (renumbered claim 9) [*42] of the '979 Patent as of the filing date of the '618 Application.

*b. Whether the '998 Patent acquired the filing date of the '618 Application.* The same analysis applies with respect to whether the '618 Application adequately described the device claimed in the '998 Design Patent. The '998 Patent is a design patent that discloses a bow maker with two retaining members. A reasonable jury could find that the claims and drawings in the '618 Application sufficiently described the later invention in the '998 Patent. The fact that the '618 Application was for a utility patent while the '998 Patent was for a design patent does not bar the Court from considering the drawings in the earlier application. *See Vas-Cath, 935 F.2d at 1565* ("Whether the drawings are those of a design application or a utility application is not determinative . . . . In the instant case . . . the design drawings are substantially identical to the utility application drawings."). However, because the application for the '998 Patent was filed after the abandonment of the '618 Application, an additional step is required for the '998 Patent to survive PPR's on-sale bar challenge. [1]

1  PPR also claims that all of E-Z Bowz's patents are invalid because they were allegedly filed after the '618 Application was abandoned. *See* Def. Mem. at 14-15. However, the prosecution history of the '618 Application shows that E-Z Bowz abandoned that application on January 24, 1995, *see* Express Abandonment, dated January 24, 1995 (reproduced in '618 History), at 1, and the USPTO acknowledged the abandonment on February 9, 1995. *See* Notice of Abandonment, dated February 9, 1995 (reproduced in '618 History), at 1. It is undisputed that the applications for the '979 and '733 Patents were

filed on January 11, 1995, *see* Def. 56.1 Statement PP 9, 11 -- prior to the notice and recognition of abandonment.

[*43] PPR claims that the '998 Patent is invalid because it never acquired the filing date of the '733 Patent and, therefore, could not have acquired the filing date of the '618 Application. *See* Def. Mem. at 9-10. The '998 Patent claimed to be a continuation in part of both the '379 Application -- which matured into the '733 Patent -- and the '618 Application. The validity of the '733 Patent is not before this Court. *See* section III.A.1. However, in order for the '998 Patent to acquire the filing date of the '618 Application, the '733 Patent must first have acquired the filing date of the '618 Application. To have done this, the '618 Application needed to have adequately described the invention in the '733 Patent. *See Dart Indus., Inc. v. Banner, 204 U.S. App. D.C. 412, 636 F.2d 684, 688 (D.C. Cir. 1980)* ("[HN17]Under section 120, no claimed subject matter is entitled to the benefit of the filing date of an earlier application unless that subject matter has been disclosed in every intervening application relied upon to establish a chain of copendency.") (citing *In re Schneider, 481 F.2d 1350, 1356 (C.C.P.A. 1973)); see also Lemelson v. TRW, Inc., 760 F.2d 1254, 1266-67 (Fed. Cir. 1985)* [*44] ("In order for the [earlier] patents to be entitled . . . to the filing date of an earlier application in the chain of applications of which they are part, it must be shown that as to the inventions claimed there has been 'continuing disclosure through the chain of applications.'") (quoting *Schneider, 481 F.2d at 1356*) (citations omitted). Thus, in order to determine whether the '998 Patent is invalid due to the on-sale bar, the Court must address whether or not the '733 Patent met the requirements of 35 U.S.C. § 120 to acquire the filing date of the '618 Application.

As noted, the claims in the '618 Application disclosed a device with "at least a first and second retainer member." '618 History, Description at 10-13. Because the '733 Patent is a design patent, the description of the invention claimed is contained in its drawings. *See In re Daniels, 144 F.3d 1452, 1456 (Fed. Cir. 1998)* ("it is the drawings of the design patent that provide the description of the invention.") (citing *In re Klein, 987 F.2d 1569, 1971 (Fed. Cir. 1993))*. The drawings contained in the application for the '733 Patent disclosed a [*45] bow maker with three retaining members -- two of equal height and a smaller one at the side. *See* '733 History, Figures 1-3, 6, 7. For the '733 Patent to be entitled to claim the earlier filing date, the '618 Application must have "conveyed to a person skilled in the art that the inventor had possession of the claimed subject matter [of the '733 Patent] at the time of the earlier filing date." *Eiselstein, 52 F.3d at 1039* (citation omitted)

According to E-Z Bowz, it is "obvious" that the phrase "at least a first and second member" included a device with three members. Pl. Opp. Mem. at 5. However, a claim in a parent application that obviously or apparently foreshadows a potential later claim does not meet the written description requirement of 35 U.S.C. § 112. The Federal Circuit has noted:

> [HN18]Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed. It extends only to that which is disclosed. . . . The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification. Rather, a prior application itself [*46] must describe an invention, and *do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought*. . . . Although the exact terms need not be used *in haec verba* . . . the specification must contain an equivalent description of the claimed subject matter. A description which renders obvious the invention for which an earlier filing date is sought is not sufficient.

*Lockwood, 107 F.3d at 1571-72* (some emphasis added) (citations omitted); *see also In re Winkhaus, 527 F.2d 637, 640 (C.C.P.A. 1975)* ("although it may be apparent . . . that does not mean that such a step is described as part of the[] invention. That a person skilled in the art might realize from the disclosure that such a step is possible is not a sufficient indication to that person that that step is part of appellants' invention.").

E-Z Bowz is correct that the term "at least a first and second" retaining member mathematically includes the possibility of a device containing a third member. The problem, however, is that such a description could similarly include a fourth, fifth, [*47] or sixth member and so on. Of even greater significance is that neither the claims in the '618 application nor any drawings indicate the placement of the potential third retaining member in relation to the first two members, such as the distances, angles, etc.. Nor does the '618 application show the dimensions of a potential third retaining member. If E-Z Bowz's construction were correct, it could be entitled to claim the '618 Application filing date to patent a bow making apparatus with retaining members from two to infinity in any possible size and configuration.

E-Z Bowz's lack of claim to a three member device is made clear by the drawings of the '618 Application, which depict only a two member device. In addition, numerous descriptions of the device contained within the '618 Application refer only to two members without any reference to the "at least" language or even the possibility of additional members. *See, e.g.*, Description (reproduced in '618 History) at 4 (the claimed apparatus contains "a pair of retainer members"); Abstract of the Disclosure (reproduced in '618 History) ("The apparatus also includes first and second retainer members extending upwardly . . . [*48] ."); Amendment (reproduced in '618 History) at 4 (apparatus includes "first and second retainer members"). These descriptions in combination with drawings that show exclusively a two member device would not allow a skilled artisan to "clearly conclude," *Lockwood*, 107 F.3d at 1572, that the '618 Application disclosed the three member device that is depicted in the drawings of the '733 Patent. *See Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1302 (Fed. Cir. 1999) ("a court must examine whether the 'disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at the time of the later claimed subject matter'") (quoting *Waldemar Link v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994), in turn quoting *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 865 (Fed. Cir. 1993)). Because there is no evidence that would allow a reasonable jury to find that the '618 Application claimed the specific three member device disclosed in the '733 Patent, the '733 Patent is not entitled to the earlier filing date. As the '733 Patent cannot claim the filing date of the '618 Application, [*49] the '998 Patent also cannot relate back to the '618 Application.

As noted, it is undisputed that the device embodied in the '998 Patent was first sold to the public on November 18, 1993. Def. 56.1 Statement P 5; Pl. 56.1 Resp. P 5. Without the benefit of the earlier filing date, the '998 Patent was filed on November 2, 1995, *see* Def. 56.1 Statement P 13; Pl. 56.1 Resp. P 13, almost two years after the device was sold to the public. Therefore, the bow making apparatus claimed in the '998 Patent "is invalid because the invention had been on sale for more than one year." *Pfaff*, 525 U.S. at 59-60.

*c. Conclusion.* PPR has not met its burden to show by clear and convincing evidence that the claims 15 and 16 (renumbered claims 9 and 10) of the '979 Patent are invalid under the on-sale bar. A reasonable jury could find that the '618 Application adequately disclosed the later invention so as to entitle E-Z Bowz to the benefit of the earlier filing date. Thus, summary judgment must be denied as to the '979 patent.

However, the '998 Patent is invalid under the on-sale bar contained in 35 U.S.C. § 102(b). Accordingly, summary judgment should [*50] be granted in favor of PPR as to the '998 Patent and thus E-Z Bowz's claim of design patent infringement, *see* Am. Compl. PP 16-19, should be dismissed.

### 3. *Failure to Name Slater as a Co-Inventor*

PPR also argues that the '979 Patent is invalid because it was initially filed naming Cavender as the inventor without any mention of Slater. *See* Def. Mem. at 13-14. Following the initial application, however, Cavender and Slater filed a petition to add Slater's name to the application. *See* Pet. to Add Inventor at 1-2. In addition, Cavender filed an affidavit in connection with the application to add Slater. *See* Affidavit of Deborah L. Cavender, dated February 13, 1997 ("Cavender Pat. Aff.") (reproduced in '979 History). The affidavit explains that the '295 Application originally concerned a three member bow making device and that Cavender was the sole inventor of this apparatus. *See id.* PP 3-6. Cavender further averred that, upon review, she and her patent attorneys determined that the subject matter of the '295 Application was substantially similar to the subject matter in the '618 Application -- of which Slater was a co-inventor. *See id.* P 7. Cavender's [*51] affidavit states that there were extenuating circumstances that resulted in the delay in moving to add Slater as an inventor. *See id.* P 9. In the affidavit, Cavender swore that her failure to name Slater originally was done without fraudulent intent. *See id.* P 11.

In addition to the evidence in the prosecution history of the '979 Patent, E-Z Bowz has submitted evidence on the motion for summary judgment reflecting that E-Z Bowz made a recent filing to add Slater as a co-inventor of the '979 Patent. On October 31, 2002, E-Z Bowz petitioned the USPTO to add Slater as a co-inventor of the '979 Patent. *See* Petition to Correct. This petition was subsequently granted by the USPTO. *See* Decision on Petition under 37 CFR 1.324 (undated) (reproduced in Pl. 56.1 Resp., Ex. C).

[HN19]"Omission of an inventor can invalidate a patent unless the omission was an error 'without any deceptive intention.'" *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001) (quoting 35 U.S.C. § 256) (citations omitted). However, every issued patent enjoys a presumption of validity. *See* 35 U.S.C. § 282. [*52] "Intent to mislead or to deceive must be proved by clear and convincing evidence. . . .

Deceptive intent is not inferred simply because information was in existence that was not presented to the examiner." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1365 (Fed. Cir. 1998) (citation omitted), *cert. denied*, 526 U.S. 1130, 143 L. Ed. 2d 1008, 119 S. Ct. 1804 (1999). Thus, "in order to rebut [the] presumption [of validity], a party challenging patent validity for omission of an inventor must present clear and convincing evidence" that shows the patent is invalid. *Acromed*, 253 F.3d at 1379 (citing *Environ Prods. v. Furon Co.*, 215 F.3d 1261, 1265 (Fed. Cir. 2000)).

Here, PPR has not met its burden of showing that it is entitled to summary judgment on this issue. Indeed, the only evidence in the record regarding the initial failure to name Slater as a co-inventor indicates that it was done without deceptive intent. *See* Cavender Pat. Aff. P 11; Petition to Correct, at 1; *see also* Statement of Tina Lucille Benton Slater in Support of Petition to Correct Inventorship Under 37 CFR 1.324, dated October 21, 2001 (reproduced [*53] in Pl. 56.1 Resp., Ex. B) ("The inventorship error of failing to include Tina Lucille Benton Slater as an inventor of U.S. patent number 5,617,979 occurred without any deceptive intention"). PPR has offered no evidence -- let alone evidence of a clear and convincing nature -- that contradicts or rebuts this evidence. PPR's apparent belief that E-Z Bowz bears the burden to prove the lack of deceptive intent, *see* Professional Product Research Co., Inc.'s Reply Brief in Support of its Motion for Partial Summary Judgment, filed February 18, 2003 (Docket # 129) ("Def. Reply"), at 5, is mistaken as case law is clear that E-Z Bowz bears no such burden. *See, e.g., Acromed*, 253 F.3d at 1379. In any event, E-Z Bowz has adduced evidence which, if accepted by the trier of fact, would show a lack of deceptive intent. Accordingly, summary judgment is inappropriate for PPR's claim of invalidity for failure to name a co-inventor.

In sum, PPR's motion for summary judgment on its counterclaim seeking a declaration of invalidity of E-Z Bowz's patents must be denied as to the '979 Patent. However, the motion should be granted as to the '998 Patent.

B. *PPR's Motion on the* [*54] *Trade Dress Infringement and Common Law Unfair Competition Claim*

1. *Trade Dress*

PPR argues that it is entitled to summary judgment on E-Z Bowz's claims of trade dress infringement because (1) E-Z Bowz cannot prove secondary meaning in its trade dress and (2) its trade dress is functional. *See*

Def. Mem. at 15-20. While E-Z Bowz's patent claims are decided under the law of the Federal Circuit, the trade dress claims are examined under Second Circuit precedent. *See, e.g., Thompson v. Haynes*, 305 F.3d 1369, 1374 (Fed. Cir. 2002) ("[HN20]in deciding non-patent issues, such as . . . trade dress . . . under § 43(a) of the Lanham Act, this Court applies regional circuit law") (citing cases).

E-Z Bowz makes the following claims as to its trade dress. First, it asserts that the base of the bow maker has a "unique and distinctive design." It notes that the base is made of a "generally light-colored, lightly-grained, unpainted wood with a non-shiny finish" with specific dimensions. Second, E-Z Bowz asserts that the shape, size and "look, feel, color, finish and texture" of the dowels are of the same texture as the base. Third, it points to the graphics [*55] on the base, including the label affixed to the surface of the base, which contains the plaintiff's trademark, as well as the trademark's color, typeface and placement in relation to the base. Finally, it asserts trade dress in the instructions that accompany the bow maker. The instructions contain drawings and text depicting the various types of bows that can be made. *See generally* Pl. Resp. to Interr. P 6.

Section 43(a) of the Lanham Act provides a civil remedy against any person who

> [HN21]in connection with any goods . . . or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods . . . by another person[.]

15 U.S.C. § 1125(a). [HN22]The protection afforded by this section applies equally to claims involving unregistered trademarks and trade dress. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992). [*56] "Trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) (citation omitted); *see also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992) ("'trade dress' of a product "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics."'") (quoting

*LeSportsac, Inc. v. K-mart Corp.*, 754 F.2d 71, 75 (2d Cir. 1985), in turn quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)).

[HN23]To succeed in an action for trade dress infringement a plaintiff must show "(a) that its trade dress is entitled to protection under the Act, and (b) that the defendant's dress infringes on the plaintiff's dress by creating a likelihood of confusion." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 377 (2d Cir. 1997). If the plaintiff's trade dress is based on the design [*57] of its product it must have acquired a secondary meaning to be protected. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216, 146 L. Ed. 2d 182, 120 S. Ct. 1339 (2000) ("a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning."). However, if the trade dress is not solely based on the design of the product, a plaintiff may show that the trade dress is protected because it is either inherently distinctive or has a secondary meaning. *See Two Pesos*, 505 U.S. at 769; *Landscape Forms*, 113 F.3d at 377. Thus, when a claimed trade dress involves the actual product itself, *see*, *e.g.*, *Wal-Mart*, 529 U.S. at 207 (children's clothing), secondary meaning must be proven. *See id. at 216.* However, when the claimed trade dress involves features that are not actually the product itself, *see*, *e.g.*, *Two Pesos*, 505 U.S. at 765 (interior and exterior design of a restaurant), the dress may be protected without proof of secondary meaning. *See id. at 769-70.* Because E-Z Bowz's claimed trade dress is based at least [*58] in part on the design of its product, it must demonstrate the trade dress has acquired secondary meaning. A product has acquired a secondary meaning if "'in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself.'" *Two Pesos*, 505 U.S. at 766 n.4 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11, 72 L. Ed. 2d 606, 102 S. Ct. 2182 (1982)).

In addition, [HN24]to prove trade dress infringement a plaintiff must prove that a likelihood of confusion exists. *See*, *e.g.*, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 118-19 (2d Cir. 2001). The Second Circuit utilizes the eight factors announced in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 7 L. Ed. 2d 25, 82 S. Ct. 36 (1961), to examine this question. *See Nora Beverages*, 269 F.3d at 119. PPR, however, has not raised any argument regarding the likelihood of confusion and thus this issue will not be considered further.

[HN25]A party accused of trade dress infringement [*59] can defeat such a charge by asserting that the claimed trade dress is functional. *See*, *e.g.*, *id. at 120 n.4* ("A plaintiff is barred from gaining trade dress protection

for a product if the trade dress is functional.") (citation omitted). "'[A] product feature is functional,' and cannot serve as [trade dress], 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165, 131 L. Ed. 2d 248, 115 S. Ct. 1300 (1995) (quoting *Inwood Labs.*, 456 U.S. at 850 n.10); *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32, 149 L. Ed. 2d 164, 121 S. Ct. 1255 (2001) ("a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'") (quoting *Qualitex*, 514 U.S. at 165). The party asserting trade dress protection bears the burden of demonstrating its claimed device is not functional. 15 U.S.C. § 1125(a)(3). Finally, while "[a] utility patent is strong evidence that the features therein [*60] claimed [as trade dress] are functional," *TrafFix Devices*, 532 U.S. at 29, a "design patent" can be "presumptive evidence of non-functionality." *Topps Co. Inc. v. Gerrit J. Verburg Co.*, 1996 U.S. Dist. LEXIS 18556, 1996 WL 719381, at *9 (S.D.N.Y. Dec. 13, 1996) (citing *In re Morton Norwich Prods., Inc.*, 671 F.2d 1332, 1342 n.3 (C.C.P.A. 1982)).

*a. Secondary Meaning.* [HN26]The factors utilized to evaluate whether a claimed trade dress has secondary meaning include "'(1) advertising expenditures, (2) consumer studies linking the dress to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the [dress]'s use.'" *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.3d 258, 263 (2d Cir. 1996) (quoting *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987), in turn quoting *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)). No factor is determinative and a court need not examine each factor to reach a decision. *See L. & J.G. Stickley*, 79 F.3d at 263. [*61]

PPR contends that E-Z Bowz has not properly alleged secondary meaning in its amended complaint or adduced sufficient evidence to establish such meaning. *See* Def. Mem. at 16. Because this is a motion for summary judgment, the Court will examine whether E-Z Bowz has brought forward sufficient evidence to establish the existence of a genuine issue of material fact. [HN27]The Second Circuit has noted that "proof of secondary meaning entails vigorous evidentiary requirements" and, therefore, "careful weighing of [the] evidence necessary to determining secondary meaning renders it an unlikely candidate for summary judgment." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 169 (2d Cir. 1991) (citation omitted).

E-Z Bowz has brought forward several different types of evidence in an attempt to demonstrate that its

trade dress acquired secondary meaning. First, E-Z Bowz has offered evidence that between the years of 1994 to 2001 it spent $ 1,065,909 to advertise its products -- primarily its bow maker, *see* Cavender Decl. P 8, and has included copies of paid advertisements for the E-Z Bowz bow maker placed in craft magazines. *See id.* Ex. B. Next, E-Z [*62] Bowz has adduced evidence showing media coverage of the product on television programs including the Home Shopping Network, *see id.* PP 12-14, and the QVC network, *see id.* PP 15-18; on various other television programs, *see id.* PP 19-26; and in print media between 1997 to 2002. *See id.* P 30; *id.* Ex. H. As evidence of the sales success of the dress, E-Z Bowz has offered evidence showing gross revenues for its products totaled $ 19,442,804 between the years of 1994 to 2001. *See id.* P 10. E-Z Bowz has also showed that its product is sold in various retail stores throughout the United States. *See id.* P 31. Finally, E-Z Bowz has shown that there have been a number of attempts, beyond just PPR, to copy the asserted trade dress. *See id.* P 33; *id.* Ex. I.

PPR responds to E-Z Bowz's evidence by pointing out that E-Z Bowz manufactures an entire product line that includes products not containing the elements of the trade dress claimed in this case. *See* Def. Reply at 7-9. PPR also argues that E-Z Bowz's evidence is insufficient because it may relate to the entire product line, not necessarily to the specific product at issue here. *See id.* at 9. However, [*63] these contentions raise an argument regarding the strength of E-Z Bowz's evidence -- not its existence -- and are insufficient to result in a grant of summary judgment for PPR. *See, e.g., Anderson, 477 U.S. at 250* ("If reasonable minds could differ as to the import of the evidence" summary judgment is inappropriate). Moreover, [HN28]cases have denied summary judgment where a party has submitted similar evidence regarding secondary meaning. *See, e.g., U-Neek, Inc. v. Wal-Mart Stores, Inc., 147 F. Supp. 2d 158, 172 (S.D.N.Y. 2001)* (evidence of advertisements, sales amounts, and purported infringement of the product); *see also Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd., 2000 U.S. Dist. LEXIS 10394, 2000 WL 1028634, at *21 (S.D.N.Y. July 25, 2000)* (denying summary judgment where the evidence was "not sufficient in and of itself to establish secondary meaning" but did "establish an issue of material fact"). Accordingly, summary judgment should be denied with respect to PPR's claim that E-Z Bowz has failed to demonstrate secondary meaning.

*b. Functionality.* PPR also argues that E-Z Bowz's trade dress is functional because [*64] (1) there are so many symbols and graphics on E-Z Bowz's products that there is no particular expression of trade dress; (2) E-Z Bowz's products incorporate common shapes and graphics so as to be generic and not protectible; (3) the

claimed trade dress was disclosed in a utility patent (the '979 Patent); and (4) the separate paper instructions included with the bow maker are functional and cannot serve as trade dress. *See* Def. Mem. at 17-21. The first two contentions are easily disposed of because E-Z Bowz has only sought protection in this case as to one product, not its entire line. PPR's contention that elements of E-Z Bowz's trade dress are generic is relevant to a determination of distinctiveness, not functionality. *See, e.g., Two Pesos, 505 U.S. at 768* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976))*. Moreover, PPR's attempt to dissect the individual elements of the trade dress is unavailing as case law makes clear that "even if certain individual elements of [plaintiff's] trade dress are functional, the appropriate inquiry looks at the trade dress as a whole." *Majestic Drug Co., Inc. v. Olla Beauty Supply, Inc., 1997 U.S. Dist. LEXIS 900, 1997 WL 37955, at *12 (S.D.N.Y. Jan. 31, 1997) [*65]* (citing *LeSportsac, 754 F.2d at 76*); *accord O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd., 1999 U.S. Dist. LEXIS 979, 1999 WL 47191, at *25 (S.D.N.Y. Feb. 2, 1999)*; *see also Masterfoods USA v. Arcor USA, Inc., 230 F. Supp. 2d 302, 309 (W.D.N.Y. 2002)* ("any worthwhile litigation lawyer could distinguish almost every separate element of [a claimed trade dress] and find that just about each element, alone, was functional," but the claimed dress must be "viewed as a whole"). Accordingly, the proper inquiry on this motion is whether E-Z Bowz has brought forward evidence that could show its trade dress, viewed as a whole, is not functional.

[HN29]To determine whether a claimed trade dress is functional the Court "must assess the degree of usefulness of the similar features on the competing dress, the degree of similarity between the non-useful, ornamental features of the packaging, and the feasibility of alternatives to the useful features." *Fun-Damental Too, 111 F.3d at 1002* (citation omitted); *accord Fabrication Enters., Inc. v. Hygenic Corp., 64 F.3d 53, 59 (2d Cir. 1995)*. The factors [*66]

should be considered along a continuum. On one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection.

*Fabrication Enters., 64 F.3d at 59* (quoting *Stormy Clime Ltd. v. ProGroup, Inc., 809 F.2d 971, 977 (2d Cir. 1987)).*

PPR's best argument comes from the existence of the '979 Patent. In *TrafFix Devices*, the Supreme Court stated that "[a] utility patent is strong evidence that the features therein claimed are functional." *532 U.S. at 29*; *accord id. at 30* (utility patent "adds great weight to the statutory presumption that features are . . . functional"). [HN30]When trade dress features are among the claims established in the utility patent, "one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is [*67] merely an ornamental, incidental, or arbitrary aspect of the device." *Id. at 30.* The Court noted, however, that

> [HN31]in a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as . . . an ornamental pattern painted on [features disclosed in the patent] . . . the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent.

*Id. at 34.* E-Z Bowz seizes on this language to argue that, taken as a whole, its trade dress is arbitrary and ornamental. *See* Pl. Opp. Mem. at 29-30. If such a claim is raised, a court can "be aided by going beyond the claims and examining the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention." *TrafFix Devices, 532 U.S. at 34.* Accordingly, the Court will examine the '979 Patent and its prosecution history to determine whether any elements of E-Z Bowz's claimed trade dress were disclosed in the patent and, if so, whether they were a useful feature of the device.

The first and second elements [*68] of E-Z Bowz's claimed trade dress, the base and dowels (that is, retaining members), are clearly functional elements included in the '979 Patent. The base of the apparatus is described in claims 1, 3, 4, 5, 7, 8, 9, and 10 of the '979 Patent, while the dowels are described in claims 1, 2, 5, 6, and 9. *See* '979 Patent. Moreover, these elements are described within the patent itself as functional:

> The bow making apparatus . . . includes a base member . . . defining an upper work surface . . . for supporting bow fabricating material . . . during the bow making operation. The apparatus . . . also includes first, second and third retainer members . . . extending upwardly from the upper work surface . . . of the base member . . . for releasably receiving and maintaining the position of the gathered sections of bow fabricating material.

'979 Patent, Abstract (reproduced in '979 History). Accordingly, these elements of the patent are functional and cannot sustain a claim for trade dress.

Other portions of the base and dowels, however, are ornamental and have no function in the bow making machine. Specifically, the color, grain and texture of the wood used in the bow maker [*69] have no relation to the actual function and operation of the device.

The most complicated element of E-Z Bowz's claimed trade dress pertains to the colors, graphics and markings on the base of the bow maker. Much of the coloring and placement of graphics on the bow maker serve an aesthetic and ornamental purpose and are unrelated to the function of the bow maker. The measuring lines or indicia on the base of the bow maker, by contrast, are functional. This is because the measuring lines were disclosed as part of the '979 Patent to "facilitate the making of bows having looped portions of preselected length." '979 Patent Claim 3; *accord* '979 History, Description at 4 ("In a preferred embodiment of the apparatus the upper work surface of the base member is provided with measuring indicia to facilitate the making of bows having preselected dimensions."). Facilitating the making of bows was the entire purpose of the bow maker and these indicia were intended to help this function. Thus, the graphics and markings on the base element consist of both functional as well as arbitrary and ornamental elements. On this motion for summary judgment, drawing all reasonable inferences in favor [*70] of E-Z Bowz, the Court cannot say that the functional portions of this element so outweigh the ornamental portions as to deprive them of any trade dress protection as a matter of law.

The remaining element of E-Z Bowz's trade dress claim is the instructions on how to use the bow making product. The Court concurs with PPR's argument that these instructions are inherently functional. The purpose of the bow making device is to allow people to make decorative bows. The instructions are in no way arbitrary but are instead designed to allow consumers to fulfill the purpose of the bow maker.

In support of its position that its trade dress is not functional, E-Z Bowz has submitted evidence that at least 36 different bow making machines exist that utilize

dress different from the E-Z Bowz bow maker. *See* Cavender Decl. P 34; *id.* Ex. K (providing copies of numerous advertisements for different bow makers). Such evidence is relevant because [HN32]"one factor in establishing the non-functionality of a trade dress is a demonstration that feasible, or cost-effective, alternatives to the design exist." *Neutrik AG v. Switchcraft, Inc., 2001 U.S. Dist. LEXIS 3180, 2001 WL 286722, at *2 (S.D.N.Y. Mar. 23, 2001)* [*71] (citing *Stormy Clime, 809 F.2d at 977*), *aff'd*, 2002 WL 315032 (Fed. Cir. Feb. 27, 2002). The existence of these other trade dresses shows that E-Z Bowz's trade dress does not inhibit or prevent companies from entering this market and helps to prevent a finding of functionality. *See Landscape Forms, 113 F.3d at 377* (the functionality defense "requires a showing that trade dress protection would deprive competitors of alternative designs, and, thus, foreclose competition from the relevant market")*(citing Restatement (Third) of Unfair Competition, § 17 cmt. c (1995))*. Thus, "there is no risk of . . . market foreclosure" in this case because E-Z Bowz "seeks protection only of a single specific design." *P.E. Guerin, Inc. v. Nanz Custom Hardware, Inc., 1997 U.S. Dist. LEXIS 19914, 1997 WL 777812, at *6 (S.D.N.Y. Dec. 16, 1997)*.

E-Z Bowz also points to the existence of the '998 Design Patents as evidence of non-functionality. *See* Pl. Opp. Mem. at 30. [HN33]Courts have stated that "the existence of a design patent . . . is relevant to the functionality defense." *Krueger Int'l, Inc. v. Nightingale Inc., 915 F. Supp. 595, 605 (S.D.N.Y. 1996)* [*72] (citing cases). While such evidence does not, by itself, require a finding that the trade dress is non-functional, *see* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 7:93 (4th ed. 2003), it provides some additional weight in support of E-Z Bowz's argument. [2]

    2    The fact that this Court has recommended finding the '998 Design Patent invalid due to the on-sale bar does not abrogate its relevance to the question of functionality. [HN34]A design patent cannot be issued if the invention is functional. *See, e.g., Hupp v. Siroflex of Am., Inc., 122 F.3d 1456, 1460 (Fed. Cir. 1997)* ("A design or shape that is entirely functional . . . does not meet the statutory design criteria of a design patent.") (citing cases). It follows that "because a design patent is granted only for non-functional designs, it can serve as evidence that a plaintiff's trade dress is not functional." *Krueger Int'l, 915 F. Supp. at 605* (citations omitted). The expiration of a design patent does not remove its relevance to the functionality question. *See Topps Co., 1996 U.S. Dist. LEXIS 18556, 1996 WL 719381, at*

*10. That such a patent may be invalidated due to the on-sale bar is also of no logical relevance to the question of whether the patent as granted showed non-functionality.

[*73]    The Court is mindful that [HN35]if "'there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" *Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003)* (quoting *Fischl v. Armitage, 128 F.3d 50, 55-56 (2d Cir. 1997))*. While many of the elements in E-Z Bowz's claimed trade dress are functional, the proper inquiry is not into the individual elements but the dress as a whole. *See, e.g., Landscape Forms, 113 F.3d at 381*. [HN36]Trade dress "accords protection to symbols consumers are likely to rely upon in distinguishing goods, while denying protection that would hamper efforts to market competitive goods." *Id. at 380*. In this case, E-Z Bowz has assembled a bow making device with a specific color scheme and markings as part of its design. *See* Cavender Decl. Ex. A. While some portions of this dress are functional, some are purely arbitrary and designed to allow consumers to distinguish the E-Z Bowz bow maker from other products. On this motion for summary judgment, E-Z Bowz has submitted evidence creating a genuine issue of material [*74] fact as to whether its claimed trade dress is functional.

    *c. Conclusion.* Because E-Z Bowz has provided sufficient evidence that its trade dress carries a secondary meaning and that it is not functional, PPR's motion for summary judgment on E-Z Bowz's trade dress claims should be denied.

### 2. Common Law Unfair Competition

Finally, E-Z Bowz has asserted a claim of common law unfair competition against PPR. *See* Am. Compl. PP 12-15. PPR argues that because the New York law of unfair competition requires a showing of non-functionality, it is entitled to summary judgment. *See* Def. Mem. at 21 n.19. PPR is correct that "a claim for unfair competition under New York law requires proof of a competitor's deliberate use of a non-functional trade dress." *Morex S.p.A. v. Design Inst. Am., Inc., 779 F.2d 799, 801 (2d Cir. 1985)* (per curiam). However, because E-Z Bowz has adduced sufficient evidence of non-functionality, PPR's motion for summary judgment on this ground should be denied.

### IV.    *E-Z BOWZ'S MOTION FOR SUMMARY JUDGMENT*

E-Z Bowz (that is, E-Z Bowz, L.L.C.) has also moved for summary judgment dismissing counts 1 through 4, and counts [*75] 6 and 7 of PPR's counterclaims. ³ *See* Memorandum of Law in Support of E-Z Bowz Defendant's Motion for Partial Summary Judgment, filed January 21, 2003 ("E-Z Bowz Mem.") (Docket # 111), at 5-23. These counts relate to antitrust, unfair competition, fraud and deceit, trade libel, and certain tort claims. Each of these counts is discussed in turn.

> 3     E-Z Bowz has not moved for summary judgment in its favor with regard to PPR's counterclaim of patent invalidity and non-infringement of E-Z Bowz's patents or trade dress. *See* PPR Complaint PP 102-07. As discussed in section III.A above, the Court has already determined that PPR's motion for summary judgment on this count should be granted in part and denied in part.

These same counterclaims form the basis of the third-party complaint against the E-Z Defendants, LNG and Threadgill. In a separate Report and Recommendation, however, it has been recommended that the third-party complaint be dismissed for lack of personal jurisdiction over these defendants. Thus, [*76] PPR's summary judgment motion is considered only with respect to the counterclaims against plaintiff E-Z Bowz, L.L.C..

A. *Antitrust Claims*

E-Z Bowz argues that PPR's claims under section 2 of the Sherman Antitrust Act fail for (1) failure to present evidence regarding the relevant market, (2) failure to prove monopoly power, (3) failure to demonstrate antitrust injury and (4) failure to prove attempted monopolization. *See* E-Z Bowz Mem. at 5-11. PPR has opposed E-Z Bowz's motion on the ground that it has provided sufficient evidence to show monopoly and attempted monopolization under section 2 of the Sherman Act, 15 U.S.C. § 2. *See* Professional Product Research Co., Inc.'s Memorandum of Law in Opposition to the Several E-Z Bowz, L.L.C.'s Defendants' Motion for Summary Judgment, filed February 6, 2003 (Docket # 120) ("PPR Mem."), at 3-14. PPR also appears to assert that it has shown violations not only of section 2 of the Sherman Act but also separate violations of section 4 of the Clayton Act, 15 U.S.C. § 15. *See* PPR Complaint PP 75-84. [HN37]Section 4 of the Clayton act, however, is the provision that allows a private right of [*77] action for substantive violations of the antitrust laws. *See*, *e.g.*, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 331 n.1, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990). The section provides no separate cause of action.

For the reasons set forth below, E-Z Bowz's motion must be granted because PPR has failed to define a relevant market, failed to prove E-Z Bowz's market power and failed to show that it suffered antitrust injury. Moreover, PPR has not provided evidence to support the underpinning of its antitrust claim: that is, that E-Z Bowz committed fraud before the USPTO.

As an initial matter, PPR argues that the Supreme Court has cautioned against the use of summary judgment in complex antitrust cases, citing *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 7 L. Ed. 2d 458, 82 S. Ct. 486 (1962). *See* PPR Mem. at 3. More recent case law, however, has squarely held that [HN38]"summary judgment serves a vital function in the area of antitrust law." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998) (citing *Matsushita*, 475 U.S. at 593-94) (citation omitted); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) [*78] (per curiam) ("In the context of antitrust cases . . . summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces.") (citing *Tops Mkts.*, 142 F.3d at 95). Moreover, at least one court has noted, "although *Poller* has not been overruled, the courts, including the Supreme Court, now more freely approve the granting of summary judgment in antitrust cases." *Texaco Puerto Rico, Inc. v. Medina*, 834 F.2d 242, 247 (1st Cir. 1987) (citing cases).

### 1. *PPR has Failed to Adduce Evidence of the Relevant Market*

[HN39]To demonstrate a monopolization violation of section 2 of the Sherman Act, a plaintiff (or, in this instance, a counterclaimant) must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993) [*79] ("the plaintiff charging attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required the definition of the relevant market and examination of market power"). To meet this burden, an antitrust plaintiff must establish the geographic scope of the market and define the actual product market. *See PepsiCo*, 315 F.3d at 105 ("It is necessary to define the relevant product and geographic market. . . . A relevant product market consists of 'products that have reasonable

interchangeability for the purposes for which they are produced -- price, use and qualities considered.'") (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 100 L. Ed. 1264, 76 S. Ct. 994 (1956)); *see also United States v. Microsoft Corp.*, 346 U.S. App. D.C. 330, 253 F.3d 34, 81 (D.C. Cir.) (en banc) (per curiam) ("Defining a market . . . involves . . . a detailed description of the purpose of [the product] -- what functions may be included and what are not -- and an examination of the substitutes that are part of the market and those that are not."), *cert. denied*, 534 U.S. 952, 151 L. Ed. 2d 264, 122 S. Ct. 350 (2001). [*80] "Products will be considered reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" *PepsiCo*, 315 F.3d at 105 (quoting *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998)). The party alleging a violation of the antitrust laws has the burden of defining the relevant market and all of its relevant parts. *See*, *e.g.*, *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001) (affirming summary judgment where plaintiff "failed to define in which markets [defendant] supposedly exercised monopoly power").

PPR's counterclaim defines the relevant market as "the domestic hand-tied bow maker market." PPR Complaint P 76. Standing alone, this definition of the market would be insufficient to withstand a motion to dismiss, let alone one for summary judgment. As one court has noted:

> [HN40]An antitrust complaint must explain why the market it alleges is the relevant, economically significant product market. . . . Because a relevant market includes all products which are reasonably interchangeable, . . . 'plaintiff's failure to define its market by reference to the rule of [*81] reasonable interchangability is, standing alone, valid grounds for dismissal.'"

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171-72 (S.D.N.Y. 1995) (quoting *E & G Gabriel v. Gabriel Bros., Inc.*, 1994 U.S. Dist. LEXIS 9455, 1994 WL 369147, at *3 (S.D.N.Y. June 13, 1994)) (citation omitted). Thus, [HN41]even on a motion to dismiss, an antitrust claim will be dismissed "'if a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand.'" *Commercial Data Servers, Inc. v. Int'l Bus. Mach. Corp.*, 166 F. Supp. 2d 891, 896 (S.D.N.Y. 2001) (quoting *Re-Alco Indus. Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391

(S.D.N.Y. 1993)) (citation omitted). Neither PPR's complaint nor any of the evidence it has submitted in support of its motion properly identifies comparable products or any cross-elasticity of demand for other products that could or could not compete with the E-Z Bowz bow maker.

PPR's entire antitrust claim is premised on its contention that E-Z Bowz fraudulently obtained [*82] the patents at issue. This premise -- which PPR failed to prove in its own motion for summary judgment, *see* section III.A.3 -- is insufficient to constitute evidence defining a relevant market. [4] As one court has noted, "it is obvious that [HN42]merely obtaining a patent for a product does not create a product market for antitrust purposes." *B.V. Optische*, 909 F. Supp. at 172 (citations omitted). In *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 15 L. Ed. 2d 247, 86 S. Ct. 347 (1965), a case on which PPR heavily relies, the Supreme Court explicitly referred to the importance of establishing the relevant market in an antitrust case alleging a fraudulently obtained patent. *See id.* at 177-78 ("Without a definition of the market there is no way to measure [defendant's] ability to lessen or destroy competition. . . . There may be effective substitutes for the device which do not infringe the patent."). Thus, "proof of fraud on the USPTO is insufficient to survive a motion to dismiss; rather, all of the elements of a § 2 claim must be established." *B.V. Optische*, 909 F. Supp. at 171 (citing *Walker Process*, 382 U.S. at 177-78); [*83] *see also Walker Process*, 382 U.S. at 174 ("enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements to a § 2 case are present").

> 4    PPR has not even shown there was any "fraud" in obtaining the patents at issue. The fact that the Court has found the '998 Patent invalid due to the on-sale bar does not establish fraud. *See Digital Equip. Corp. v. Diamond*, 653 F.2d 701, 719 (1st Cir. 1981) ("At most, the USPTO has established that [the inventor] was 'negligent' in not exploring . . . the possibility that the early commercial activity constituted an 'on sale' bar. Such negligence is not by itself equivalent to fraud.").

PPR attempts to distinguish *B.V. Optische* by claiming that the alleged market in that case "merely defined the relevant market in terms identical to the allegedly fraudulent patents." PPR Mem. at 12 (citing *B.V. Optische*, 909 F. Supp. at 172). However, the case says [*84] no such thing and is not limited in the way PPR suggests.

PPR also claims that E-Z Bowz defined the relevant market through statements made during the discovery

process. *See* PPR Mem. at 6-7. However, it is PPR who bears the burden of delineating the relevant market. Moreover, even the evidence cited by PPR shows that E-Z Bowz has not attempted to monopolize the entire domestic bow making market. Specifically, Cavender testified that one competing product, the Bow Master, was so different so as not to infringe upon the E-Z Bowz patents. *See* Deposition of Lea Cavender, dated August 29, 2001 (reproduced in Exhibits to Professional Product Research Co., Inc.'s Opposition to the E-Z Bowz, Defendants' Motion for Summary Judgment, filed February 6, 2003 ("PPR Opp. Exhibits") (filed with PPR Mem.), Ex. 3), at 84-86. Thus, the domestic bow maker market includes products that have not been subject to E-Z Bowz's alleged monopoly.

  2.  *PPR has Failed to Demonstrate Market Power*

  Even if PPR had sufficiently defined a product market, it has failed to demonstrate the existence of market power. [HN43]"The core element of a monopolization claim is market power, which is defined as [*85] 'the ability to raise price by restricting output.'" *PepsiCo*, 315 F.3d at 107 (quoting 2A Philip E. Areeda, *et al.*, *Areeda & Hovenkamp's Antitrust Law*, P 501, at 85 (2002)); *see also Tops Mkts.*, 142 F.3d at 97-98 ("Monopoly power, also referred to as market power . . . is 'the power to control prices or exclude competition.'") (quoting *EI du Pont*, 351 U.S. at 391) (citation omitted). Market power may be proven in two ways: either "directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage of the relevant market." *Tops Mkts.*, 142 F.3d at 98 (citing *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995)). PPR has failed to proffer evidence that could support a finding under either method.

  PPR's only evidence regarding E-Z Bowz's alleged market power consists of efforts by E-Z Bowz to stop other parties from allegedly infringing its patents. *See, e.g.*, Letter to Can Creations, Inc., from John O. Threadgill, dated February 2, 2001 (reproduced in PPR Opp. Exhibits, Ex. 5). However, such [*86] acts alone cannot constitute a violation of the antitrust laws. The Federal Circuit has stated:

  [HN44]Neither the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability. . . . Since a principal purpose of the patent system is to provide

innovators with a property right upon which investment and other commercial commitments can be made . . . the patentee must have the right of enforcement of a duly granted patent, unencumbered by punitive consequences should the patent's validity or infringement not survive litigation.

*See C.R. Bard*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) (citations omitted). The only exception to this statement is if the party initiates a "sham litigation as a tactic to destroy competition." *See id. at 1368*. The "sham litigation" exception is not even at issue, however, because there is no evidence that any litigation ensued. As the holder of a patent that is presumed valid, *see* 35 U.S.C. § 282, E-Z Bowz was certainly within its rights to notify parties that allegedly infringed upon those patents [*87] of the prospect of litigation.

  To the extent that PPR is claiming that E-Z Bowz has exerted market power by initiating the instant suit, it has failed to demonstrate the suit falls under the definition of sham. [HN45]The standard to evaluate whether litigation qualifies as sham requires: "(1) the lawsuit must be objectively meritless such that 'no reasonable litigant could expect success on the merits' and (2) it must be found that 'the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor.'" *C.R. Bard*, 157 F.3d at 1368 (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993), in turn quoting *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961)). There is no need to evaluate the second step of the process unless the litigation is found to be objectively meritless. *See Prof'l Real Estate Investors*, 508 U.S. at 60. In this case, PPR has provided no evidence that would demonstrate that E-Z Bowz's patent claims are objectively meritless. [*88] In fact, the denial in part of PPR's motion for summary judgment, *see* section III. A above, shows exactly the opposite.

  In addition, PPR has not brought forward any evidence regarding market share. *See, e.g., Tops Mkts.*, 142 F.3d at 98 [HN46]("A court may infer monopoly power from a high market share.") (citing cases). PPR claims that "the use of certain fraudulently procured patents to exclude others from the relevant market may be sufficient in itself to constitute monopoly power." PPR Mem. at 6. [HN47]The Federal Circuit has noted that "unless the patent had been obtained by fraud such that the market position had been gained illegally, the patent right to exclude does not constitute monopoly

power prohibited by the Sherman Act." *C.R. Bard,, 157 F.3d at 1368* (citing *Walker Process, 382 U.S. at 177-78*); *see also SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1204 (2d Cir. 1981)* ("No court has ever held that the antitrust laws require a patent holder to forfeit the exclusionary power inherent in his patent the instant his patent monopoly affords him monopoly power over a relevant product market."). However, PPR has failed [*89] to establish the existence of any fraud on the part of E-Z Bowz in obtaining the patents at issue. Without such evidence, "[a] patent alone does not demonstrate market power." *In re Indep. Serv. Orgs. Antitrust Litig., 203 F.3d 1322, 1325 (Fed. Cir. 2000)* (citation omitted), *cert. denied,* 531 U.S. 1143, 148 L. Ed. 2d 954, 121 S. Ct. 1077 (2001); *accord C.R. Bard, 157 F.3d at 1368* ("It is not presumed that the patent-based right to exclude necessarily establishes market power in antitrust terms.") (citation omitted). Without its reliance on E-Z Bowz's alleged fraud, PPR has no argument to support its contention that E-Z Bowz exercised market power.

In the course of briefing this issue, PPR disclosed in its brief the terms of E-Z Bowz's alleged offer to settle this case, purportedly made during the course of a settlement conference before the undersigned. *See* PPR Mem. at 8 n.14. The apparent purpose of this disclosure was to show that the instant litigation is in fact a "sham." Such evidence, however -- even if true -- is plainly inadmissible under Fed. R. Evid. 408 and thus inadmissible under Fed. R. Civ. P. 56(e). In addition, it violated an order of this Court's [*90] stating that "all communications made as part of the conference process are strictly confidential." *See* Standing Order In Cases Referred for Settlement to Magistrate Judge Gabriel W. Gorenstein, P 1. Obviously, the Court has not considered PPR's allegation on this score.

### 3. *PPR has Failed to Demonstrate Antitrust Injury*

Compounding its multiple failures of proof, PPR has also failed to demonstrate an antitrust injury. [HN48]A party claiming an antitrust violation "must prove the existence of 'antitrust injury, which is to say injury of the type antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atl. Richfield, 495 U.S. at 334* (emphasis omitted) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)*). "The antitrust laws . . . were enacted for 'the protection of competition not competitors.'" *Brunswick, 429 U.S. at 488* (quoting *Brown Shoe Co. v. United States, 370 U.S. 294, 320, 8 L. Ed. 2d 510, 82 S. Ct. 1502 (1962)*). Thus, the party asserting a claim under the

antitrust laws "must allege [*91] not only cognizable harm to [itself], but an adverse effect on competition market-wide." *Todd v. Exxon Corp., 275 F.3d 191, 213 (2d Cir. 2001)* (citing *Elecs. Communications Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 242 (2d Cir. 1997)*). "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1158 (9th Cir. 2003)* (citations omitted).

PPR seems to assert that it has demonstrated an antitrust injury because E-Z Bowz has allegedly used its patents to drive lower priced competitors from the market so it could undercut the prices of remaining competitors. *See* PPR Mem. at 13. But PPR has failed to offer any evidence that E-Z Bowz was engaging in any type of predatory pricing -- that is, by offering its product below its costs. Without proof of such behavior, PPR has failed to demonstrate any antitrust injury. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993)* ("we have rejected . . . the notion that [*92] above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws") (citing *Atl. Richfield, 495 U.S. at 340*). [HN49]The Supreme Court has made clear that "low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Atl. Richfield, 495 U.S. at 340*; *see also Cargill Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 116, 93 L. Ed. 2d 427, 107 S. Ct. 484 (1986)* ("To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result."). Without any evidence showing that E-Z Bowz sold its products below its costs, PPR cannot rely on allegations of predatory pricing to establish antitrust injury.

Even had PPR brought forward evidence regarding E-Z Bowz's costs, it still failed to demonstrate the second element of predatory pricing. [*93] [HN50]"The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had, . . . under § 2 of the Sherman Act, a dangerous probability[] of recouping its investment in below-cost prices." *Brooke Group*, 509 U.S. at 224 (citations omitted). Assuming, *arguendo*, that E-Z Bowz did lower its prices to gain market share, it "is of no moment to the antitrust laws" that these actions "imposed painful losses on" PPR. *Id.* Lower prices for bow makers benefitted consumers unless PPR had

brought forward evidence of "a dangerous probability that [E-Z Bowz] would monopolize [the] particular market." *Spectrum Sports*, 506 U.S. at 459. PPR has not brought forward any such evidence.

> ### 4. *PPR has Failed to Demonstrate a Conspiracy or Attempted Monopolization*

[HN51]In order to state a claim for a conspiracy to monopolize PPR must offer evidence that shows "'(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.'" *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 795-96 [*94] (2d Cir.) (quoting *Paralegal Inst., Inc. v. Am. Bar Ass'n*, 475 F. Supp. 1123, 1132 (E.D.N.Y. 1979)) (citations omitted), *cert. denied*, 482 U.S. 915, 96 L. Ed. 2d 677, 107 S. Ct. 3188 (1987). PPR's argument regarding concerted action to achieve an unlawful monopoly consists of the allegations of fraud before the USPTO. However, as noted above, PPR has failed to demonstrate that these actions were undertaken to achieve an unlawful monopoly. Thus, PPR's claim of a conspiracy to monopolize fails.

[HN52]For PPR to succeed on its claim of attempted monopolization it needed to show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports*, 506 U.S. at 456 (citation omitted); *accord Tops Mkts*, 142 F.3d at 99-100. As noted above, there is no evidence that E-Z Bowz engaged in any predatory or anticompetitive conduct sufficient to support this claim. Even if PPR had adduced sufficient evidence of a specific intent to monopolize, its claim would still fail because it has not shown a dangerous probability of success. [HN53]"Critical to deciding [*95] the dangerous probability prong of [an] attempted monopolization claim is defendant's economic power in the relevant market. . . . Attempted monopolization requires some degree of market power." *Tops Mkts*, 142 F.3d at 100 (citations omitted). A lesser degree of market power is required for a claim of attempted monopolization than for a claim of a completed monopoly. *See id.* However, as noted in section IV.A.2 above, PPR has not brought forward any evidence regarding market power. Thus, even under the reduced quantum of proof required for this claim, PPR has failed to offer evidence that could allow a reasonable jury to find in its favor.

### B. *Unfair Competition Claims*

PPR asserted two counterclaims of unfair competition against E-Z Bowz: one under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and one for common law unfair competition. *See* PPR Complaint PP 85-95. Both of these claims must be dismissed.

> ### 1. *PPR's Lanham Act Claim*

Section 43(a) of the Lanham Act provides in pertinent part:

> [HN54](1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce [*96] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - -
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). PPR has claimed that E-Z Bowz made four allegedly false claims in connection with its bow maker. *See* PPR Complaint PP 86(a)-(d). Specifically, PPR claims that statements of "more than 1 million sold;" "more than 3 million sold;" that the bow maker was "made in the U.S.A.;" and that the bow maker was protected by the '979, '733 and/or '998 Patents were false. *Id.* (capitalization omitted). E-Z Bowz claims that PPR's claim under the Lanham Act fails because PPR lacks standing to assert this claim and that the alleged misrepresentations were true. *See* E-Z Bowz Mem. at 13-14. The Court need not reach the argument [*97] regarding the truth of the statements because, as discussed below, PPR has failed to demonstrate that it has standing to assert this claim.

E-Z Bowz's argument that PPR lacks standing is based on two contentions. The first contention -- that PPR allegedly infringed upon E-Z Bowz's product, *see* E-Z Bowz Mem. at 13 -- is irrelevant. At this stage, E-Z Bowz has not been called upon to offer its proof that PPR infringed upon any protectible interest of E-Z Bowz.

E-Z Bowz also contends that PPR has failed to bring forward any evidence that it suffered a cognizable injury sufficient to establish standing. *See* E-Z Bowz Mem. at 15. [HN55]"In order to establish standing to sue under [section 43(a)], a plaintiff must establish a 'reasonable interest to be protected' against the advertiser's false or misleading claims, . . . and a 'reasonable basis' for believing that this interest is likely to be damaged by the false or misleading advertising." *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994) (citations and some quotation marks omitted). In order to have satisfied the "reasonable basis" prong, PPR "must submit specific evidence that [E-Z Bowz's] [*98] advertising causes direct harm to the product in which [PPR] claims a pecuniary interest.'" *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1112 (2d Cir. 1997) (quoting *Coca-Cola Co. v. Tropicana Prods, Inc.*, 690 F.2d 312, 316 (2d Cir. 1982)). While PPR "need not demonstrate that it . . . has definitely lost sales because of [E-Z Bowz's] advertisements . . . 'the likelihood of injury and causation will not be presumed, but must be demonstrated in some manner." *Ortho Pharm.*, 32 F.3d at 694 (citations omitted). PPR has failed to adduce any evidence that shows any harm attributable to E-Z Bowz's allegedly false statements.

The only evidence that PPR points to is the deposition testimony of one of its employees, Robert Notine, who testified about the circumstances of PPR's discontinuing making its bow maker. *See* Deposition of Robert G. Notine, III, dated July 25, 2002 ("Notine Dep.") (reproduced in PPR Opp. Exhibits, Ex. 20), at 55-59. However, this testimony shows that PPR stopped producing its item because of the potential of a patent infringement lawsuit. *See id.* at 56. Notine does not offer any testimony that PPR stopped [*99] producing this item because of any allegedly false statements made by E-Z Bowz on its packaging. Thus, there is no evidence that the statements made by E-Z Bowz on its packaging caused PPR any damage.

In addition, [HN56]because PPR seeks money damages, *see* PPR Complaint at 28, it "must introduce evidence of actual consumer confusion." *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991) (citations omitted); *accord* *Sun Trading Distrib., Inc. v. Evidence Music, Inc.*, 980 F. Supp. 722, 728 (S.D.N.Y. 1997). PPR has not introduced any such evidence. Nonetheless, "'where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public,' and the defendant's 'deliberate conduct' in this regard is of an 'egregious nature,' a presumption arises 'that consumers are, in fact, being deceived.'" *Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992) (quoting *Res. Developers, 926*

F.2d at 140). "In such a case, once a plaintiff establishes deceptive intent, 'the burden shifts to the defendant to demonstrate the absence [*100] of consumer confusion.'" *Johnson & Johnson*, 960 F.2d at 299 (quoting *Res. Developers*, 926 F.2d at 140). This presumption is inapplicable here because PPR has failed to offer evidence of a deceptive intent.

PPR seems to claim that deposition testimony from the Cavenders shows an intent to deceive because they could not remember when exact sales figures had been reached or when some products were made in Mexico as opposed to the United States. *See* PPR Mem. at 16-17. But the fact that the Cavenders could not specifically remember dates and exact sales figures during their depositions does not mean that they acted in bad faith years earlier. [HN57]Without any evidence tending to show E-Z Bowz acted with an intent to deceive, PPR is not entitled to a presumption of deception. *See Res. Developers*, 926 F.2d at 141 ("The fact that the defendant's state of mind is in issue does not alter the result where only speculative allegations are offered to demonstrate the existence of state of mind after ample opportunity to engage in relevant discovery.") (citation omitted).

Finally, PPR cites to *Alto Prods. Corp. v. Ratek Indus. Ltd.*, 1996 U.S. Dist. LEXIS 12812, 1996 WL 497027 (S.D.N.Y. Sept. 3, 1996) [*101]   , for the proposition that mislabeling a product "made in the U.S.A." is sufficient to establish a likelihood of deception. *See* PPR Mem. at 18-19. *Alto Prods.* found that the sale of a product that violated the Tariff Act, 19 U.S.C. § 1304, by failing to designate its country of origin, violated the *Lanham Act*. *See* 1996 U.S. Dist. LEXIS 12812, 1996 WL 497027, at *5. Here, however, Art Cavender testified that the E-Z Bowz products that were made in Mexico were appropriately labeled to reflect this fact. *See* Deposition of Arthur D. Cavender, dated August 30, 2001 (reproduced in PPR Opp. Exhibits, Ex. 16), at 73 ("it also had a sticker on the Bow Maker that said Made in Mexico, and the master carton said Made in Mexico, too. So they were identified that they were manufactured in Mexico."). PPR has not brought forward evidence to contradict this claim. In addition, the evidence in *Alto Prods.* showed that a foreign manufacturer intentionally sold foreign made products as American made. *See* 1996 U.S. Dist. LEXIS 12812, 1996 WL 497027, at *7; *id.*1996 U.S. Dist. LEXIS 12812, [WL] at *4 (finding the foreign company specifically intended to sell its products "in violation of the *Lanham* [*102]_Act*"). PPR has not brought forward any similar evidence in this case.

### 2. *PPR's Common Law Claim*

PPR's common law unfair competition under New York law fares even worse. [HN58]"In a common law unfair competition claim under New York law, the plaintiff must show . . . actual confusion in an action for damages . . . [and] there must be some showing of bad faith." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995) (citations omitted). As noted above, PPR has failed to offer any evidence that would show actual confusion or bad faith. Accordingly, the common law unfair competition claim must fail.

## C. *Fraud and Deceit Claim*

PPR's fourth counterclaim is for common law fraud based on allegedly false statements from E-Z Bowz regarding: (1) the enforceability of the '979, '733 and '998 Patents; (2) the sales figures of E-Z Bowz's products; (3) where E-Z Bowz's products were manufactured; and (4) representations to users regarding the validity of E-Z Bowz's patents. *See* PPR Complaint PP 98(a)-(d). E-Z Bowz has moved for summary judgment as to PPR's allegation of fraud, claiming that PPR cannot prove the requisite elements [*103] of fraud. *See* E-Z Bowz Mem. at 16-19.

[HN59]To prove a claim of fraud under New York law, PPR must show by clear and convincing evidence: "1) the defendant made a material misrepresentation; 2) the defendant knew of its falsity; 3) the defendant possessed an intent to defraud; 4) the plaintiff reasonably relied on the misrepresentation; and 5) the plaintiff suffered damage as a result of the misrepresentation." *Kaye v. Grossman*, 202 F.3d 611, 614 (2d Cir. 2000) (citation omitted); *see also New York City Transit Auth. v. Morris J. Eisen, P.C.*, 276 A.D.2d 78, 85, 715 N.Y.S.2d 232 (1st Dep't 2000) ("An actionable fraud claim requires proof that defendant made a misrepresentation of fact which was false and known to be false. It also requires a showing that the misrepresentation was made with the intent to induce another party's reliance upon it.").

PPR cannot assert a claim of fraud based on statements made to the general public or the courts involved in this lawsuit. Assuming, *arguendo*, that these statements were false and made with an intent to defraud, PPR is not the proper party to bring claims regarding these statements. [HN60]A fraud claim "may not [*104] rest on allegations of speculative or remote injury to the plaintiff; rather, the plaintiff must have suffered losses as a 'direct, immediate, and proximate result' of the defendant's misrepresentation." *Kaye*, 202 F.3d at 614 (quoting *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993)). Here, any false statements made to the general public or the courts could not have caused any direct harm to PPR. Any harm suffered by PPR is, at best, tangential and indirect. This is insufficient to establish a fraud claim. *See id.* In addition, there is no evidence of reliance by PPR -- let alone reasonable reliance -- on virtually any of the allegedly untrue statements made by E-Z Bowz.

The only exception are the statements made directly to PPR regarding the validity of E-Z Bowz's patents. PPR claims that it reasonably relied on E-Z Bowz's attorney's representation that E-Z Bowz held valid patents that PPR was infringing. *See* Letter to Professional Products from John O. Threadgill, dated August 9, 1996 (reproduced in PPR Opp. Exhibits, Ex. 11); Letter to Larry Brown from John O. Threadgill, dated June 19, 1997 (reproduced in PPR Opp. Exhibits, Ex. [*105] 12); Letter to Barth X. deRosa from John O. Threadgill, dated August 7, 1998 (reproduced in PPR Opp. Exhibits, Ex. 12). However, PPR's own employees testified that they relied upon the opinions of their own attorneys regarding the validity of E-Z Bowz's patents in deciding to stop producing PPR's bow maker. *See* Notine Dep. at 55-56 (stating that PPR stopped selling its product after receiving an opinion from its attorney that E-Z Bowz held its claimed patents). Thus, PPR did not directly rely on E-Z Bowz's statements.

In any event, PPR has not provided evidence that would allow a reasonable jury to conclude that E-Z Bowz knew or held any belief that its patents were invalid. As discussed previously, an issued patent enjoys a presumption of validity, *see* 35 U.S.C. § 282, and PPR has failed to prove that the key patent at issue, Patent '979, was invalid. Moreover, PPR has not brought forward any evidence, let alone evidence of a clear and convincing nature, that shows that E-Z Bowz knew, or even suspected, that any of the remaining patents were invalid. Thus PPR could not show that E-Z Bowz knew its claims regarding its patents were false. Without such [*106] knowledge, E-Z Bowz's assertions that it held enforceable patents cannot support a claim for common law fraud. *See Kaye*, 202 F.3d at 614.

## D. *Trade Libel Claim*

### 1. *Identification of the Claim PPR is Asserting*

PPR's sixth counterclaim seeks monetary damages for trade libel in violation of N.Y. General Business Law § 360-l. *See* PPR Complaint PP 108-11; *id.* at 29-30. At the outset, it is unclear what claim PPR is purporting to assert. N.Y. Gen. Bus. L. § 360-l does not concern trade libel. The statute states:

[HN61]Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. L. § 360-l. By its terms, this statute creates only a cause of action for injunctive relief. *See Scholastic, Inc. v. Stouffer, 124 F. Supp. 2d 836, 848 (S.D.N.Y. 2000).* Yet PPR has sought only monetary damages for [*107] this purported claim. *See* PPR Complaint at 29-30.

[HN62]New York does recognize a cause of action for trade libel as a common law tort. *See, e.g., Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C., 136 A.D.2d 633, 634, 523 N.Y.S.2d 875 (2d Dep't 1988); cf. Collins & Aikman Prods. Co. v. Building Sys., Inc., 58 F.3d 16, 22 (2d Cir. 1995)* (characterizing a claim of trade libel as a "tort claim"). This cause of action allows for monetary relief. *See Waste Distillation, 136 A.D.2d at 634* (noting that a claim of trade libel requires proof of "special damages").

Strangely, neither party has addressed the proper construction of PPR's sixth counterclaim. Accordingly, the Court will examine whether PPR brought forward sufficient evidence to avoid summary judgment for either a tort or statutory claim. The difference is of little importance, however, because PPR's claim fails either way.

### 2. *General Business Law § 360-l*

[HN63]To state a claim for dilution under N.Y. Gen. Bus. L. § 360-l, PPR "must show (1) ownership of a distinctive mark, and (2) a likelihood of dilution." *E. Am. Trio Prods., Inc. v. Tang Elec. Corp., 97 F. Supp. 2d 395, 423 (S.D.N.Y. 2000)* [*108] (citing cases), *appeal dismissed, 243 F.3d 559 (Fed. Cir. 2000); see also Winner Int'l LLC v. Omori Enters., Inc., 60 F. Supp. 2d 62, 73 (E.D.N.Y. 1999)* ("In order to establish a claim for injury to business reputation or dilution, plaintiff must establish two elements: (1) a distinctive mark capable of being diluted and (2) a likelihood of dilution.") (citing *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1030 (2d Cir. 1989)).* PPR has not even asserted, let alone demonstrated, that it was ever the owner of any distinctive mark. Accordingly, it cannot state a claim for dilution under General Business Law § 360-l.

In its brief, PPR does not address whether it has provided evidence to satisfy this statute but instead asserts that it has met the elements of an entirely different statute: N.Y. Gen. Bus. L. § 360-m. *See* PPR Mem. at 22. This statute, [HN64]however, requires a party to own a trademark in order to state a claim for damages. *See N.Y. Gen. Bus. L. § 360-m* ("Any owner of a mark . . . may proceed by suit"). PPR has not provided evidence that it owns a trademark in its bow making device. The case [*109] cited by PPR in its brief, *Monsanto Co. v. Haskel Trading, Inc., 13 F. Supp. 2d 349 (E.D.N.Y. 1998),* is also irrelevant for an entirely different reason. *Monsanto Co.* dealt with a "common law claim of unfair competition" for monetary damages, *id. at 361* -- a claim for which PPR provided no evidence as discussed in Section IV.B.2 above.

### 3. *Trade Libel*

[HN65]"The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Waste Distillation, 136 A.D.2d at 634* (citation omitted); *see also Global Merch., Inc. v. Lombard & Co., 234 A.D.2d 98, 99, 650 N.Y.S.2d 724 (1st Dep't 1996)* ("trade libel . . . requires 'knowing publication of false matter derogatory to the plaintiff's business.'") (quoting *Waste Distillation, 136 A.D.2d at 634).* Thus, under New York law PPR needs to prove "'four essential elements . . . (1) the falsity of the alleged statements; (2) publication to a third [*110] person; (3) malice; and (4) special damages.'" *Computech Int'l, Inc. v. Compaq Computer Corp., 2002 U.S. Dist. LEXIS 20307, 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002)* (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 75 F. Supp. 2d 235, 239 (S.D.N.Y. 1999)).*

Assuming, *arguendo,* that PPR could prove the existence of false statements, malice and special damages, it has not alleged nor proven the publication of any statements by E-Z Bowz regarding PPR. PPR has offered testimony of E-Z Bowz employees discussing when they did or did not recall creating instructions for the E-Z Bowz bow maker. *See* PPR Mem. at 23 n.36. However, this has no connection or relevance to a claim for trade libel. Without any evidence showing that E-Z Bowz published false statements regarding PPR, the claim for trade libel fails.

E. *Tortious Interference with Business Relations Claim*

PPR's final counterclaim is for tortious interference with business relations. *See* PPR Complaint PP 112-19. Specifically, PPR claims that E-Z Bowz interfered with its existing and prospective business relations. *See id.* Contrary to E-Z Bowz's argument, *see* E-Z Bowz Mem. at 22, [HN66]New [*111] York recognizes tortious interference with both existing contractual relations and prospective economic advantage. *See, e.g.,* *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993); *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 253-54 (S.D.N.Y. 2001). Each is examined separately.

1. *Tortious Interference with Contractual Relations*

[HN67]To assert a claim for tortious interference with contractual relations under New York law a plaintiff must prove: "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to the plaintiff." *Kronos, Inc.*, 81 N.Y.2d at 94; *accord G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir.), *cert. denied*, 516 U.S. 944, 133 L. Ed. 2d 304, 116 S. Ct. 381 (1995). Because the alleged interference here involved E-Z Bowz's assertion of patent rights, PPR must also prove that E-Z Bowz was acting in bad faith. *See Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed. Cir. 1999) [*112] ("bad faith is a prerequisite to [defendant's] state-law tortious interference claim; without it, the claim is preempted by patent law").

PPR has adduced evidence that shows that E-Z Bowz contacted at least one customer of PPR to attempt to stop it from selling PPR's product. *See* Letter to Carol Wrights Gift Catalog Sales from John O. Threadgill, dated August 9, 1996 (reproduced in PPR Opp. Exhibits, Ex. 28), at 1-2. In a case that did not involve patent rights, such evidence might be sufficient to withstand a motion for summary judgment. However, [HN68]"because the 'law recognizes a presumption that the assertion of a duly granted patent is made in good faith,' . . . defendants are 'charged with the task of coming forward with some affirmative evidence of bad faith in order to survive a motion for summary judgment.'" *Gleason Works v. Oerlikon Geartec, AG*, 141 F. Supp. 2d 334, 341 (W.D.N.Y. 2001) (quoting *C.R. Bard*, 157 F.3d at 1369; *System Mgmt. Arts, Inc. v. Avesta Techs., Inc.*, 87 F. Supp. 2d 258, 271 (S.D.N.Y. 2000)) (citation omitted). As noted already, PPR has failed to offer any evidence concerning E-Z Bowz's

motives or lack [*113] of good faith. Thus, PPR's claim for tortious interference with contractual relations fails.

2. *Tortious Interference with Economic Advantage*

[HN69]A claim for tortious interference with economic advantage requires four elements: "(1) a prospective contractual relation or business with a third party; (2) defendants' interference with that relation; (3) defendant acted with the sole purpose of harming plaintiff or used dishonest, unfair or improper means; and (4) injury to the plaintiff." *G-I Holdings*, 179 F. Supp. 2d at 253-54. In addition, "a higher degree of interference is required" for this tort than a claim for tortious interference with contract. *Id.* at 254 (citing *Lane's Floor Coverings, Inc. v. Ardex, Inc.*, 1996 U.S. Dist. LEXIS 20293, 1996 WL 19181, at *3 (E.D.N.Y. Jan. 4, 1996)); *see also* *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996) ("where there has been no breach of an existing contract, but only interference with prospective contract rights . . . plaintiff must show more culpable conduct on the part of the defendant") (citation omitted). This tort is also [*114] subject to the same bad faith requirement as just described with respect to an assertion of patent rights. *See Zenith Elecs.*, 182 F.3d at 1355. Because PPR cannot prove this element with respect to a claim for tortious interference with contract, it also cannot prove this element with respect to the claim for tortious interference with economic advantage.

*Conclusion*

For the foregoing reasons, E-Z Bowz's motion for partial summary judgment (Docket # 110) should be granted. PPR's motion for summary judgment (Docket # 105) should be granted in part and denied in part. Based on this disposition, PPR's previously filed motion to dismiss or, in the alternative for summary judgment, *see* Notice of Motion, filed April 3, 2001 (Docket # 17), should be denied.

Accordingly, the remaining patent issues to be tried are whether the '979 Patent is valid and, if so, whether PPR's bow making device infringed upon this patent. In addition, trial is necessary on the issue of whether E-Z Bowz has a protectible interest in its claimed trade dress and, if so, whether PPR infringed upon that dress.

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant [*115] to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any objections. *See also* Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Honorable Laura Taylor Swain, 40 Centre Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Swain. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See* *Thomas v. Arn*, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985).

Dated: September 5, 2003

New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge

# EXHIBIT 5

LEXSEE



Caution
As of: Sep 14, 2007

**E-Z BOWZ, L.L.C., Plaintiff, -v.- PROFESSIONAL PRODUCT RESEARCH CO., INC., Defendant. PROFESSIONAL PRODUCT RESEARCH CO. INC., Third-Party Plaintiff, -v.- DEBORAH LEA CAVENDER, et al., Third-Party Defendants.**

**00 Civ. 8670 (LTS) (GWG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2003 U.S. Dist. LEXIS 15257**

**September 5, 2003, Decided**

**SUBSEQUENT HISTORY:** Magistrate's recommendation at, Summary judgment proceeding at E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., 2003 U.S. Dist. LEXIS 15364 (S.D.N.Y., Sept. 5, 2003)
Adopted by E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., 2005 U.S. Dist. LEXIS 3453 (S.D.N.Y., Mar. 8, 2005)

**PRIOR HISTORY:** E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., 2003 U.S. Dist. LEXIS 15256 (S.D.N.Y., Sept. 5, 2003)

**DISPOSITION:** Magistrate recommended that defendant's motion to dismiss for failure to join indispensable party be denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent assignee sued defendant alleged infringer, asserting infringement of two patents and related trade dress and unfair competition claims. Before a magistrate for a report and recommendation was the alleged infringer's motion to dismiss, under Fed. R. Civ. P. 12(b)(7), for failure to join an indispensable party.

**OVERVIEW:** The alleged infringer argued that the assignee was not "the owner" of the entire right, title, and interest to the patents in suit when the complaint was brought. According to the alleged infringer, the two patents were in fact owned by both the assignee and a co-

inventor, the alleged indispensable party, at the time the complaint was filed. It appeared to concede, however, that the co-inventor assigned her interest in both patents to the assignee after the infringement action was filed. The assignee argued in response that it did possess the two patents when the action was commenced, and even if it was not in possession of both patents at that time, the co-inventor was not an indispensable party under Fed. R. Civ. P. 19, given that she assigned her "entire right, title and interest" in both patents in October 1999. The latter argument disposed of the motion. The co-inventor was no longer an "owner, and her absence would not have resulted in a situation where complete relief could not have been accorded among those already parties. Nor did she any longer claim an interest relating to the subject of the action. The remaining requirements of Rule 19 also were not met.

**OUTCOME:** The magistrate recommended that the motion to dismiss for failure to join an indispensable party be denied.

**CORE TERMS:** patent, indispensable party, infringement, reproduced, assigned, co-owner, join, citation omitted, indispensable, summary judgment, joinder, joined, patent infringement, rights of action, right to sue, subject matter, substantial risk, incurring, assignor, double, complete relief, ability to protect, per se, transferred, adjudicated, asserting, accorded, needless, qualify, deprive

**LexisNexis(R) Headnotes**

**Civil Procedure > Parties > Joinder > Indispensable Parties**
**Civil Procedure > Parties > Joinder > Necessary Parties**
[HN1]Fed. R. Civ. P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. At the first step, the court must determine if the party sought to be joined belongs in the suit, i.e., whether the party qualifies as a "necessary" party under Rule 19(a).

**Civil Procedure > Jurisdiction > General Overview**
**Civil Procedure > Pleading & Practice > Service of Process > General Overview**
**Civil Procedure > Parties > Joinder > Necessary Parties**
[HN2]See Fed. R. Civ. P. 19(a).

**Civil Procedure > Parties > Joinder > Necessary Parties**
[HN3]If the court makes a threshold determination that a party is necessary under Fed. R. Civ. P. 19(a), and joinder is not feasible, the court must proceed to the second step and determine whether the party is "indispensable" under Rule 19(b).

**Civil Procedure > Parties > Joinder > Necessary Parties**
[HN4]See Fed. R. Civ. P. 19(b).

**Civil Procedure > Parties > Joinder > Necessary Parties**
[HN5]If a party does not qualify as necessary under Fed. R. Civ. P. 19(a), then the court need not decide whether the party's absence warrants dismissal under Rule 19(b).

**Civil Procedure > Parties > Joinder > Necessary Parties**
**Copyright Law > Civil Infringement Actions > Standing > Copyright Act of 1976**
**Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview**
[HN6]Traditionally, co-owners of a patent were considered indispensable parties in a patent infringement action. The logic of this rule was that because all co-owners have standing to sue for infringement, if all the co-owners are not joined in an infringement suit, there

may be a risk that the defendant will be subject to multiple suits. Since the introduction of Fed R. Civ. P. 19 and the 1966 amendments to the rule, however, courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of a patent co-owner.

**Civil Procedure > Parties > Joinder > Necessary Parties**
[HN7]The decision whether to dismiss (i.e., the decision whether the person missing is "indispensable") must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests. Fed. R. Civ. P. 19 does not prevent the assertion of compelling substantive interests; it merely commands the courts to examine each controversy to make certain that the interests really exist. To say that a court "must" dismiss in the absence of an indispensable party and that it "cannot proceed" without him puts the matter the wrong way around: a court does not know whether a particular person is indispensable until it has examined the situation to determine whether it can proceed without him.

**Civil Procedure > Parties > Joinder > Necessary Parties**
[HN8]Regarding Fed. R. Civ. P. 19, the modern approach requires courts to face squarely the pragmatic substantive and procedural considerations which properly should be controlling in determining whether a party is needed for the just adjudication of a case.

**Civil Procedure > Parties > Joinder > Necessary Parties**
**Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview**
**Patent Law > Ownership > Conveyances > Assignments**
[HN9]Co-owners may avoid the inconvenience or undesirability of the joinder rule by structuring their interests so that one party is no longer in law an "owner."

**Civil Procedure > Parties > Joinder > Necessary Parties**
**Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview**
**Patent Law > Ownership > Conveyances > Assignments**
[HN10]A party which assigns all of its rights and interests under a patent should not be compelled to litigate an infringement action merely because it was the

patent owner on the day suit was filed and for a few days thereafter. A party which divests itself of all of its interest in a patent does not have a sufficient stake in the outcome of the controversy to require that it remain a party. Any other result would exalt form over substance.

*Civil Procedure > Parties > Joinder > Necessary Parties*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview*
[HN11]The precedential value of the Switzer decision must be doubted in light of more recent case authority holding that a patent's co-owner may not be an indispensable party to an infringement action if the shaping of relief can avoid any possible prejudice.

**COUNSEL:** [*1] For E-Z Bowz, LLC, PLAINTIFF: Edward Vincent Di Lello, Darby & Darby, PC, New York, NY USA. John O Threadgill, John O Threadgill, PC, Knoxville, TN USA. Andrew S Neely, Richard W Barnes, Jr, Luedeka, Neely & Graham, PC, Knoxville, TN USA.

For Professional Product Research Company, Inc, DEFENDANT: Hiram D Gordon, Janvey, Gordon, Herlands, Randolph, Rosenberg & Cox, LLP, New York, NY USA. Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

For Professional Product Research Company, Inc, THIRD-PARTY PLAINTIFF: Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

For Deborah Lea Cavender, Arthur D Cavender, E-Z Crafts, LLC, THIRD-PARTY DEFENDANTS: Edward Vincent Di Lello, Darby & Darby, PC, New York, NY USA.

For E-Z Bowz, LLC, COUNTER-DEFENDANT: John O Threadgill, John O Threadgill, PC, Knoxville, TN USA. Andrew S Neely, Richard W Barnes, Jr, Luedeka, Neely & Graham, PC, Knoxville, TN USA.

For Professional Product Research Company, Inc, THIRD-PARTY [*2] PLAINTIFF: Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

For Professional Product Research Company, Inc, COUNTER-CLAIMANT: Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

For E-Z Bowz, LLC, COUNTER-DEFENDANT: John O Threadgill, John O Threadgill, PC, Knoxville, TN USA. Andrew S Neely, Richard W Barnes, Jr, Luedeka, Neely & Graham, PC, Knoxville, TN USA.

For professional Product research Company, Inc, COUNTER-CLAIMANT: Hiram D Gordon, Janvey, Gordon, Herlands, Randolph, Rosenberg & Cox, LLP, New York, NY USA. Thomas P Pavelko, Stevens, Davis, Miller & Mosher, LLP, Washington, DC USA. Robert R Campbell, John W Wheeler, Hodges, Doughty & Carson, PLLC, Knoxville, TN USA.

For E-Z Bowz, LLC, COUNTER-DEFENDANT: Edward Vincent Di Lello, Darby & Darby, PC, New York, NY USA. John O Threadgill, John O Threadgill, PC, Knoxville, TN USA. Andrew S Neely, Richard W Barnes, Jr, Luedeka, Neely & Graham, PC, Knoxville, TN USA.

**JUDGES:** GABRIEL W. GORENSTEIN, [*3] United States Magistrate Judge.

**OPINION BY:** GABRIEL W. GORENSTEIN

**OPINION**

REPORT AND RECOMMENDATION

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

To the Honorable Laura T. Swain, United States District Judge

Defendant Professional Product Research Co., Inc. ("PPR") moves this Court pursuant to Fed. R. Civ. P. 12(b)(7) to dismiss the complaint filed by plaintiff E-Z Bowz, LLC ("E-Z Bowz") for failure to join an indispensable party under Fed. R. Civ. P. 19. The Court has issued separate Report and Recommendations today addressing the parties' various motions for summary judgment or partial summary judgment (the "Summary Judgment R&R") and the third party defendants' motion to dismiss PPR's third party complaint for lack of personal jurisdiction. The Summary Judgment R&R contains a complete description of the allegations in this case and its procedural history. Familiarity with that Report is assumed. This Report will provide only the background necessary for an understanding of the instant motion.

## I. BACKGROUND

As reflected in the Summary Judgment R&R, E-Z Bowz brought this action against PPR asserting patent infringement and related trade dress and unfair competition [*4] claims alleging infringement by PPR of two patents: U.S. Patent No. 5,617,979 (the "'979 Patent") and U.S. Patent Design No. 389,998 (the "'998 Patent"). Both the original and amended complaint - as well as the motion being considered in this Report and Recommendation - were filed in the United States District Court for the Eastern District of Tennessee. The action was thereafter transferred to this Court on motion by PPR.

### A. The '979 and '998 Patents

During the course of the application for the '979 Patent, Deborah L. Cavender included Tina Lucille Benton Slater as a co-inventor. See Affidavit of Deborah L. Cavender, dated February 13, 1997 (reproduced in Memorandum in Support of Defendant's Motion to Dismiss Under Rule 12(b)(7) for Failure to Join an Indispensable Party Under Rule 19, F.R.C.P., filed March 21, 2000 ("PPR Mem."), Ex. C), PP 1, 6-7. When the '979 Patent was issued to Deborah L. Cavender on April 8, 1997, however, Cavender was listed as the sole inventor. See United States Patent, dated April 8, 1997 (PPR Mem., Ex. B). After suit was filed, the United States Patent and Trademark Office ("USPTO") granted Cavender's petition to add Slater as a coinventor [*5] on the '979 Patent. See Decision on Petition under 37 CFR 1.324, undated (reproduced in E-Z Bowz' Response to PPR's Statement of Material Undisputed Facts, filed February 6, 2003, Ex. C).

On August 1, 1997, Slater signed a document in which she transferred to Cavender "her entire right, title, and interest in [the '979 Patent], including the right to sue for past, present or future infringements thereof." See Transfer of Rights to Patent, dated August 1, 1997 ("1979 Transfer") (reproduced in Plaintiff's Memorandum in Response to Defendant's Motion to Dismiss Under Rule 12(b)(7) for Failure to Join an Indispensable Party Under Rule 19, filed April 7, 2000 ("E-Z Bowz Mem."), Ex. B). Thereafter, on January 25, 1999, Cavender assigned "all of her right, title and interest throughout the world in and to [the '979 Patent], the subject matter disclosed in the patent, and any and all prior, current, or pending rights of action therein" to E-Z Bowz. See Assignment, dated January 25, 1999 (reproduced in E-Z Bowz Mem., Ex. D).

The '998 Patent was issued on February 3, 1998 to both Cavender and Slater. See United States Patent, dated February 3, 1998 (reproduced [*6] in PPR Mem., Ex. A). On January 25, 1999, Cavender assigned "all of

her right, title and interest throughout the world in and to [the '998 Patent], the subject matter disclosed in the patent, and any and all prior, current, or pending rights of action therein" to E-Z Bowz. See Assignment, dated January 25, 1999 (reproduced in E-Z Bowz Mem., Ex. J).

On October 14, 1999 - after E-Z Bowz commenced the action against PPR - Slater entered into an agreement by which she assigned to E-Z Bowz her "entire right, title and interest" in the '979 and '998 Patents and "any and all prior, current, or pending rights of action therein." See Assignment, dated October 14, 1999 ("Oct. 14 Assignment") (reproduced in E-Z Bowz Mem., Ex. H). This assignment was recorded in the USPTO on October 25, 1999. See United States Patent and Trademark Office Notice of Recordation of Assignment Document, dated January 24, 2000 (reproduced in E-Z Bowz Mem., Ex. I).

### B. The Instant Motion

On March 21, 2000, PPR moved to dismiss the complaint for failure to join an indispensable party. PPR argues that E-Z Bowz "was not 'the owner' of the entire right, title and interest to the patents in suit when [*7] the Complaint was brought." PPR Mem. at 1. According to PPR, the '979 and '998 Patents were in fact owned by both E-Z Bowz *and* Slater at the time E-Z Bowz filed the complaint in this action. PPR Mem. at 1-2. PPR appears to concede, however, that Slater assigned her interest in both patents to E-Z Bowz after the infringement action was filed. See PPR Mem. at 2-3.

E-Z Bowz argues in response that i) it did possess the '979 and '998 Patents at the time this action was commenced and ii) even if it was not in possession of both patents at that time, Slater is not an indispensable party under Rule 19 given that she assigned her "entire right, title and interest" in both patents in October 1999. See E-Z Bowz Mem. at 1-9. Because the latter argument disposes of the motion, it is unnecessary to consider the first argument.

## II. DISCUSSION

### A. Applicable Law

[HN1]"Fed. R. Civ. P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party." *Viacom Intl, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir.), *cert. denied*, 531 U.S. 1051 (2000). At the first step, the court must [*8] determine if the party sought to be joined "belongs in the suit, *i.e.*, whether the party qualifies as a 'necessary' party under Rule 19(a)." *Id.* (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 124, 19 L. Ed. 2d 936, 88 S. Ct. 733 (1968)) (emphasis in original). Rule 19(a) states in relevant part:

[HN2]A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

[HN3]If the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder is not feasible, the court [*9] must proceed to the second step and determine whether the party is "indispensable" under Rule 19(b). See Viacom, 212 F.3d at 725.

Rule 19(b) provides that:

[HN4]If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

[HN5]If, however, the party does not "qualify as necessary under Rule 19(a), then the court need not decide whether [the party's] absence warrants dismissal under Rule 19(b)." Viacom, 212 F.3d at 724 [*10]

(citing Associated Dry Goods Corp. v. Towers Fin. Corp., 920 F.2d 1121, 1123 (2d Cir. 1990)).

PPR argues that Slater is "necessary" under Rule 19(a)(2)(ii) because the filing of this suit "by less than all the owners of the patent could subject defendant to multiple, and perhaps inconsistent, liability for alleged infringement by each of the patent owners, and deprives the court of any jurisdiction over the action." PPR Mem. at 3.

B. *Whether Slater is an Indispensable Party*

[HN6]"Traditionally, co-owners of a patent were considered indispensable parties in a patent infringement action." *See Michaels of Oregon Co. v. Mil-Tech, Inc.*, 1995 U.S. Dist. LEXIS 20875, 1995 WL 852122, at *1 (D. Or. Oct. 17, 1995) (citing Waterman v. Mackenzie, 138 U.S. 252, 255, 34 L. Ed. 923, 11 S. Ct. 334, 1891 Dec. Comm'r Pat. 320 (1891)). The logic of this rule was that because "all co-owners have standing to sue for infringement, if all the co-owners are not joined in an infringement suit, there may be a risk that the defendant will be subject to multiple suits." *Int'l Bus. Mach. Corp. v. Conner Peripherals, Inc.*, 1994 U.S. Dist. LEXIS 2884, 1994 WL 409493, at *3 (N.D. Cal. Jan. 28, 1994) (citation omitted); [*11] *accord Michaels of Oregon*, 1995 U.S. Dist. LEXIS 20875, [WL] at *1 (citations omitted).

Since the introduction of Fed R. Civ. P. 19 and the 1966 amendments to the rule, however, "courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of a patent co-owner." *Michaels of Oregon*, 1995 U.S. Dist. LEXIS 20875, [WL] at *2 (citations omitted); *accord Parkson Corp. v. Fruit of the Loom, Inc.*, 1992 U.S. Dist. LEXIS 21905, 1992 WL 541570, at *3 (E.D. Ark. 1992) ("the adoption of the 1966 amendment to Rule 19 of the Federal Rules of Civil Procedure makes clear that patent owners are not *per se* indispensable parties in infringement actions") (emphasis in original); Howes v. Med. Components, Inc., 698 F. Supp. 574, 576 (E.D. Pa. 1988) ("the adoption of the 1966 amendments to Rule 19 'makes inappropriate any contention that patent co-owners are *per se* indispensable in infringement suits'") (quoting 'Catanzaro v. Int'l Tel. and Tel. Corp., 378 F. Supp. 203, 205 (D. Del. 1974)) (citations omitted) (emphasis in original).

The Supreme Court in *Provident* [*12] *Tradesmens Bank & Trust Co.*, observed:

[HN7]The decision whether to dismiss (i.e., the decision whether the person missing is "indispensable") must be based on factors varying with the different

cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests. Rule 19 does not prevent the assertion of compelling substantive interests; it merely commands the courts to examine each controversy to make certain that the interests really exist. To say that a court "must" dismiss in the absence of an indispensable party and that it "cannot proceed" without him puts the matter the wrong way around: a court does not know whether a particular person is "indispensable" until it has examined the situation to determine whether it can proceed without him.

390 U.S. at 118-19. [HN8]The modern approach thus "'requires courts to face squarely the pragmatic substantive and procedural considerations which properly should be controlling in determining whether a party is needed for the just adjudication of a case.'" *Howes*, 698 F. Supp. at 577 (quoting *Tycom Corp. v. Redactron Corp.*, 380 F. Supp. 1183, 1186 (D. Del. 1974)). [*13]

PPR argues that "it is hornbook law that all of the owners of the entire right, title and interest in the patent(s) must be present before the court as plaintiffs or the court lacks jurisdiction and the case must be dismissed." PPR Mem. at 3 (citing *Waterman*, 138 U.S. at 252; *Moore v. Marsh*, 74 U.S. 515, 19 L. Ed. 37 (1869); *Switzer Bros., Inc. v. Byrne*, 242 F.2d 909 (6th Cir. 1957)). As noted above, however, Slater is no longer an "owner" as she assigned her interest in the '979 and '998 Patents to E-Z Bowz after commencement of the present action. *See* Oct. 14 Assignment; *cf. 'Int'l Bus. Mach. Corp.*, 1994 U.S. Dist. LEXIS 2884, [WL] at *3, *6 [HN9]("Co-owners may avoid the inconvenience or undesirability of the joinder rule by structuring their interests so that one party is no longer in law an 'owner.'") (citations omitted).

PPR nonetheless contends that "the fact that [Slater] . . . quitclaims, or conveys by assignment, her interest to the patents-in-suit *after* filing of the Complaint cannot give the court jurisdiction over the action as jurisdiction depends upon the state of things existing at the time suit was brought. [*14] " PPR Mem. at 3 (emphasis in original). PPR does not, however, articulate any reason why the status of the parties at the time of the filing of suit should be of any significance for purposes of the Rule 19 analysis.

Here, Slater's absence will not result in a situation where "complete relief cannot be accorded among those already parties." Fed. R. Civ. P. 19. Nor does Slater any longer "claim[] an interest relating to the subject of the action." *Id.* The remaining requirements of Rule 19(a) also are not met. The litigation will not "impair or impede" Slater's ability to protect her interests since she no longer has any interest in this litigation. Finally, PPR will in no way be "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations" inasmuch as Slater no longer has an interest or any right to sue for infringement. *See Int'l Bus. Mach. Corp.*, 1994 U.S. Dist. LEXIS 2884, [WL] at *6-*7 (rejecting argument that party moving to dismiss for failure to join indispensable party was subject to multiple or inconsistent obligations where agreement provided that the party sought to be joined did not hold the right to sue infringers). Nothing [*15] in the language of Rule 19 suggests that Slater's subsequent assignment requires that she be dragooned into being part of a litigation in which she has disclaimed all interest.

An analogous argument was advanced and rejected in *Procter & Gamble Co. v. Kimberly-Clark Corp.*, 684 F. Supp. 1403 (N.D. Tex. 1987). The patent at issue in that case was held by Raychem, which granted plaintiff Procter & Gamble an exclusive license to the patent. *Id. at 1403-04*. Procter & Gamble then filed suit against defendant Kimberly-Clark for patent infringement, after which the defendant counterclaimed against Raychem asserting that it should be a party.*Id.* Sometime after the complaint was filed, Raychem assigned all its rights under the patent to Proctor & Gamble.*Id.* When Raychem moved to dismiss, the court rejected KimberlyClark's argument that the court "should consider the facts *as they existed at the time of filing suit* in determining whether Raychem was a proper party." *Id. 1406* (emphasis in original). The court held that "even if Raychem owned the . . . patent on the day suit was filed, dismissal was proper once the patent had been [*16] assigned." *Id. at 1406-07* (citing *Robert L. Ferman & Co. v. Gen. Magnaplate Corp.*, 33 F.R.D. 326, 329 (D.N.J. 1963) and *Irving Air Chute Co. v. Switlik Parachute & Equip. Co.*, 26 F. Supp. 329, 330 (D.N.J. 1939)). The court concluded that

[HN10][a] party which assigns all of its rights and interests under a patent should not be compelled to litigate an infringement action merely because it was the patent owner on the day suit was filed and for a few days thereafter. A party which divests itself of all of its interest in a patent does not have a sufficient stake in the outcome of the controversy to require

that it remain a party. Any other result would exalt form over substance.

*Id.* at 1407. *See also* *Rawlings v. Nat'l Molasses Co.*, 394 F.2d 645, 647 (9th Cir. 1968) (rejecting argument that assignment of patent rights after litigation commenced made assignor an indispensable party because assignor's absence "does not leave the defendants subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations"); *Valmet Paper Mach., Inc. v. Beloit Corp.*, 868 F. Supp. 1085, 1089 (W.D. Wis. 1994) [*17] (denying motion to dismiss for lack of standing where assignment conveying all rights in patent to plaintiff was executed after action was filed; to hold otherwise "would result in needless delay and needless expenditure of the parties' and the court's resources" for the plaintiff would "simply . . . amend the complaint to add the assignor and then dismiss it as an unnecessary party, or simply . . . reinstate the lawsuit").

While PPR cites one case that supports its position, *Switzer Bros., Inc. v. Byrne*, 242 F.2d 909 (6th Cir. 1957), [HN11]the "precedential value [of *Switzer*] must be doubted in light of more recent case authority holding that a patent's co-owner may not be an indispensable party to an infringement action if the shaping of relief can avoid any possible prejudice." *Procter & Gamble Co.*, 684 F. Supp. at 1406 (citing *Windsurfing Int'l, Inc. v. Ostermann*, 100 F.R.D. 82, 83-84 (S.D.N.Y. 1983)). *See generally Michaels of Oregon*, 1995 U.S. Dist. LEXIS 20875, [WL] at *2 (recent courts are "more

concerned with whether the rights of the parties can be fairly adjudicated absent joinder of a patent co-owner") (citations omitted). [*18]

*Conclusion*

For the foregoing reasons, PPR's motion to dismiss for failure to join an indispensable party should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any objections. *See also* Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Honorable Laura T. Swain, 40 Centre Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Swain. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn*, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985).

Dated: September 5, 2003

New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge [*19]

# EXHIBIT 6

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 217799 (S.D.N.Y.)
**(Cite as: 2006 WL 217799 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Bruce DUNN, Michael Weissman and James Ver-
raster, Plaintiffs,
v.
STANDARD BANK LONDON LTD. and Standard
International Holdings, Defendants.
**No. 05 Civ.2749(DLC).**

Jan. 30, 2006.

Susan B. Egan, Egan Law Firm LLC, New York,
NY, for Plaintiffs.

James P. Philbin III, Seth Kaplan, Maral N.
Kazanjian, Morgan, Lewis & Bockius LLP, New
York, NY, for Defendants.

OPINION & ORDER

COTE, J.

**\*1** Plaintiffs bring this action to recover bonus
amounts they believe they are due from their
former employer. They allege common law breach
of contract, unjust enrichment, and conversion
claims, as well as violations of Article 6 of the New
York Labor Law, against Standard Bank London
Ltd. ("Standard London") and Standard Internation-
al Holdings ("Standard International"). The defend-
ants claim that plaintiff's employer was Standard
New York Trading Corp. ("Standard New York")
rather than the captioned defendants, and that the
action should thus be dismissed for failure to add
an indispensable party under Rule 19, Fed.R.Civ.P.

It is undisputed that the sole basis for this Court's
jurisdiction is diversity jurisdiction under 28 U.S.C.
§ 1332(a)(1). Standard New York is an indispens-
able party, and must be joined as a defendant. Since
the parties dispute whether the principal place of
business of Standard New York is in New York, and
thus whether diversity exists, the parties will be
permitted an opportunity to take limited discovery
addressed to that discrete issue.

*Background*

On March 10, 2005, plaintiff Bruce Dunn ("Dunn")
brought this action against "Standard Bank Group"
in federal court. In his original complaint, he rep-
resented that he had been employed by Standard
New York, a "division of Standard Bank Group loc-
ated in New York," as a "Sales/Trader on the Pre-
cious Metals Desk" from October 1998 through Au-
gust 2004. Dunn alleged that he had been promised
specific bonus amounts over the years of his em-
ployment, but that the company had withheld por-
tions of those bonus amounts subject to his being
employed by Standard New York two years from
the date each bonus was awarded. When Dunn left
the company in 2004, $88,333 of the bonus
amounts that he had earned was still being withheld
by Standard New York. Standard New York re-
fused to pay Dunn this amount when he demanded
it upon his resignation.

On April 27, Dunn filed an Amended Complaint
adding Standard New York and Standard Americas,
Inc. ("Standard Americas") as defendants. These
two entities are apparently the same; Standard New
York became Standard Americas at an unspecified
date. [FN1] After the Court inquired about the basis
for subject matter jurisdiction at an initial pretrial
conference of May 24, defendants sent a letter of
June 3, advising that Standard New York was a sep-
arate entity that, while incorporated in Delaware,
has its principal place of business in New York. It
is undisputed that Dunn resides in New York as
well. Dunn responded with a letter proposing that
Standard Bank London Ltd. ("Standard London")
and Standard International Holdings, Inc.
("Standard International") be added as defendants.
After more correspondence, plaintiff was granted
permission to add additional parties to the action.

>    FN1. Both entities are thus hereinafter re-
>    ferred to interchangeably as "Standard
>    New York."

Dunn filed a Second Amended Complaint (the

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2006 WL 217799 (S.D.N.Y.)
**(Cite as: 2006 WL 217799 (S.D.N.Y.))**

"Complaint") on June 27. Two additional plaintiffs, Michael Weissman ("Weissman") and James Verraster ("Verraster"), were added to the Complaint. Their allegations are similar to Dunn's. In addition, the Complaint listed the sole defendants as Standard London and Standard International. Although the Complaint states that the plaintiffs "were located in and conducted business on behalf of [Standard London] *in [Standard Americas],"* neither Standard New York nor Standard Americas is captioned as a defendant.

**\*2** On August 5, defendants filed a motion to dismiss for failure to join an indispensable party under Rule 19(b), Fed.R.Civ.P. They argue that the Complaint represents an "attempt to circumvent the jurisdictional requirements of the federal courts by covertly removing from [the] pleadings the only proper defendant in this action--[plaintiffs'] former employer, [Standard New York]." The defendants contend that, because the action is for the recovery of unpaid compensation, the entity that actually employed the plaintiffs is an indispensable party. They accordingly request dismissal of the action pursuant to Rule 12(b)(7), Fed.R.Civ.P.

*Discussion*

Rule 12(b)(7), Fed.R.Civ.P., provides that an action may be dismissed for failure to join a party under Rule 19. The Rule 19 framework was described by this Court in *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2004 WL 2955237 (S.D.N.Y Dec. 22, 2004). In brief, Rule 19 sets forth a two-step test for determining whether a court must dismiss an action for failure to join an indispensable party. *Viacom Int'l Inc. v. Kearney,* 212 F.3d 721, 724 (2d Cir.2000). First, the court must determine whether an absent party is a "necessary" party under Rule 19(a). *Id.* Rule 19(a) provides that the absent party should be joined, if feasible, where:

(1) in the person's absence complete relief cannot be accorded among those already parties or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the per-

son's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Rule 19(a), Fed.R.Civ.P. With respect to the second prong of Rule 19(a), "there must be more than an unsupported assertion that [the non-joined party] has a claim to that interest." *Jonesfilm v.. Lion Gate Int'l,* 299 F.3d 134, 140 (2d Cir.2002).

Where a court makes a threshold determination that a party is necessary under Rule 19(a) and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must then determine whether the party is "indispensable" under Rule 19(b). *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.,* 312 F.3d 82, 87 (2d Cir.2002). Rule 19(b) provides:

The court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

**\*3** Rule 19(b), Fed.R.Civ.P.

In deciding a motion to dismiss, the court may consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). With their motion papers, the defendants have submitted Standard New York's original offer letters to all three plaintiffs. Plaintiffs likewise attach correspondence from Standard New York to Dunn and Weissman. All correspondence issues from "Standard New York Trading Corp." in New York City. A Septem-

Not Reported in F.Supp.2d    Page 3
Not Reported in F.Supp.2d, 2006 WL 217799 (S.D.N.Y.)
**(Cite as: 2006 WL 217799 (S.D.N.Y.))**

ber 29, 1998 letter to Dunn, attached by both the plaintiffs and defendants, states: "We are pleased to offer you a position at Standard New York Trading Corp .... effective September 30, 1998." That letter refers again to Standard New York and to no other entity. Verraster's offer letter, dated July 11, 1996, begins: "We are pleased to offer you a position at Standard New York, Inc." That letter, too, refers repeatedly to Standard New York and to no other entity. Weissman's November 20, 1995 offer letter is similar. All three letters welcome the new employees "on behalf of the management of [Standard New York]" and describe how bonuses are to be awarded. Letters attached by the plaintiffs regarding specific bonus awards also issue from Standard New York and no other entity. Plaintiffs have submitted no documentation suggesting that they worked for a corporate entity other than Standard New York. They do attach a printout of a web page describing the precious metals business of Standard Bank Group, but the web page gives no indication that Standard New York (or Standard Americas) is not a distinct entity and an employer in its own right.

In their opposition papers, plaintiffs allege that the Precious Metals trading desk that employed plaintiffs "was run by Standard Bank London and that the bonuses which were the subject of the complaint[ ] had been awarded by a compensation committee sitting in London acting pursuant to a policy implemented and enforced by [Standard International]." They submit Dunn's offer letter, which states that "Future bonuses will take into account the profitability of the Standard New York Trading Corp. Precious Metals Desk as well as the global profitability of this area." A letter informing Weissman of his bonus for 1999 and a portion of 1998 informs him that "[Standard New York], as part of the Standard International Holdings S.A. group of companies ... follow[s] the renumeration policy of [Standard International]."

The documents submitted by the parties, as well as the wording of Dunn's original complaint, firmly establish that Standard New York was plaintiffs' employer. Even the documents attached by

plaintiffs, purportedly submitted as support for their contention that another entity was the plaintiffs' employer, unambiguously list the employer as Standard New York. The omission of Standard New York from the current iteration of the Complaint is nothing more than artful pleading designed to avoid destroying the basis for federal diversity jurisdiction over the action.

**\*4** As the plaintiffs' employer, Standard New York is a necessary party to the action. Whether Standard New York was indeed contractually bound to compensate the plaintiffs with particular bonus amounts is the central issue to be adjudicated in this case. "If the resolution of a plaintiff's claim would require the definition of a non-party's rights under a contract, it is likely that the non-party is necessary under *Rule 19(a)*." *Jonesfilm, 299 F.3d at 141*. Moreover, it is difficult to see how plaintiffs could be accorded complete relief if the sole named party with which they contracted is absent from the action. The plaintiffs will have an adequate remedy if the action is dismissed: the action may proceed in state court. There is no reason plaintiffs will be prejudiced by being deprived of a federal forum for their action, as their claims are based entirely on New York state law, and it is not disputed that Standard New York is subject to the jurisdiction of New York courts.

Standard New York also qualifies as an indispensable party under *Rule 19(b)*. Of the factors listed in *Rule 19(b)*, the most pertinent to this case is the third. Because there is no indication that either of the defendants was actually a party to the contracts on which plaintiffs premise their action, no adequate judgment could be rendered in Standard New York's absence. *Cf. Envirotech Corp. v. Bethlehem Steel Corp., 729 F.2d 70, 75 (2d Cir.1984)* (upholding the district court's determination that the real party in interest to the contracts at issue was an indispensable party). As noted above, the plaintiffs themselves would not be prejudiced by bringing their claims in state court. Since *Rule 19(b)* is essentially an inquiry into the equities that affect the necessary but absent party and the named parties to the litigation, it is appropriate to observe that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 217799 (S.D.N.Y.)
**(Cite as: 2006 WL 217799 (S.D.N.Y.))**

plaintiffs have altered their pleadings with the clear intent to manufacture jurisdiction. Standard New York is accordingly an indispensable party.

The sole remaining issue is the location of the principal place of business of Standard New York. The defendants assert that Standard New York's principal place of business is New York, but the plaintiffs dispute this assertion. The parties shall be given an opportunity to conduct limited discovery directed at the resolution of this single disputed fact.

*Conclusion*

The defendants' motion to dismiss is denied without prejudice to renewal following discovery addressed to identifying the location of the principal place of business of Standard New York.

Not Reported in F.Supp.2d, 2006 WL 217799 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.